## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| FIRST BRANDS GROUP, LLC., *et al.* | ) | Case No. 25-90399 (CML) |
|  | ) |  |
|  | ) |  |
| Debtors.[1] | ) | (Jointly Administered) |
|  | ) |  |

### NOTICE OF APPEAL

**Part 1: Identify the Appellants**

1.  **Name of appellants:**

    QBE Insurance Corporation ("QBE"), Ironshore Indemnity, Inc. ("Ironshore"), Fair American Insurance and Reinsurance Company ("FAIRCO"), Allianz Global Risks US Insurance Company ("Allianz"), Westfield Select Insurance Company ("Westfield"), AXIS Insurance Company ("AXIS"), and Zurich American Insurance Company ("Zurich").

2.  **Position of appellants in the bankruptcy case that is the subject of this appeal:**

    Parties in interest.

**Part 2: Identify the Subject of this Appeal**

   Pursuant to 28 U.S.C. § 158(a)(1) and Rule 8003(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), QBE, Ironshore, FAIRCO, Allianz, Westfield, AXIS, and Zurich hereby appeal from (i) the *Order Regarding Motion for Entry of an Order (I) Authorizing*

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands. The Debtors' service address for these chapter 11 cases is 127 Public Square, Suite 5300, Cleveland, OH 44114.

*and, to the Extent Necessary, Modifying the Automatic Stay to Allow Use of Proceeds of Directors and Officers Liability Insurance Policies Issued to Non-Debtor Mayfair Enterprises, LLC for Insureds' Defense Costs or, in the Alternative, (II) Confirming that Advancement of Defense Costs and Providing Notice in Accordance with Directors and Officers Liability Insurance Policies Does Not Violate the Automatic Stay* [Dkt. No. 1231] entered in the above-captioned case on January 7, 2026 (the "Order"), and (ii) the Court's oral ruling at the January 7, 2026 hearing in the above-captioned case, as referenced in the Order (the "Oral Ruling"); however, pursuant to Bankruptcy Rule 8003(a)(6), such appeal is limited to only the parts of the Order and Oral Ruling finding "that Debtors have an interest in the proceeds of the ABC Policy, and that interest is property of the estate under § 541." Order at 1. A copy of the Order is attached hereto as Exhibit A, and a copy of the transcript of the January 7, 2026 hearing at which the Oral Ruling was issued is attached hereto as Exhibit B.

**Part 3: Identify the Other Parties to the Appeal**

The names of all parties to the judgment, order, or decree from which the appeal is taken and the names, addresses, and telephone numbers of their respective attorneys are as follows:

| Party | Attorneys |
|---|---|
| Edwards James | **BRACEWELL LLP**<br>Rachel B. Goldman<br>Mark E. Dendinger<br>David A. Shargel<br>Mark Wulfe<br>31 W 52nd Street, Suite 1900<br>New York, NY 10019-0019<br>(212) 408-6100 |
| Debtors and Debtors in Possession | **WEIL, GOTSHAL & MANGES LLP**<br>Gabriel A. Morgan<br>Clifford W. Carlson<br>700 Louisiana Street, Suite 3700<br>Houston, Texas 77002<br>Telephone: (713) 546-5000 |

| Party | Attorneys |
|---|---|
| | Matthew S. Barr<br>Sunny Singh<br>Andriana Georgallas<br>Kevin Bostel<br>Jason H. George<br>767 Fifth Avenue<br>New York, New York 10153<br>Telephone: (212) 310-8000 |
| Ad Hoc Group of Lenders | **GIBSON, DUNN & CRUTCHER LLP**<br>Scott J. Greenberg<br>Jason Zachary Goldstein<br>C. Lee Wilson<br>Stephen D. Silverman<br>Christina M. Brown<br>200 Park Avenue<br>New York, New York 10166<br>Telephone: 212-351-4000<br><br>AnnElyse Scarlett Gains<br>1700 M Street N.W.<br>Washington, D.C. 20036-3504<br>Telephone: 202-955-8500<br><br>-and-<br><br>**HOWLEY LAW PLLC**<br>Tom A. Howley<br>Eric Terry<br>700 Louisiana Street, Suite 4220<br>Houston, TX 77002<br>Telephone: 713-333-9125 |
| Katsumi Servicing, LLP | **MAYER BROWN LLP**<br>Charles S. Kelley<br>700 Louisiana Street, Suite 3400<br>Houston, Texas 77002<br>Telephone: (713) 238-3000<br><br>Sean T. Scott<br>Kyle J. TumSuden<br>71 South Wacker Drive<br>Chicago, Illinois 60606<br>Telephone: (312) 782-0600 |

| Party | Attorneys |
|---|---|
| | Richard A. Stieglitz<br>Lauren C. Blanchard<br>1221 Avenue of the Americas<br>New York, New York 10020<br>Telephone: (212) 506-2500 |
| Official Committee of Unsecured Creditors | **COLE SCHOTZ P.C.**<br>Ian R. Phillips<br>Seth Van Aalten, Esq.<br>Justin R. Alberto, Esq.<br>901 Main Street, Suite 4120<br>Dallas, TX 75202<br>Telephone: (469) 557-9390<br><br>-and-<br><br>**BROWN RUDNICK LLP**<br>Robert J. Stark, Esq.<br>Jeffrey L. Jonas, Esq.<br>Michael S. Winograd, Esq.<br>Bennett S. Silverberg, Esq.<br>Kenneth J. Aulet, Esq.<br>Andrew M. Carty, Esq.<br>Hayden A. Miller, Esq<br>7 Times Square<br>New York, NY 10036<br>Telephone: (212) 209-4800<br><br>Tristan G. Axelrod, Esq.<br>Matthew A. Sawyer, Esq.<br>One Financial Center<br>Boston, MA 02111<br>Telephone: (617) 856-8200 |
| Patrick James | **QUINN EMANUEL URQUHART & SULLIVAN, LLP**<br>Cameron Kelly<br>700 Louisiana, Suite 3900<br>Houston, Texas 77002<br>Telephone: 713-221-7000<br><br>Michael B. Carlinsky<br>James C. Tecce<br>Scott Hartman<br>Eric S. Kay<br>Reece Pelley<br>Grace Sullivan |

| Party | Attorneys |
|---|---|
| | 295 Fifth Avenue<br>New York, New York 10016<br>Telephone: 212-849-7000<br><br>-and-<br><br>**DEBEVOISE & PLIMPTON LLP**<br>Erica S. Weisgerber<br>M. Natasha Labovitz<br>Erica S. Weisgerber<br>Matthew J. Sorensen<br>Christopher R. Ceresa<br>66 Hudson Boulevard<br>New York, New York 10001<br>Telephone: 212-909-6000 |
| Stephen Graham | **KOBRE & KIM LLP**<br>Danielle L. Rose<br>Daniel J. Saval<br>800 Third Avenue<br>New York, New York 10022<br>Telephone: 212-488-1200<br><br>Adriana Riviere-Badell<br>201 S. Biscayne Blvd., Suite 1900<br>Miami, Florida 33131<br>Telephone: 305-967-6100 |
| Michael Baker | **MORVILLO ABRAMOWITZ GRAND IASON & ANELLO PC**<br>Robert J. Anello<br>Telemachus P. Kasulis<br>565 Fifth Avenue<br>New York, New York 10017<br>Telephone: 212-856-9600 |
| Shekhar Kumar | **MOLOLAMKEN LLP**<br>Jennifer Schubert<br>Pratik Raj Gosh<br>Ryan Baldwin<br>430 Park Avenue<br>New York, New York 10022<br>Telephone: (212)-607-8160<br><br>Megan Cunniff Church<br>300 North LaSalle Street<br>Chicago, Illinois 60654 |

| Party | Attorneys |
|---|---|
| | Telephone: (312)-450-6700 |
| Scott Wallace | **MOLOLAMKEN LLP**<br>Jennifer Schubert<br>Pratik Raj Gosh<br>Ryan Baldwin<br>430 Park Avenue<br>New York, New York 10022<br>Telephone: (212)-607-8160<br><br>Megan Cunniff Church<br>300 North LaSalle Street<br>Chicago, Illinois 60654<br>Telephone: (312)-450-6700 |
| Laurie Stein | **ZUCKERMAN SPAEDER LLP**<br>Margarita K. O'Donnell<br>Aitan D. Goelman<br>Ross M. Slaughter<br>2100 L Street, NW, Suite 400<br>Washington, DC 20037<br>Tel: 202-778-1800 |
| Nigel Crighton | **LEVINSON LLP**<br>Jeffrey M. Levinson<br>3601 Green Road, Suite 200<br>Beachwood, Ohio 44122<br>Tel. (216) 514-4935<br><br>-and-<br><br>**FLANNERY \| GEORGALIS, LLC**<br>Christos N. Georgalis<br>Paul M. Flannery<br>1621 Euclid Avenue, Floor 20<br>Cleveland, Ohio 44115<br>Tel. (216) 466-0169 |
| Nelly Luna | **CHIESA SHAHINIAN & GIANTOMASI PC**<br>Sam Della Fera, Jr.<br>Matthew E. Beck<br>105 Eisenhower Parkway<br>Roseland, New Jersey 07068<br>Telephone: (973) 325-1500 |
| Amanda Coxbill | **GOODWIN PROCTER LLP**<br>William J. Harrington<br>The New York Times Building |

| Party | Attorneys |
|---|---|
|  | 620 Eighth Avenue<br>New York, New York 10018<br>Telephone: (212) 813-8800 |
| Peter Andrew Brumbergs | **HECKER FINK LLP**<br>Sean Hecker<br>David Gopstein<br>Nicole Ng<br>350 Fifth Avenue, 63rd Floor<br>New York, NY 10118<br>Telephone: (212) 763-0883 |
| David Parker | **DAVIS & SANTOS, PLLC**<br>Jason M. Davis<br>Sarah Santos<br>H. Jay Hulings<br>719 S. Flores Street<br>San Antonio, Texas 78204<br>Tel: (210) 853-5882<br><br>-and-<br><br>**MARTINEZ & TIJERINA P.L.L.C**<br>Benigno (Trey) Martinez<br>Tomas F. Tijerina<br>1201 E. Van Buren<br>Brownsville, Texas 78520<br>Ph. (956) 550-4868 |

## Part 4: Optional Election to Have Appeal Heard by District Court (Applicable Only in Certain Districts)

The election permitted under 28 U.S.C. § 158(c)(1) is not applicable as no bankruptcy appellate panel has been established in this district.

Dated: Houston, Texas
February 4, 2026

Respectfully submitted,

*/s/ Howard L. Close*
Howard L. Close
Texas Bar No. 04406500
Ronnie L. Flack Jr.
Texas Bar No. 24095655
Daniela Mondragón
Texas Bar No. 24096750
WRIGHT CLOSE BARGER & GUZMAN, LLP
One Riverway, Suite 2200
Houston, Texas 77056
Telephone: (713) 572-4321
Facsimile: (713) 572-4320
close@wcbglaw.com
flack@wcbglaw.com
mondragon@wcbglaw.com

*Counsel for QBE Insurance Corporation,
Ironshore Indemnity, Inc., Fair American
Insurance and Reinsurance Company,
Allianz Global Risks US Insurance
Company, Westfield Select Insurance
Company, AXIS Insurance Company, and
Zurich American Insurance Company*

## CERTIFICATE OF SERVICE

I, Howard Close, certify that on February 4, 2026, I caused a true and correct copy of

the foregoing document to be served by the Court's CM/ECF system on all parties entitled to

notice.

*/s/ Howard L. Close*
Howard L. Close

# EXHIBIT A

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CASE NO: 25-90399 |
| FIRST BRANDS GROUP, LLC, | § | |
| Debtors. | § | Jointly Administered |
| | § | CHAPTER 11 |

### ORDER REGARDING MOTION FOR ENTRY OF AN ORDER
### (I) AUTHORIZING AND, TO THE EXTENT NECESSARY, MODIFYING
### THE AUTOMATIC STAY TO ALLOW USE OF PROCEEDS OF
### DIRECTORS AND OFFICERS LIABILITY INSURANCE POLICIES
### ISSUED TO NON-DEBTOR MAYFAIR ENTERPRISES, LLC
### FOR INSUREDS' DEFENSE COSTS OR, IN THE ALTERNATIVE,
### (II) CONFIRMING THAT ADVANCEMENT OF DEFENSE COSTS
### AND PROVIDING NOTICE IN ACCORDANCE WITH DIRECTORS
### AND OFFICERS LIABILITY INSURANCE POLICIES DOES NOT
### <u>VIOLATE THE AUTOMATIC STAY</u>
### (ECF NO. 798)

For the reasons stated on the record at the January 7, 2026 hearing, IT IS ORDERED that the Side A Policies[1] and the proceeds of the Side A Policies are not property of the estate under § 541 of the Bankruptcy Code. Thus, the automatic stay under § 362 of the Bankruptcy Code does not apply to the Side A Policies or their proceeds; and it is further

ORDERED that Debtors have an interest in the proceeds of the ABC Policy, and that interest is property of the estate under § 541. The Court denies the request to lift the automatic stay for cause under § 362(d) without prejudice; and it is further

ORDERED that this Order is effective immediately and any applicable stay is waived. The Court retains jurisdiction over the interpretation, interpretation, enforcement, and implementation of this Order.

Signed: January 07, 2026

_____
Christopher Lopez
United States Bankruptcy Judge

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion at ECF No. 798.

# EXHIBIT B

```
 1                 UNITED STATES BANKRUPTCY COURT
                   SOUTHERN DISTRICT OF TEXAS
 2                      HOUSTON DIVISION

 3                              )  CASE NO: 25-90399 (CML)
     FIRST BRANDS GROUP LLC, et al.)
 4                              )  Houston, Texas
                                )
 5           Debtor.            )  Wednesday, January 7, 2026
                                )
 6                              )  9:03 a.m. to 3:28 p.m.
     ----------------------------)
 7   FIRST BRANDS GROUP LLC, et al.)  CASE NO: 25-03803 (CML)
                   Plaintiffs,  )  ADVERSARY
 8        Vs.                   )
     PATRICK JAMES, THE PATRICK )
 9   JAMES TRUST, ALBION REALTY LLC)
     ALESTER TECHNOLOGIES LLC,  )
10   BATTERY PARK HOLDINGS LLC, )
     LARCHMONT LLC, PEGASUS     )
11   AVIATION LLC, JOHN AND JANE)
     DOE(S) 1-100 and ABC       )
12   CORPORATION(S) 1-100,      )
                   Defendants.  )
13   ----------------------------)

14                         HEARING

15        BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
                UNITED STATES BANKRUPTCY JUDGE
16

17   APPEARANCES:

18   For Debtors:          SUNNY SINGH
                           ROBERT NILES-WEED
19                         Weil Gotshal & Manges LLP
                           767 Fifth Avenue
20                         New York, NY 10153

21   For Onset Financial,  ANTHONY S. FIOTTO
     Silverpoint Capital:  Morrison & Foerster
22                         200 Clarendon Street, Floor 21
                           Boston, MA 02116
23
     For Onset Financial:  BRYAN KOTLIAR
24                         Morrison & Foerster
                           250 West 55th Street
25                         New York, NY 10019
```

```
 1    For Defendants:          ERICA WEISGERBER
                               Debevoise & Plimpton LLP
 2                             66 Hudson Boulevard
                               New York, NY 10001
 3
      For SPV Entities:        MICHAEL FISHEL
 4                             Fishel Law Group
                               602 Sawyer, Suite 400
 5                             Houston, TX 77007

 6    For SPV Entities:        BRYCE L. FRIEDMAN
                               DAVID ZYLBERBERG
 7                             NICHOLAS BAKER
                               425 Lexington Avenue
 8                             New York, NY 10017

 9    For Edward James:        JAMES TECCE
                               CAMERON KELLY
10                             Quinn Emmanuel Urquhard & Sullivan
                               51 Madison Avenue, 22nd Fl.
11                             New York, NY 10010

12    For Ad Hoc Group of      ANNELYSE GAINS
      DIP Lenders:             Gibson Dunn & Crutcher LLP
13                             1050 Connecticut Avenue NW
                               Washington, DC 20036
14
      For Committee:           ROBERT J. STARK
15                             JEFF JONAS
                               MICAEL WINOGRAD
16                             STEVEN A. TYRELL
                               JASNOOR HUNDAL
17                             7 Times Square
                               New York, NY 10036
18
      For Carnaby II and II:   MEGAN YOUNG-JOHN
19                             JOHN F. HIGGINS, IV
                               1000 Main Street, 36th Floor
20                             Houston, TX 77002

21                             ALLAN S. BRILLIANT
                               Dechert LLP
22                             1095 Avenue of the Americas
                               New York, NY 10036
23
      For Evolution Credit     VINCENT INDELICATO
24    Partners:                Proskauer Rose LLP
                               11 Times Square
25                             New York, NY 10036
```

```
 1
    For Katsumi Servicing:    SEAN SCOTT
 2                            KYLE J. TUMSUDEN
                              Mayer Brown LLP
 3                            71 South Wacker Drive, Ste 3900
                              Chicago, IL 60606
 4
    For Edward James:         MARK DENDINGER
 5                            Bracewell LLP
                              31 W. 52nd Street, Ste 1900
 6                            New York, NY 10019

 7  For Stephen Graham:       DANIEL J. SAVAL
                              Kobre and Kim LLP
 8                            800 Third Avenue
                              New York, NY 10022
 9
    For David Parker:         SARAH PATRICIA SANTOS
10                            HARRY JAY HULINGS
                              Davis & Santos PC
11                            719 S. Flores Street
                              San Antonio, TX 78204
12
    For Laurie Stein:         MARGARITA K. O'DONNELL
13                            Zuckerman Spaeder LLP
                              2100 L Street NW, Ste 400
14                            Washington, DC 20037

15  For Michael Baker:        PETER MENZ
                              Morvillo Abramowitz Grand
16                            Iason & Anello PC
                              565 Fifth Avenue
17                            New York, NY 10017

18  Court Reporter:           Yesenia Lila

19  Courtroom Deputy:         Yesenia Lila

20  Transcribed by:           Veritext Legal Solutions
                              330 Old Country Road, Suite 300
21                            Mineola, NY 11501
                              Tel: 800-727-6396
22

23

24
    Proceedings recorded by electronic sound recording;
25  Transcript produced by transcription service.
```

1          <u>HOUSTON, TEXAS; WEDNESDAY, JANUARY 7, 2026; 9:03 AM</u>

2                              (Call to Order)

3          CLERK:  All rise.

4          THE COURT:  Please be seated.  Good morning,

5    everyone.  Happy New Year.

6          ALL:  Happy New Year, Your Honor.

7          THE COURT:  All right.  Let's see.  Good morning.

8    And Happy New Year, everyone.  This is Judge Lopez.  Today

9    is January 7th.  I'm going to call First Brands.  Sounds

10   like we're here all morning.  I'm going to start with the

11   adversary proceeding, 25-03803.  I'll take appearances on

12   that one first.  Good morning.

13         MR. SINGH:  Good morning, Your Honor.  Sunny

14   Singh, Weil, Gotshal, on behalf of the Debtors.

15         MR. FIOTTO:  Good morning, Your Honor.  Tony

16   Fiotto on behalf of Onset, also on behalf of Silver Point

17   Capital.

18         THE COURT:  Good morning.

19         MR. FIOTTO:  Good morning.

20         MS. WEISGERBER:  Good morning, Your Honor.  Erica

21   Weisgerber from Debevoise on behalf of the defendants in the

22   adversary.

23         THE COURT:  Good morning.

24         MR. FISHEL:  Good morning, Your Honor.  Michael

25   Fishel, Fishel Law Group, with my colleagues at Simpson

 1  Thacher, Bryce Friedman, David Zylberberg, and Nick Baker on

 2  behalf of the SPV entities.

 3          THE COURT:  Welcome.

 4          MR. NILES-WEED:  Also Robert Niles-Weed, from

 5  Weil, on behalf of the Debtors with respect to the

 6  adversary.

 7          THE COURT:  Good morning.

 8          MR. TECCE:  Good morning, Your Honor.  James Tecce

 9  of Quinn Emanuel on behalf of Mr. James.  I'm joined by

10  Cameron Kelly, and Happy New Year.

11          THE COURT:  Good morning.

12          MS. GAINS:  Your Honor, AnnElyse Gains, of Gibson,

13  Dunn, on behalf of the HAC Group of DIP Lenders.

14          THE COURT:  Good morning.  Good morning, Mr.

15  Stark.

16          MR. STARK:  Good morning, Your Honor.  Robert

17  Stark with Jeff Jonas, Mike Winograd, Steve Tyrrell, and

18  Jasnoor Hundal, from Brown Rudnick, on behalf of the

19  committee.  We are not -- actually, we have not intervened

20  in the adversary proceedings.  So I don't think we're going

21  to have anything to say.

22          THE COURT:  No.  I know, you want to preserve.  I

23  got it.

24          MR. STARK:  We might.  Thank you, Your Honor.

25          MS. YOUNG-JOHN:  Good morning, Your Honor.  Megan

```
 1    Young-John of Porter Hedges on behalf of the Carnaby II and

 2    III secured parties.  I'm also joined on the phone by John

 3    Higgins from my firm and co-counsel from Dechert, Allan

 4    Brilliant who will be taking the lead.  We are likewise not

 5    involved in the adversary, but I understand there's a status

 6    conference that will be involving us.

 7             THE COURT:  Got it.

 8             MS. YOUNG-JOHN:  I'm going ahead and making our

 9    appearance.

10             THE COURT:  Okay.

11             MS. YOUNG-JOHN:  Thank you.

12             THE COURT:  Good morning.  Let's see.  Let me just

13    unmute a few lines here on the phone.  There's a (212)

14    number.  I should hit the unmute button if I call.

15             MR. INDELICATO:  Your Honor, good morning.

16    Vincent Indelicato, Proskauer Rose LLP, on behalf of

17    Evolution Credit Partners.  While Evolution, Your Honor, has

18    not intervened in this adversary proceeding, we noted on the

19    agenda that the Debtors filed with the court late yesterday

20    that the Debtors anticipate making a status update.  To the

21    extent that status pervades the adversary, and involves

22    macro issues, we very much would like Your Honor's

23    indulgence to provide our perspective on what really has

24    become an emergency in these cases.

25             THE COURT:  Okay.
```

1              MR. INDELICATO:  Thank you.

2              THE COURT:  Let's see.  There's another; I've got

3      two more.  Mr. Singh, I've got -- let's see, another (212)

4      number.

5              MR. BRILLIANT:  Your Honor, Allan Brilliant on

6      behalf of Carnaby II and Carnaby III secured lenders.  As,

7      you know, Ms. John said, we're appearing solely in

8      connection with the status conference this morning.

9              THE COURT:  All right.  Thank you.  And a (312)

10     number.  A (312) 701 number?  All right.  I'll try another

11     one.

12             MR. SCOTT:  Good morning, Your Honor.

13             THE COURT:  Yes.

14             MR. SCOTT:  Sean Scott of Mayer Brown on behalf of

15     Katsumi Servicing LLC.  I'm joined by my colleague Kyle

16     TumSuden, who was the other number, but maybe was unable to

17     unmute it.  We will be dealing with the D&O issues, but like

18     the -- many of the other parties here, given the status

19     conference, I did want to raise our appearance at this point

20     in time.  Thank you, Your Honor.

21             THE COURT:  Good morning.  All right.  Mr. Singh,

22     I'm going to turn it over to you.  For the lines that I have

23     unmuted, if you would please just keep your phone on mute.

24     I'm going to keep your line unmuted on this end just so we

25     can all hear each other.  Good morning.

1          MR. SINGH:  Good morning, Your Honor.  Thank you.

2   Again for the record, Sunny Singh, Weil, Gotshal, on behalf

3   of the Debtors.  Your Honor, as we noted in the agenda and

4   as just mentioned by some of the parties, we thought it

5   would be helpful for the Court and for parties in interests

6   to provide a status update of the cases this morning and

7   obviously, answer any questions Your Honor may have.

8          Your Honor, we have one slide that we did file

9   this morning.  It's at docket 1216.  If you could give

10  authorization to my colleague, Jason George, he can put it

11  up for those not --

12          THE COURT:  All right.

13          MR. SINGH:  -- in the courtroom.

14          THE COURT:  I'm getting faster.  All right.  Mr.

15  George, you should be the presenter if I did this right.

16  Okay.  Whenever you're ready.

17          MR. SINGH:  It looks like it's -- I didn't see it

18  on the screen.

19          THE COURT:  Oh.

20          MR. SINGH:  But it looks like it's okay.

21          THE COURT:  Yep.  Let me -- let's see.  Am I --

22  let's just proceed.

23          MR. SINGH:  Yeah.  I don't mean to test your

24  technical skills, Your Honor.

25          THE COURT:  Yeah.  No.

```
 1              MR. SINGH:  I was just saying I couldn't see it.
 2    That's all.  I'm fine to proceed.  Sorry.
 3              THE COURT:  You said it's on the docket, right?
 4              MR. SINGH:  It's on the docket.  Yes.
 5              THE COURT:  On the docket.  All right.
 6              MR. SINGH:  Yes.  Yes.  Yes.  It's on the docket.
 7              THE COURT:  All right.
 8              MR. SINGH:  And I can sort of see it on that
 9    computer over here.  So I think we're probably good to go.
10              THE COURT:  All righty.
11              MR. SINGH:  Okay.  Thank you, Judge.  So Your
12    Honor, as summarized on this slide, you know, really before
13    the month of January, we've been focused on what we would
14    describe as Phase 1 of these cases, focused on stabilizing
15    the situation.  You know assess the business, assess the
16    situation, get our financing in.  Secure our first day
17    relief, and start to stabilize the operations, and work on a
18    business plan and a strategy forward with all of our
19    stakeholders.
20              That's been going on, Your Honor, for the better
21    part of the last three months.  And I think where we are now
22    is really, we have moved into Phase 2 of these Chapter 11
23    cases, which is focused on negotiations going forward.  So
24    we can pursue asset sales and/or orderly wind-down of
25    certain assets.  You know really negotiate a path to exit
```

1    from Chapter 11, and deal with issues we need to deal with

2    like securing remaining case funding, finishing, or

3    continuing the investigation, and pursuing potential claims,

4    and then addressing value allocations.

5         So Your Honor, you know, we are at a critical

6    juncture.  And as I mentioned moving into the second phases

7    of these cases, right now January is essential.  We are

8    focused on case funding.  We are focused on negotiating a

9    path from out of Chapter 11 with respect to the businesses

10   through a sale process.  And you know we'd like to do it

11   with as much consensus as possible with our stakeholders.

12   We really think now is the time for everyone to come

13   together.

14        You know that, of course, includes the DIP

15   Lenders, the UCC, all of our SPV and ABL counterparties.

16   And we've, you know, commenced discussions with many of

17   them, in particular, the DIP Lenders and the UCC, our state

18   fiduciaries.

19        Your Honor, currently, we have approximately $190

20   million in unrestricted cash as of the beginning of this

21   week.  That's sufficient liquidity to allow us to operate

22   through the January -- you know we're working through all of

23   our options to enhance liquidity and the runway for sale

24   process in this case.

25        And in that regard, Your Honor, we're really

```
 1    looking for all sources of liquidity to preserve our

 2    businesses and run a good sale process.  That includes our

 3    current DIP Lenders, but it also includes, and we'll need to

 4    work with ABL and SPV lenders on the use of cash collateral

 5    during this process.

 6              And as I mentioned, Your Honor, you know, we're

 7    talking, of course, to the UCC about all of this.  You know

 8    January, I can't stress enough really is a critical month

 9    for this estate or these estates.

10              We did receive a term sheet, Your Honor, from our

11    DIP Lenders earlier this week for an injection of capital.

12    We're evaluating that and we are going to need to negotiate

13    it.  But other steps are also in motion.  And as I

14    mentioned, Judge, we're going to need support of all of our

15    stakeholders, you know, customers, lenders to really give us

16    a shot here to maximize value for everyone's benefit here.

17              As I mentioned, Judge, we're moving forward with

18    the sale process, some informal outreach began earlier this

19    week by Lazard.  Your Honor, we'll see by the end of this

20    week on the docket bidding procedures motion that we will

21    file and seek approval for from the court.

22              Your Honor, given the liquidity position that I

23    mentioned, we unfortunately, don't have a lot of time to run

24    an extended sale process.  Admittedly, it will be short.

25    Likely concluding -- proposing that it conclude by the end
```

1    of this month, unless we can find a way to enhance our

2    liquidity and extend our runway.  And the timing, of course,

3    will also depend on the level of support that we get from

4    our stakeholders in this process.

5           Your Honor, we recognize that we're asking the

6    parties to move quickly, but we really do believe that this

7    timeline is necessary and warranted under the circumstances.

8    The Debtors, frankly -- and you'll hear more about this in

9    connection with our bid procedures motion when we're finally

10   before you and with evidence.  But the Debtors really do

11   need to get as many of these business lines out of Chapter

12   11 as soon as possible to maximize value, to save jobs, and

13   to keep their going concern.

14          We appreciate and acknowledge, Your Honor, that

15   there's many disputes about who is entitled to the value at

16   the end of the day that will be generated, which of course,

17   we plan to address.  But we -- in order to maximize the

18   value, in order to have those disputes, Your Honor, in a way

19   that, you know, we're talking about maximum proceeds that

20   people are arguing about, or hopefully settling about, but

21   we'll see.

22          But in order to do that, we really do need to

23   focus right now on getting these businesses out of Chapter

24   11 so we can normalize and firm up relationships with our

25   customers, with vendors, with suppliers, financing parties,

1    et cetera.

2              Your Honor, we anticipate that the DIP Lenders

3    will participate in the sale process.  You know their term

4    sheet that we received does contemplate that.  They are

5    bidding for certain of the Debtors' assets.  But a lot TBD,

6    Your Honor, we just got that, I think, a day ago.

7              Judge, there's a lot more work to be done.  We're

8    encouraged, though, by our recent conversations and

9    discussions, and we think an optimized path forward here to

10   maximize value is an expedited sale process, which you'll

11   hear more about.

12             So Your Honor, we expect to be back in front of

13   you later this month for consideration of our bid procedures

14   that I mentioned, hopefully incremental funding and outline

15   our path forward from Chapter 11.  I think to the extent

16   able, we'll also provide, and subject, of course, to your

17   availability updates if we can along the way.  I think

18   there's a couple of hearings where we can certainly update

19   the court with respect to that.

20             Your Honor, as I mentioned, we're trying to build

21   as much consensus as possible and minimize the fighting.  So

22   there's two updates that I have.  One is with respect to the

23   factoring procedures motion, Your Honor, that's scheduled

24   for the 13th.  This relates to the debtor's motion for

25   procedures to authorize release of additional cash.  Your

 1    Honor, we had a status conference on the 30th.

 2         Nothing has changed yet in terms of that hearing.

 3    But we are in discussions with the third-party factors in

 4    our attempt to try to reach an agreement on the scope of

 5    relief that we would be seeking at the January 13th hearing,

 6    including to try to delay or postpone, I should say, with

 7    people's consent, any litigation or discovery related to

 8    that motion, at least until the examiner is finished with

 9    their work, I would say.

10         Again, as I mentioned, Your Honor, nothing final.

11    We made a proposal out to those parties about the January

12    13th hearing.  If possible, and we can get there, our goal

13    is to be in a position to file a revised proposed order

14    reflecting an agreement with the factors in advance of the

15    hearing.  And of course, we can provide you an update.  I

16    think Friday, there's a hearing as well related to the

17    examiner.  We can provide you an update on status as well as

18    obviously on the 13th itself.

19         Another update, Your Honor, relating to the

20    investigation and the examiner.  As I think Your Honor

21    knows, you know the special committee is continuing to

22    progress its investigation.  You know we're doing that in

23    coordination with the creditors committee.  I think we are

24    now in a position to start to commence additional litigation

25    against parties potentially this week, more to come on that,

1    Your Honor.

2           And what I would say is we've also met now the

3    examiner has been selected by The U.S. Trustee.  We've met

4    with the examiner on the debtor side, his professionals

5    that, you know, he intends to retain to kick off that

6    conversation, the flow of information.  I believe Friday,

7    this Friday, there is a motion to formally approve the

8    appointment of the examiner.  So they'll probably give you a

9    little bit more of their perspective then.  But I just

10   wanted to let you know, we have had that meeting and kickoff

11   and follow-up, et cetera.  It's all in the works.

12          Your Honor, finally, with respect to the Carval

13   motion or motions that are on for this Friday right now,

14   there's the hearing relating to our proposal for adequate

15   protection, fair stay relief, and motion for, I think it's

16   to either dismiss or appoint a trustee.

17          Your Honor, you know we've had constructive

18   conversations this week with Mr. Brilliant and his team and

19   the Carval team.  And we've agreed that in light of the

20   current situation that I just described, with the sale

21   process and January being a critical month to see where we

22   really are in these cases, that we would put off that

23   hearing.

24          So I think we've agreed, if Your Honor is

25   amenable, to adjourn the hearing.  I think we did check with

1    Your Honor's chambers that we could agree to put that

2    hearing on for January 22nd, you might have availability,

3    but that we would have a status conference, Your Honor, on

4    January 13th, which is that other hearing for the factoring

5    motion that I mentioned.

6          So we can give you an update where we are with

7    Carval on the 13th.  And right now as a placeholder, I'm

8    hoping we don't need it.  But if we do, the 22nd would be

9    that date.

10          THE COURT:  Would that adjourn all the matters?

11          MR. SINGH:  Yes.

12          THE COURT:  So far?

13          MR. SINGH:  All of the matters on the 9th related

14    to Carval.  So there would -- the only hearing, I think, you

15    would have on Friday then, Your Honor, is to appoint the

16    examiner formally.  That would be the only thing left for

17    Friday.

18          Your Honor, one thing we did agree to with Carval,

19    which is if we can't -- you know the goal is we've

20    adjourned, we're going to work with them now, and have

21    already started to, to come up with an arrangement over use

22    of collateral, you know, for the next 30-ish so relating to

23    the sale process, et cetera.

24          Ideally, we'd be reporting that to you on the 13th

25    or before.  If we can't, then we have agreed that the

1    Debtors would no longer use the Carval collateral, including

2    their cash collateral, beyond the 13th without Carval's

3    consent or further order of the Court.  So we would have to

4    come back.

5              THE COURT:  Okay.

6              MR. SINGH:  If that really became an issue.  So

7    with that, Your Honor, unless you have any questions for me,

8    that's the update we wanted to provide you, and we can

9    obviously --

10             THE COURT:  Now, just subject to what Mr.

11   Brilliant, and I just wanted to confirm the dates, I think

12   the 22nd you mentioned.

13             MR. SINGH:  Yes.  The 22nd is the holding date for

14   the motions that are currently --

15             THE COURT:  Yeah.  I'm just saying --

16             MR. SINGH:  -- on the 9th.

17             THE COURT:  -- I'm looking at my calendar and if

18   it looks good to me, if Rosario tells you it works, then

19   I've got no issues with that and keeping the 13th as a

20   status conference.

21             MR. SINGH:  Yes.  And I think we confirmed all

22   that with Mr. Brilliant, and said it works with him.

23             THE COURT:  Okay.

24             MR. SINGH:  And so if you're okay, we will file

25   the various notices.

```
 1              THE COURT:  And I've got no issues with that.
 2              MR. BRILLIANT:  Your Honor, I can confirm that the
 3    dates work.  We had discussed them with the Weil firm
 4    yesterday.  They had checked with chambers that it was
 5    available, and we checked with the witnesses, and that does
 6    work for all the parties.
 7              THE COURT:  Okay.  All right.  Thank you.
 8              MR. SINGH:  Thank you, Your Honor.
 9              MR. STARK:  May I have a moment, Your Honor?
10              THE COURT:  Yeah.  Of course.
11              MR. STARK:  Good morning, Honor.  I won't be long.
12    Following Mr. Singh, I always find myself jogs a lot of good
13    thoughts and so I figured I'd share just a few.
14              THE COURT:  All right.
15              MR. STARK:  If I can just take one step back and
16    go back a couple of months, but I won't belabor it too much,
17    Your Honor.  Obviously, this is a very newsworthy, observed,
18    and important case, and it's fascinating.  Fraud cases are
19    usually fascinating, but this one, at least for me, is an
20    unusual fraud case.
21              And I want to pause it this way because it's a
22    phrase that I've been using a bunch.  We didn't know, and I
23    don't think we still know whether or not this case is at its
24    heart, a business with a fraud attached, or is a fraud with
25    a business attached.  And think about that for a moment if
```

1    you will, Your Honor.  Because I've been doing a lot of

2    thinking about that over the last couple of months.

3           Because if it's one, you have a certain set of

4    logical agenda items that you have to deal with.  If it is

5    the other, you have a different set of logical agenda items,

6    and they compete.  The DNA of a fraud case is it wants to

7    devolve into litigation.  And we've seen it here.  It's

8    chaotic at times.  The last status conference was chaotic

9    and trying to find order out of the chaos is tough.

10          When on the one hand, the debtor is quite

11   rightfully trying to preserve and enhance reorganization

12   value assuming that this is a business case with a fraud

13   attached when the litigation, inter nascent litigation and

14   third-party litigation has its own agendas that compete with

15   those that the debtor is pursuing.  The poor DIP Lenders are

16   sitting there having to fund both, and not really sure what

17   to do and how to do it.

18          Those competing agendas have played out quite a

19   bit in the court and out of the court.  And we haven't

20   really figured out what this case is yet in terms of one

21   versus the other.  What we do know is we're out of money.

22   It just is too much.  This case fell into bankruptcy, and I

23   give purple hearts all around for the Debtors professionals

24   who by the way been constructive and transparent and worked

25   with us and talked with us daily and worked us through.

1    That's not only the lawyers but the financial advisors and

2    the bankers.  It's just a tough case, and we've run out of

3    money.

4            When it files and everyone said we need an

5    examiner, that makes all the sense in the world.  We were

6    supportive of that.  It takes a little while and get going

7    and now we're out of cash.  I want to make sure because I

8    completely agree with Mr. Singh, as usual, when he gets up

9    and make a presentation about where we're going, is we got

10   to talk.

11           And Ms. Gains and my good friends from Gibson

12   Dunn, we had the similar scenario in Ascend not so very long

13   ago where it looked like it wasn't going to work, and we sat

14   in a room and some coffee and late nights, and we figured it

15   out.  And I think we're going to figure it out here too.

16   And I'm very much looking forward to sitting down with my

17   friends and colleagues and trying to see what we can figure

18   out.

19           As Mr. Singh's presentation laid itself out,

20   focusing on that value, that business value, that enterprise

21   value, they're doing all the right things, and we intend to

22   meet them halfway in the middle to try to get there.

23           We also have the litigation piece, and we cannot

24   allow -- because we don't know what it is yet.  We cannot

25   allow that -- well, let me say it differently.  This informs

1    that.  The litigation informs the restructuring.

2            The restructuring informs the litigation because

3    they compete with one another, and we have to create

4    rationality and order.  We knew it might come, and you'll

5    hear about this a little bit later in the contested matters

6    for today.  We knew it might come that we'd run out of money

7    in January.  That was the big D Day in the DIP.  And we're

8    now at D Day and it's not looking like hopes are going to be

9    achieved.  We got going and we're close to ready, but we're

10    not done yet.

11            And so as we move forward with the agenda for the

12    rest of the day, and I don't want to port that into this,

13    but I don't want to lose sight of the other piece of what

14    this case may be because we have to finish that as part of

15    this process in January.  I wish there was time for an

16    examiner to -- and we can all sit back and allow them to do

17    it, but I don't think that's where we are.  And so we'll

18    talk about that more today.

19            THE COURT:  Okay.  Thank you.

20            MR. STARK:  Thank you, Your Honor.

21            THE COURT:  Mr. Indelicato?

22            MR. INDELICATO:  Your Honor, can you hear me?

23            THE COURT:  I can hear you just fine.

24            MR. INDELICATO:  Thank you, Your Honor.  Good

25    morning and Happy New Year.  Again for the record, Mr.

1    Indelicato, Proskauer Rose LLP, on behalf of Evolution

2    Credit Partners.  Your Honor, we certainly do not oppose Mr.

3    Singh's desire for speed, but speed, Your Honor, certainly

4    cannot abrogate parties' legal rights and violate this

5    court's orders.

6         And I want to make it clear upfront because I know

7    our client has myriad ongoing relationships with these

8    Debtors.  I rise today not to address, Your Honor, the AR

9    and factoring issue that the Elsberg firm has appeared

10   before you on, but rather to talk about a very simple issue,

11   which is the brake parts inventory.

12        Inventory that had so much criticality to these

13   estates, Your Honor, that the Debtors requested the ability

14   to use and sell that inventory in the ordinary course of

15   these cases.  And you may recall when we talked early on at

16   the first day hearing about the three buckets of Evolution

17   exposure, the most significant, the most material began and

18   ended with the inventory financing, $230 million to finance

19   brake parts inventory that the Debtors have been using and

20   selling throughout the cases.

21        And Your Honor will recall, they've been doing

22   that pursuant to an adequate protection order that Your

23   Honor entered in exchange for allowing them to use the

24   inventory to provide us, Your Honor, with adequate

25   protection in the form of collateral maintenance thresholds.

```
 1              They had to maintain a minimum threshold of

 2    collateral throughout the case so that, Your Honor, if the

 3    cases should pivot to a wind-down or liquidation, Evolution

 4    or Bank of America, whoever is on first, if you'll recall,

 5    with respect to that inventory collateral, will have ample

 6    cushion so it can look to its recovery in those alternative

 7    recovery scenarios.

 8              And so we heard it from Mr. Singh loud and clear.

 9    We heard it from Mr. Stark.  We certainly read the pleading

10    that the statutory creditors committee filed in earnest last

11    week.  Here we stand several months later on the brink of a

12    wind-down or liquidation.

13              And not only have the Debtors, Your Honor,

14    conceded that Mr. Singh will not dispute this, he

15    conspicuously omitted it from his status update that the

16    Debtors right here, right now, today are in violation of

17    that adequate protection maintenance covenant threshold by

18    at least $43 million of a deficit.

19              But remarkably, Your Honor, the Debtors have also

20    confirmed, and Mr. Singh cannot deny, that they are

21    continuing to use and sell our inventory collateral in

22    brazen violation of Your Honor's order.  And so, Your Honor,

23    we need an emergency hearing.  Court orders matter.  We need

24    an emergency hearing.  Because every day that goes by with

25    the Debtors willfully violating Your Honor's order is
```

1   another day that our client, or whoever ends up being on

2   first with respect to this inventory, suffers diminution and

3   degradation.

4          The inventory gets sold, poof, it's gone.  And the

5   people that have a first lien on that inventory can never

6   look to it for recovery again.  And so not only, Your Honor,

7   do we need your assistance with scheduling an emergency

8   hearing, but more importantly, Judge, we don't see how you

9   can allow the Debtors to continue to violate the Court's

10  order and continue to sell the inventory, which they told us

11  as recently as last night, they're doing right now until

12  either you've ruled on that matter or they and we and the

13  other parties have reached the consensual agreement.

14          THE COURT:  Has anyone filed a motion requesting

15  an emergency hearing?

16          MR. INDELICATO:  Yes.  Yes.  We filed a motion,

17  Judge.  I want to say shortly after we learned of this

18  substantial deficiency and noncompliance with that order, it

19  may have been the week of Christmas or the week before

20  Christmas.

21          THE COURT:  Got it.

22          MR. INDELICATO:  And quite frankly, since we're

23  all putting our cards on the table in a very candid and

24  dispassionate way, we and the Debtors had refrained from

25  pressing Your Honor for a hearing.  Because the Debtors had

1    assured us that they would be providing us with adequate

2    protection, and that a proposal from their DIP Lenders was

3    forthcoming.

4              And what do you know, Judge?  Day after day after

5    day, holiday, New Year passes, we got nothing.  And we got

6    nothing because they don't have money.  And that's okay.

7    But they can't continue to use our collateral to fund the

8    optionality of their case.  It flies right in the face of

9    your order.  Orders have to have meaning, Judge.

10             THE COURT:  So you -- I am looking at --

11             MR. INDELICATO:  I've looked -- I've never seen

12   anything like it.  They told us we're violating your order.

13   We know it.  We know we have to give you -- like your

14   protection.  We don't have anything to give you, but we're

15   going to keep violating the court's order.

16             THE COURT:  So why don't I set it --

17             MR. INDELICATO:  It's astounding, Judge.

18             THE COURT:  -- for the 13th at 1:00?  We're

19   already going to be here on that day.  Why don't we set it

20   for the 13th at 1:00?

21             MR. INDELICATO:  But, Your Honor, respectfully,

22   again, timing is one consideration.  And I appreciate Your

23   Honor's accommodation in the short term.

24             THE COURT:  But what -- no.  No.

25             MR. INDELICATO:  But we need Your Honor right now

```
 1    --

 2              THE COURT:  I guess what I'm saying is, you asked

 3    relief by January 9th.  I'm giving you -- that's a Friday.

 4    I'm giving you a hearing on the following Tuesday.

 5              MR. INDELICATO:  I don't quarrel with the timing,

 6    Judge.  I appreciate Your Honor's accommodation.  But we

 7    just learned late last night for the first time that they're

 8    continuing to diminish and degrade and deplete our

 9    collateral.  So we need you to say until that hearing, they

10    have to stop doing that.

11              THE COURT:  I don't -- Mr. Singh is going to have

12    to -- I need Mr. Singh to come talk to me about what's going

13    on.

14              MR. INDELICATO:  I think Mr. Singh --

15              THE COURT:  In other words, people put stuff on

16    paper and sometimes people take different perspectives and

17    different views on it.  I'm just -- I saw that you filed a

18    motion on December 23rd.

19              MR. INDELICATO:  I think what Your Honor --

20              THE COURT:  Yeah.

21              MR. INDELICATO:  -- respectfully, what Mr. Singh

22    ought to address is, one, are the Debtors currently in

23    violation of the court order that you entered by at least

24    $43 million.  Number 2, are they --

25              THE COURT:  Mr. Indelicato, I --
```

1            MR. INDELICATO:  -- continuing to use our

2    collateral?

3            THE COURT:  Mr. Indelicato, I get the -- I got it.

4            MR. INDELICATO:  Thank you.

5            THE COURT:  Thank you.  Mr. Singh?

6            MR. SINGH:  Yeah.  Thank you, Your Honor.

7            THE COURT:  Tell me what's going on.

8            MR. SINGH:  Your Honor, I'm going to say just a

9    couple of things.  We're happy to go forward on the 13th if

10   that's the date.  I don't disagree that we've got an issue

11   with respect to the cash collateral order that we've trying

12   to work it out.  We are trying to work out with them.  But

13   these are difficult facts and circumstances.  I don't agree

14   with a lot of what he said in terms of, oh, is it 43

15   million, et cetera?  I don't think we've said that.  I don't

16   think we've said we're blatantly violating a court order.

17           What we said is we've got a very challenging

18   situation.  We don't have additional funding.  We need you

19   to work with us.  Yes.  We are continuing to sell inventory

20   in the ordinary course to date.  In our view, that is

21   frankly, you can't just shut down a massive operation

22   overnight and say you're not shipping.  That's going to

23   destroy the entire value of the business.

24           We made a proposal to them as early as this

25   morning.  We are in ongoing conversations.  I'm hopeful that

```
 1    we'll get to some sort of resolution under the

 2    circumstances.  But I wasn't prepared to argue these issues

 3    this morning.  And I think we should defer that for the

 4    right time.  And if you want to -- I think if it's the 13th,

 5    that's fine with us, Your Honor.

 6            It's not like he's not -- Mr. Indelicato and his

 7    client are not going to hear from us.  I believe we're

 8    scheduling a call later this afternoon.  I don't think it's

 9    in his interest or frankly -- one thing I would clarify is,

10    Mr. Indelicato made a very impassioned speech about it's

11    their collateral.  Well, no, it's disputed whether or not

12    it's their collateral.

13            Frankly, in our investigation, we've come to a

14    view as to whether or not it's their collateral, and we

15    don't believe they're going to be senior.  But that's not

16    the issue for today.  The ABL lenders, who are the other

17    party who are not here, do not have an objection.  And I

18    frankly believe it is value maximizing.  So there's a lot

19    more that Your Honor needs to hear on this.  I'm happy to do

20    it on the 13th if he wants.  It's all subject to Your

21    Honor's availability if we need to come back sooner.

22            But we can't sit here today based on no evidence

23    and just a speech that frankly --

24            THE COURT:  No.

25            MR. SINGH:  -- I have a lot of disagreements with
```

1   stop using inventory.

2           THE COURT:  What I will say is, we're going to

3   hold a hearing.  I appreciate the fact that we're having --

4           MR. STARK:  Your Honor, may I --

5           THE COURT:  -- the conversation.

6           MR. STARK:  -- briefly respond to --

7           THE COURT:  No.

8           MR. STARK:  I don't want to go tit for tat.

9           THE COURT:  I don't -- well, that's what we're

10  going end up doing.  So I don't want to do it either.

11          MR. STARK:  I hear you.

12          THE COURT:  So what I'm going to do is set a

13  hearing on the 13th at 1:00.  And what I am going to tell --

14  I mean the last thing I want is to hold a hearing on the

15  13th and something got really worse between today and the

16  time that we get the hearing.  And everybody can just read

17  it for what it is there.  I don't like surprises.  So if to

18  the extent -- but I got it, you can't shut down between now

19  and then.

20          MR. SINGH:  Yeah.

21          THE COURT:  But what I can say is I don't like --

22  it's not a -- I'm just saying this so that I don't want to

23  kind of get into it.  But to the extent, we can get to the

24  13th without any new moves, or any additional moves or any -

25  - we'll get to the 13th, and I'll be prepared to rule on

```
 1    that day on the issues.  The parties work something out,

 2    great.  If not, I got it.  I got to make a call on that day.

 3    And we'll --

 4              MR. SINGH:  We understand, Your Honor.

 5              THE COURT:  -- take it for what it is.

 6              MR. SINGH:  We understand, Your Honor, and I can

 7    assure you and Mr. Indelicato, we are doing nothing but

 8    moving forward --

 9              THE COURT:  No.  I got it.

10              MR. SINGH:  -- in good faith.

11              THE COURT:  And just to be --

12              MR. SINGH:  So we'll continue to do that.

13              THE COURT:  -- so the hearing was filed on the --

14    motion was filed on the 23rd.  Emergency relief was

15    requested by the 9th.  We're going to hold a hearing on that

16    following Tuesday.  So I'm glad we're having the

17    conversation now so we can schedule a date and, quite

18    frankly, give notice to other parties who may want to be

19    involved in the hearing one way or the other.  So we'll pick

20    it up on the 13th at 1:00 and be ready to go.

21              If there's any witness and exhibit list, I would

22    ask on that one, you know, I'll just call it Friday.  I'd

23    like to just come in on Saturday and just get really geared

24    up for it.

25              MR. SINGH:  That's fine, Your Honor. We also have
```

```
 1    --

 2              THE COURT:  To the extent have we can avoid -- I'm

 3    just going tell you.  To the extent we can avoid, and I'll

 4    just tell you.  I'll say it more bluntly.  Tuesday is a busy

 5    day for me, so I'm going to prepare a lot of it over the

 6    weekend.  So any replies or any other responsive pleadings,

 7    the more to the point, the better shot you got me of really

 8    kind of comprehending what you're saying.

 9              MR. SINGH:  Understood, Your Honor.  We will --

10              THE COURT:  For anyone.

11              MR. SINGH:  We haven't had a chance to respond to

12    the motion because it wasn't scheduled.  So if we -- we'll

13    file ours by Friday along with any witness and exhibit List

14    and if that works for the court.

15              THE COURT:  Okay.

16              MR. SINGH:  Thank you, Your Honor.

17              THE COURT:  And I got it.  I got it.  Like witness

18    and exhibits list can move and --

19              MR. SINGH:  Yeah.  But we'll have you have the --

20              THE COURT:  -- I got that.  But just a response

21    and then if there's going to be any kind of reply or

22    anything, I think more to the point of the meat of it.  And

23    then if on Tuesday, I got to make a call, then I'll make it

24    on Tuesday.

25              MR. SINGH:  Understood, Your Honor.
```

```
1              THE COURT:  Okay.

2              MR. SINGH:  I'm hopeful we won't need the hearing

3    and we can work something out.  But if not, we understand

4    the schedule.

5              THE COURT:  Okay.

6              MR. SINGH:  Thank you.

7              THE COURT:  Thank you.  Anything else we need to

8    talk about in connection with the status conference?  One

9    other point I meant is if we're not going to go forward on

10   Friday, then I think that hearing can be, to the extent

11   necessary, virtual.  I think I don't need the examiner

12   flying in.

13             MR. SINGH:  Okay.  Thank you, Your Honor.

14             THE COURT:  Or any other party that might -- we'll

15   keep it hybrid.  But to me, if somebody is already in

16   Houston, they can come in.  But if they're already --

17   parties want to -- to me, if it's just to -- when we can get

18   started right at 9:00 a.m., take that issue up.  But I don't

19   want a bunch of folks flying in to just have that hearing.

20             MR. SINGH:  Okay.

21             THE COURT:  I want to be as efficient as possible

22   in connection with that.

23             MR. SINGH:  Your Honor, we will follow your lead.

24   And if it's helpful to you, I can probably give you an

25   update at least where we are on some of the issues we talked
```

1  about on the 9th.  Not a formal status update, but just so

2  you can plan, but up to you.

3          THE COURT:  No.  I want you all to -- are you

4  talking about with the --

5          MR. SINGH:  Well, just where we are with Evolution

6  and talking to Mr. Indelicato about whether we're going to

7  go forward, et cetera.

8          THE COURT:  No.  No.

9          MR. SINGH:  Don't do anything like that.  Okay.

10         THE COURT:  That opens doors for me.

11         MR. SINGH:  You're right.  You're right.  I

12  regretted it as soon as I suggested it, so.

13         THE COURT:  If there's positive news, I'll take it

14  on the 9th.  If not, I'll just gear up.

15         MR. SINGH:  Your Honor, I'll see you on the 13th.

16         THE COURT:  All right.

17         MR. SINGH:  Your Honor, that's it for our status

18  conference then.

19         THE COURT:  Yeah.  Thank you.

20         MR. SINGH:  Thank you.

21         THE COURT:  I'm just going to take five minutes,

22  see if we can get these monitors on, and then we'll take up

23  the motion to intervene.  It should -- I'm sure there's a

24  button that I just haven't pushed that I'd rather have

25  someone else to do it.  Thank you.

1            (Off the record.)

2            CLERK:  Please be seated.

3            THE COURT:  All right.  I'm dying to know what

4    button she hit.  Dying to know.  Okay.  Let's take up a

5    motion to intervene.

6            MR. FIOTTO:  Good morning, Your Honor.

7            THE COURT:  Good morning.

8            MR. FIOTTO:  Tony Fiotto on behalf of Onset.

9    Earlier, I did not introduce my colleagues, Bryan Kotliar,

10   Brian Michael, and Deborah Perry.  I'd like to do that.  My

11   New Year's resolution is to be more mindful of that sort of

12   stuff.  Thank you, Your Honor.  Onset moves for intervention

13   as a matter of right and also in the alternative for

14   permissive intervention.

15           As you know, Your Honor, in the adversary

16   proceeding here, Debtors alleged that Mr. James and

17   nondebtor affiliates pilfered hundreds of millions of

18   dollars from the Debtors' estate.  And more specifically,

19   they alleged that Mr. James engaged in transactions with the

20   special purpose vehicles.  I'll refer to those as SPVs.

21   We've been referring to them that way before.  And he used

22   the SPVs to incur about $2.3 billion in debt.  Much of it,

23   according to the Debtors, has been diverted, diverted, and

24   pilfered.

25           More specifically, and featured in the complaint,

```
 1   in the Debtors complaint, is that Carnaby IV and Carnaby V,

 2   two of the SPV Debtors that Onset had provided funding to,

 3   were specific targets of Mr. James' and the Debtors, the

 4   affiliates pilfering.  Now Onset provided funding through

 5   FPV to the tune of billions of dollars.

 6          And as I said, the complaint alleges that

 7   repeatedly monies that Onset provided were specifically

 8   pilfered.  So Onset in its motion, and I think we're quite

 9   clear about that, and I'm going to talk about that a little

10   bit more, specifically said that we want to appear on behalf

11   of Onset, but also in the same interest that the Debtors are

12   pursuing the return of the pilfered funds.

13          Now, there's little dispute, Your Honor, about

14   what the elements of mandatory intervention are.  They're

15   very simple.  Timely motion, no question we were timely.

16   Nobody disputes that we were timely.  We were about ten days

17   after the adversary proceeding.  And interest related to the

18   property or transaction, we are overwhelmingly, we have an

19   interest.  In fact, we're featured in the complaint.  We're

20   mentioned a dozen times.  Onset's mentioned a dozen times.

21          Seven or eight paragraphs go on in the life of the

22   day of the fraud of Mr. James and the Debtors.  And Onset is

23   the entity that's featured.  Hundreds of millions of dollars

24   of Onset's funds are being -- were being pilfered.

25          The other test is -- under mandatory is whether
```

```
 1    the disposition and the action may as a practical matter,

 2    may as a practical matter impair Onset's ability to protect

 3    that interest.  And I'm going to talk a lot about that test.

 4    Because it's very different from the old test, which is what

 5    the Debtors seem to be encouraging the court to adopt.

 6         And the final element is that Onset's interest,

 7    whether Onset's interests are adequately protected or

 8    represented by the current parties.  Again, nobody disputes

 9    timeliness.  Nobody disputes interest.

10         And I want to say, Your Honor, the interest of

11    Onset is overwhelming.  I stated already that in the

12    complaint, it is Onset's funds featured in the day of the

13    life of the pilfering of the debtor's estate.  Many, many

14    paragraphs are devoted to that.

15         But the interest here is more wide reaching.

16    Because what Debtors had suggested in the adversary

17    proceeding is that, is this pilfering that has directly

18    affected the title to over a billion dollars of collateral

19    that belongs to Onset?  And what they argue is that because

20    Mr. James pilfered money from or in connection with the

21    Onset funding, the funding went to the Carnaby debtor

22    entities, are under the Viceroy entities, Carnaby debtor

23    entities, money was to be delivered under the applicable

24    agreements of Onset's transactions to an FBG subsidiary,

25    which will least -- release the inventory and the equipment
```

1    and the title to the SPV entity.  And that title was in turn

2    released to Onset.

3            And according to the Debtors, as a result of the

4    pilfering that went on, there is a question about that

5    collateral belonging to Onset.  Because of the James -- Mr.

6    James's and the defendant's pilfering of the cash.  That's a

7    wide-ranging interest more than simply that our money was

8    involved in this fraud.

9            Now, Onset's interest, I think, Your Honor, are

10   unique and singular in many other respects.  Onset is the

11   only creditor to the Carnaby defendants, which as

12   illustrated in the complaint, were a major source of the

13   James' and the defendants' pilfering.

14           A year before the petition date, Onset was the

15   largest funder of First Brands, over a billion dollars

16   injected into the entity.  And that year is critical, Your

17   Honor.  That year is very critical.  Because during that

18   year, I suspect that the defendants, Mr. James and others,

19   saw the wheels coming off, the fraudulent scheme and that

20   was an intense year during which we were being -- we were

21   funding the most amount of money.  The fraud was

22   intensifying during the last year as these sorts of frauds

23   always do.

24           Additionally, Your Honor, another singular point,

25   we in the four months leading up to the petition date, Onset

1    had entered into three forbearance agreements.

2            Basically on the fraud, the fraud that was the

3    centerpiece or that is the centerpiece of the Debtors

4    complaint.

5            Now, we're also singular, Your Honor, in another

6    way.  Both Debtors and defendants have staked in positions

7    about Onset in the pleading.  We are featured in the

8    pleading.  The Debtors have said, well, you know, there's

9    concern about Onset's collateral as a result of the

10   pilfering.  Not only that, there's concern about the books

11   and records of Carnaby which may not support Onset's

12   interest and Onset's collateral.

13           On top of that, although we disagree, the Debtors

14   have suggested that well, Onset may not have been the only

15   creditor to the Carnaby entities.  This is a new fact that's

16   been introduced in this case.

17           So not only do we have a singular identity here,

18   we're featured in the complaint, but already both parties on

19   both sides are not -- I wouldn't call it taking hits,

20   although the defendants are taking hits.  The defendants

21   naturally are trying to deflect blame by saying that Onset,

22   in fact, was in some respects predatory and Onset was a

23   contributor to the bankruptcy.  Don't look at us, say the

24   defendants, but Onset was there as well.  So both parties

25   have my client in the middle of a lawsuit.

1          Now, the one issue that the parties seem to fight

2    about are the defendants and the Debtors, adequacy of

3    representation, and I want to focus on that.  Now, adequacy

4    of representation in the opposition, the Debtors took the

5    position that provided the parties have the same ultimate

6    objective, then we're adequately representative.

7          The Debtors want to get the money back from Mr.

8    James and his cohorts.  But that's not the test, Your Honor.

9    And we point out in our reply brief numerous cases,

10   including the very case cited by both defendants, the MT

11   Technologies case, and by the Debtors, the Texas case, that

12   the standard is even if both parties have the same

13   objective, and we do, we admit, we do, we want to get that

14   money back.

15         Even if there's the same objective, where the

16   parties' interests diverge from the putative

17   representatives' interest in a manner germane to the case,

18   then there is a divergence of interest and inadequate

19   representation.

20         Now, I want to focus a little bit before I talk

21   about exactly how the divergent interests exist here.  Some

22   language that I think is instructive from Fifth Circuit.

23   There has been some suggestion by both defendants and

24   Debtors that in the Fifth Circuit, intervention is

25   disfavored, that it's a very hard test, it's impossible to

1    get to.  But that's not the case.

2          The Fifth Circuit is very clear that, "Rule 24

3    should be liberally construed."  The Fifth Circuit also says

4    we have a, "broad policy favoring intervention."  In fact,

5    the statement is so broad is that the court says that "where

6    no one would be hurt and the greater justice could be

7    attained, intervention mandatory should be allowed."

8          So let's focus on that test.  The interest being,

9    do the interest diverge in a manner germane to the case

10   because that is the test we are here to discuss.  And the

11   Fifth Circuit teaches us ways in which we analyze that.  The

12   La Union case in 2022, we cited in our reply.

13         The court found that interests diverged --

14   reversing the trial court.  Interests, in fact, diverged

15   where the intervenor's interest was narrower than the

16   broader interest of the existing party, here the debtor.

17         The Sierra Club case, 1994, it taught there,

18   reversing the trial court, that there could be a distinct

19   economic interest that the intervenor has that is not

20   absolutely and consistently shared by the existing party.

21         Another case, Your Honor, just briefly in American

22   Traffic Solutions, we talk about that case as well in the

23   reply, the court reversed the trial court, and observed that

24   existing party motivations are something the court should

25   consider when thinking about letting Onset, letting an

1    intervener in the case.

2            And finally, Bergam, Your Honor, just recently in

3    2025, that Burgum case observed that divergence exists when

4    the intervener may have "distinct evidence it wished to

5    introduce" and "distinct legal arguments it intended to

6    make."  And it referred to that those are situations where

7    the court should deeply consider a mandatory intervention.

8            Now, these principles, Your Honor, apply very much

9    here.  Onset has a distinct economic interest that is

10   narrower than the Debtors.  The Debtors' complaint takes the

11   return of asks for the return of funds to the Debtors'

12   estate.  And if you go through the complaint, you see the

13   language is returning the funds to First Brands, returning

14   the funds to the Debtors.

15           Onset has a narrower interest here, Your Honor,

16   and it seeks to make distinct evidence or introduce distinct

17   evidence and distinct legal arguments to ensure that, in

18   fact, the Carnaby interests -- because we are the only

19   debtor to Carnaby -- the Carnaby interests are the ones that

20   are protected.

21           And not only that, Your Honor, the legal

22   arguments, and evidence that's different that Onset would be

23   introducing really relates to where this money went.  Right?

24   Did James and the defendants take the money right out of

25   Onset's pocket the moment it left, essentially fleecing it

1    before it got to the debtor's estate?

2          Did Onset or did defendants take the money after

3    it reached the FBG subsidiary?  And that's a key issue.

4          THE COURT:  Isn't that -- wouldn't that come up in

5    the context of a fraudulent transfer case, where the money

6    went to determine --

7          MR. FIOTTO:  It would certainly come up, Your

8    Honor, but the way the record is created is very important.

9    For example, if the record is created such that, well, we

10   think Mr. James diverted funds between Onset and the Carnaby

11   entity or we think funds were diverted between the Carnaby

12   entity and the FBG subsidiary.  That would mean that the FBG

13   subsidiary never received the cash, the fair market value

14   and therefore, title did not go to Carnaby and therefore did

15   not go to Onset.

16         THE COURT:  So let me ask you a question, just so

17   I understand the scope of what you're asking for.  Intervene

18   as to what in the case?

19         MR. FIOTTO:  Intervene, Your Honor, as a co-

20   plaintiff.

21         THE COURT:  Well, you can't pursue fraudulent

22   transfer actions, right?  So I'm going to ask you a little

23   bit more.

24         MR. FIOTTO:  We can pursue.  And, Your Honor,

25   we've identified the equitable --

1            THE COURT:  Well, let me just --

2            MR. FIOTTO:  I'm sorry.  Didn't mean to interrupt

3    you.

4            THE COURT:  Yes.  No.  Yeah.  Just the equitable

5    one.  You're not going to get me on.  So what do you really

6    want to intervene on?

7            MR. FIOTTO:  We really want to intervene, Your

8    Honor, to establish and make the legal arguments and present

9    the evidence.

10           THE COURT:  But what does that mean in the context

11   of what?  So you want to intervene as a plaintiff and then

12   what, assert your own causes of action or?  Or just in other

13   words, I let you intervene on what grounds, right?  Because

14   there are certain causes of action that are just derivative

15   to the estate, and it's going to be really hard to get me to

16   move off of that.  So there are others.

17           On accounting, do you want to intervene on the

18   accounting or do you want to intervene on constructive

19   trust?

20           MR. FIOTTO:  Constructive trust, Your Honor,

21   accounting.  We have identified, in fact, equitable remedies

22   that we would like to show that that money belongs to the

23   Carnaby entities or belongs even to Onset, so.

24           THE COURT:  But that's a different -- that's not

25   equitable, right?  That's not an equitable remedy to

1    determine who owns the money.

2         MR. FIOTTO:  Well, but, Your Honor, the way the

3    evidence is going to be shaped is going to be very, very

4    critical.  Let's take another example.  The evidence, for

5    example, on the Debtors alleged is that the books and

6    records of the Carnaby entities are not sufficiently clear

7    enough to establish Onset's title.  We don't know that

8    transaction occurred.

9         Now, okay, well, if Onset is in that case, we have

10   the right to develop the legal arguments and the evidence

11   that, in fact, that is not the case.  That, in fact, the

12   records do clearly show or that for example, the parties

13   were all on notice about the transfers, including the SBL.

14        We have the right, Your Honor, to develop the

15   record, for example, that maybe Patrick James was an agent -

16   - excuse me -- of the ultimate FBG subsidiary, so that

17   whenever he took Onset's money, title was already -- money

18   was constructively received --

19        THE COURT:  Right.  That's a different adversary

20   proceeding is what I'm saying.

21        MR. FIOTTO:  Well, Your Honor --

22        THE COURT:  That's the concern that I have, is

23   that we're not -- in other words, you don't want to

24   intervene, you want to add causes of action.

25        MR. FIOTTO:  Well --

```
 1            THE COURT:  Right?  You want to determine the
 2    nature and extent of the debtor's interest in property and
 3    ultimately determine -- I get it, which makes -- you know I
 4    understand it from your client's perspective that you
 5    believe that that's your money, right?
 6            So if it's Onset's money, you want the opportunity
 7    to develop that record so that if the money comes back, it
 8    goes directly into your clients and not back into the estate
 9    for the determination.  But that's why I'm asking,
10    intervene.  Intervene how?
11            MR. FIOTTO:  Well, we don't necessarily -- Your
12    Honor, we would not issue or we would not submit a claim
13    that contradicted the Debtors.
14            THE COURT:  You would have to, though.  That's
15    what I'm saying.  You would have to because you keep calling
16    it Onset's money, right?  And the debtor is going to take
17    the perspective, right, that this is -- it should come into
18    the estate, right?  And so that's the question that I've got
19    for you.  It's more of a you want to intervene, but what are
20    you really asking me for?
21            MR. FIOTTO:  Well, the Debtors are going to take
22    the position that it comes into the state and we don't
23    really care where it goes.  That's the position.  We want to
24    take the position that the evidence should be shaped.  What
25    the Debtors have argued is that, look, let's just figure out
```

1    where the money gets back from.

2            THE COURT:  How do I then prevent another 15 of

3    these to get filed the next week?

4            MR. FIOTTO:  Well, Your Honor, I think the same

5    thing --

6            THE COURT:  Because everybody is going say, I got

7    a very unique interest.  I just have my own SPV debtor.

8    It's coming.

9            MR. FIOTTO:  Well, Your Honor, I think that --

10           THE COURT:  Evolution is certainly coming.  The

11   other folks are coming as well, right?  They're already

12   indicating.  Everybody believes that it's their money.

13   Katsumi.  There are others who believe that it's their

14   money, and they're all doing a bunch of investigations.  So

15   what makes -- I'm not saying it's not a valid legal

16   argument.  But the question is, should it be handled -- are

17   you really arguing the same things?

18           In other words, you want to come in as a plaintiff

19   or are you going to essentially create your own lawsuit

20   within the lawsuit?  That's the question that I have in my

21   mind.

22           MR. FIOTTO:  And I understand that, Your Honor.

23   And I don't see --

24           THE COURT:  I got questions for them, I'm just

25   trying to work --

```
1              MR. FIOTTO:  And I don't --

2              THE COURT:  -- legally through exactly --

3              MR. FIOTTO:  I don't --

4              THE COURT:  -- what I'm being asked.

5              MR. FIOTTO:  -- see it that way.  The way --

6   Debtors have argued that there's no collateral or res

7   judicata effect on what's going to go on in the adversary

8   proceeding.  I'm not necessarily sure that's true, and I can

9   talk about that.  But what's going to be developed in that

10  adversary proceeding are streams of the diversion, are the

11  clarity of the records that demonstrate Onset's title, are

12  whether Onset is, in fact, the only creditor.

13             We're not necessarily going to argue or make a

14  claim against the Debtors that you've got it wrong.  But

15  sitting at the table, creating, and helping that record, we

16  all know how an evidentiary record is put together.  It

17  depends who's sitting at the table.  It depends who the

18  parties are.  It depends what questions get asked at

19  depositions, what questions don't get asked, what documents

20  are introduced.

21             We would like the opportunity to shape that record

22  instead of after the record gets completely calcified, we're

23  down the road or in another proceeding trying to chisel away

24  at them.  And I don't think that's what the test

25  contemplates.  Because remember, it is whether the interest
```

1    may be impaired in a practical way.

2              And that's the thinking that we have here, Your

3    Honor.  We're not going to be at sword points with the

4    Debtors.  That is not our intent here.  But being able to be

5    involved in demonstrating or influencing the record.  See,

6    motivation is important.  The Debtors do not necessarily

7    have the motivation that we do to introduce evidence about

8    the clarity of the records that support our transactions,

9    about when and where the Onset money was fleeced.  These are

10   matters that are largely indifferent to the Debtors.

11             And so with our unique narrow economic interest

12   and the singularity of our position, Your Honor, I think

13   distinguishes us from other would-be interveners.  I know

14   the idea of floodgates is a common argument used that if you

15   have it here, we're going to be dealing with interveners

16   down the road.  I don't see it that way, Your Honor.

17             First of all, no one else in this case has sought

18   to intervene, and I think they've got a timeliness problem

19   at this point.  I think timeliness in the Fifth Circuit is

20   like that.  You've got to get involved and get really

21   involved.

22             We're also -- by the way, we understand the

23   scheduling order.  We're prepared to proceed.

24             THE COURT:  I agree with that too, by the way.  Go

25   ahead.

1          MR. FIOTTO:  We're proceed -- we're willing to

2    proceed with that scheduling order, substantial production

3    of documents by February 23rd.  We've already produced

4    180,000 documents to the Debtors.

5          But the Debtors position, Your Honor, that we

6    should not be involved because it doesn't have res judicata

7    or collateral estoppel effect on us.  I pointed out, we

8    pointed out in our reply brief, Your Honor, that was a 1968

9    test where the --

10         THE COURT:  It seems like what you're really

11   trying to do is establish -- get in here to establish a

12   record that -- to create a record that Onset to the funds

13   that it believes it's entitled to.

14         MR. FIOTTO:  I'm sorry, Your Honor?

15         THE COURT:  It seems like you're trying to,

16   through the intervention, essentially create the record to

17   then ultimately come back and argue that the money that

18   comes -- if any money comes back into the estate.  I want to

19   be really clear.  These are just allegations and a

20   complaint.  We don't even have an answer yet.  That some of

21   those funds, that if certain funds come back, that they

22   should go to Onset, right?  That's -- you're essentially

23   trying to --

24         MR. FIOTTO:  We want to not --

25         THE COURT:  -- create the record through --

```
 1              MR. FIOTTO:  -- to be --
 2              THE COURT:  -- this adversary proceeding.
 3              MR. FIOTTO:  We want to not be impaired by that.
 4              THE COURT:  Your concern is that somehow there
 5    could be a record in the adversary proceeding that you would
 6    then have to come back and then argue against different
 7    findings of fact that the court may make or something?
 8              MR. FIOTTO:  Correct, Your Honor.
 9              THE COURT:  Okay.
10              MR. FIOTTO:  And back in April, Your Honor, in the
11    DRF Trilogy case, you had an intervention question.  It was
12    a status conference.  It was a trial court.  It was a
13    transcript ruling.  But there was the guarantor who wanted
14    to intervene.  And the way the court -- the way I read the
15    transcript is essentially, and I quote there, you said,
16    "Look, those interests are going to be affected one way or
17    the other in this case," the guarantor's interest.
18              Even though the guarantor may not be formally
19    precluded because it was not involved in the case, but the
20    evidence is going to be developed, legal arguments are going
21    to be made, and the guarantor should have a seat at that
22    table because it's so directly involved.
23              And I think, Your Honor, Onset is fundamentally
24    involved here as well.  And if I may briefly, Your Honor,
25    touch on standing.
```

```
1              THE COURT:  Sure.

2              MR. FIOTTO:  Standing, Your Honor, we don't think

3    that's a matter that the court should spend much time on,

4    frankly.  As the Supreme Court said, and we pointed out,

5    that unless -- if the intervener is seeking essentially the

6    same relief that the existing party is seeking, there is no

7    grounds or need to establish independent standing.

8              But also Your Honor, we do talk about Section

9    1109(b).  Now, that doesn't give us automatic right.  The

10   fuel oil case says, no, that doesn't mean just because

11   you've got an interest in the case, you're automatically in.

12   What it said was that if you can prove the Rule 24 elements,

13   that is to say inadequacy of representation, then the court

14   should consider that as a matter of mandatory intervention.

15             And frankly, if we had to establish standing, I

16   mean, standing requires us to show that we were injured.  It

17   was traceable to the defendant and ruling by the court could

18   redress that.  Well, it was Onset's money that Mr. James

19   took.  It was Onset's recipient of that money that Mr. James

20   prevented, and it was Onset's title that is now being

21   jeopardized at least according to the Debtors.  So if we had

22   to establish Article III standard, we think we could.

23             Let me just end, Your Honor, on permissive

24   intervention.  I think obviously that's in the discretion of

25   the court.  But we don't see, Your Honor -- and there's no
```

1    dispute, I think, by anybody that there are common interests

2    of fact and law involved in Onset's claims and in the

3    debtor's claims.

4         There's no efficiencies, Your Honor, as we see it,

5    to be gained by Onset filing a separate litigation.  I think

6    we agree with our colleagues earlier, debtor and the

7    committee that said, look, Your Honor, we want to minimize

8    litigation.  Having Onset go off and sparking its own

9    litigation, having this court deal with multiple rounds of

10   depositions, dispute hearings, things like that, doesn't

11   seem to us to be the best way economically or for this

12   estate to proceed.  There's no delay, as I said, Your Honor.

13   We're signed on to the scheduling order.  We're ready to

14   proceed all the way.

15        And again, Your Honor, on the flood gates

16   argument, again, I think there's a timeliness issue.  No one

17   has suggested they wanted to intervene in this.  But also --

18        THE COURT: So let me come -- just see if I -- I

19   agree with you.  Timeliness, Fifth Circuit cases, two weeks,

20   three weeks, this is two months in, right, on a well-

21   publicized litigation that's already had, you know, TRO

22   hearings.  So it's, I think, Prong 1 on anyone is an issue

23   and especially under the case law.  So I think you're there.

24        I'm just summarizing your arguments, but I agree

25   with you there on timeliness of --

1            MR. FIOTTO:  Thank you, Your Honor.  And --

2            THE COURT:  And an interest in the property,

3    you're arguing that you believe some of the -- that you may

4    have an interest -- well, you're alleging that you do have

5    an interest in the property and the transactions that took

6    place in connection therewith.  And that you think

7    essentially, that your interest, that the plaintiffs may not

8    be able to adequately represent that interest.  Because your

9    interest is unique, one debtor, I should say, one entity and

10   kind of the determination as to ownership of the cash.

11           MR. FIOTTO:  That's correct, Your Honor.  And

12   three -- if I may end on just three very quick points.

13           THE COURT:  Yeah.  Yeah.

14           MR. FIOTTO:  One is that, Your Honor, in all of

15   the cases in the Fifth Circuit that we have spent time

16   reading and maybe my colleagues will correct me on this, but

17   I suspect they won't.  It is not the case where the

18   intervenor is centrally featured in the complaint.  Usually,

19   an intervener comes out, you know, some citizens group or

20   whatever comes out that's not really mentioned, but here our

21   assets, our title, our name is in the middle of this.

22           And my second point, Your Honor, is just as a

23   sense of fundamental fairness, I mean we are the ones being

24   talked about in this case and both parties have staked the

25   position.  Debtors have staked the position that our title

1   may be questionable as a result of the pilfering.

2   Defendants are going to come at us hammer and tongs, we know

3   that, in this litigation to try to deflect blame.

4           And my last point is, Your Honor, what's the harm?

5   As the Fifth Circuit said, look, our approach is an open

6   intervention policy, and we think that intervenors should be

7   there if it could enhance the justice, it can enhance the

8   ultimate ruling in the case.

9           Onset is two strong arms willing to row with the

10  Debtors.  We don't see why we wouldn't be embraced.  They've

11  got a formidable, well-funded adversary on the other side,

12  and we're prepared to start immediately to adhere to the

13  scheduling order and to proceed.  Unless the court has any

14  questions, Your Honor.

15          THE COURT:  Just tell me your best arguments for -

16  - I went through kind of the mandatory.  Tell me your best

17  argument for permissive.

18          MR. FIOTTO:  Well, permissive, Your Honor, I think

19  that I haven't heard a single party say that we do not have

20  common interests.  We do not have common interests of law,

21  that is to say, were the Onset cash, were the Onset funds

22  pilfered?  Legal issues, was the diversion of funds illegal,

23  fraudulent?  Legal issues regarding to whether fair market

24  value reached the ultimate FBG subsidiary and perfected our

25  title.  So there are common legal issues we think, Your

1    Honor, for intervention.

2         And also, I think the one question that the court

3    thinks, as I read the intervention, the permissive

4    intervention cases, I think the court is most concerned

5    about delay.  And again, I don't think there is going to be

6    delay because we have signed on, willing to go with the

7    scheduling order, and to move forward expeditiously.

8         THE COURT:  Thank you.

9         MR. FIOTTO:  Thank you, Your Honor.

10        MR. NILES-WEED:  Good morning, Your Honor.

11        THE COURT:  Good morning.

12        MR. NILES-WEED:  Robert Niles-Weed from Weil for

13   the Debtors.  I'll start with a bit of housekeeping.  I want

14   to introduce my other colleagues who are with me today, Nili

15   Moghaddam.

16        MS. MOGHADDAM:  Good morning, Your Honor.

17        MR. NILES-WEED:  And Hira Baig, who are on the

18   adversary with me.  And in terms of the run of show, I'm

19   going to go first for the Debtors and then Mr. Friedman, on

20   behalf of the independent director, Ben Duster, with respect

21   to the SPV entities wants to say a few words, and then Ms.

22   Weisgerber for the defendants.

23        THE COURT:  Okay.

24        MR. NILES-WEED:  So I want to begin with a bit of

25   a table setting about what this adversary proceeding is

1    actually about and what it's not about.

2         THE COURT:  Okay.

3         MR. NILES-WEED:  And that will lay the groundwork

4    for the intervention arguments.  This case has a very narrow

5    and focused scope.  We are here to recover hundreds of

6    millions, if not billions of dollars, defendants

7    misappropriated and bring as much money back into the

8    estates as efficiently as possible.  As a state fiduciary,

9    that's our job.  We want to maximize the value of the

10   estates for the benefit of the estates and all of their

11   creditors.

12        Our claims make clear that this is all we're

13   trying to do in this action, no more and no less.  As you

14   mentioned, they're classic claims that belong to the

15   bankruptcy estates, turnover, fraudulent transfer, and the

16   like.  We're trying to restore money that was

17   misappropriated from the estates back to the estates.

18        Importantly, none of the claims we're bringing

19   relate to creditor priority or distribution.  Those issues

20   will be resolved elsewhere in these proceedings, among all

21   parties of interest, probably in connection with the plan

22   process or as you suggested, other adversary proceedings.

23        As the court is aware, it's a complicated case

24   with many creditors, many debtor entities with competing

25   claims to a limited pool of funds.  But none of those

1    disputes are relevant to this adversary proceeding.

2    Everybody, including Onset, and including hundreds of other

3    putative creditors, will have their chance to pursue their

4    claims against whatever we recover.

5         Against that backdrop, it's somewhat

6    straightforward to see why Onset has no good reason to

7    intervene.  We are pursuing the interests of all of the

8    estates and their creditors in a unified way without fear or

9    favor to particular putative creditors in this proceeding.

10   Onset has no interest in that effort, the focus of this

11   proceeding, different from generally maximizing the property

12   of the estate.

13        If that interest were enough for Onset to

14   intervene, we would see a line out the door of potentially

15   hundreds of other interveners at least filing motions

16   seeking to intervene who would want their rights to be

17   similarly adjudicated in this adversary proceeding, or at

18   least who don't want to allow Onset to transform this

19   proceeding in a way that would secure Onset an unfair

20   advantage in future fights.

21        The dispute in this adversary proceeding are

22   binary between defendants who misappropriated estate funds

23   and us who want them back.  What happens to those funds

24   after we get them back, which is where Onset's concerns seem

25   to be, is a problem for another day.

1          And it's notable our table is crowded today.  We

2     and defendants disagree about virtually everything in this

3     case, but not on this.  This is a binary dispute, and to

4     resolve it efficiently and effectively, it is these two

5     parties that should be at the table.

6          Turning to the intervention --

7          THE COURT:  Go ahead.

8          MR. NILES-WEED:  -- standard itself, I want to

9     start with 24(c), which is a procedural requirement, but it

10    has substantive purpose.  24(c) is clear.  It requires

11    interveners to attach a pleading that "sets out the claim

12    for defense for which intervention is sought."  Onset hasn't

13    done that.  If this were something Onset could do, it would

14    have been straightforward.  We put them on notice over a

15    month ago that they didn't have a pleading, and we still

16    haven't seen a pleading.

17         Still today, it's not clear to me, and I think

18    this was Your Honor's question, intervene as to what, what

19    Onset's claims are.  I heard a lot about legal arguments and

20    evidence, not claims, concerns about the way the record is

21    created, wanting a seat at the table, but it's not clear

22    what their claims are as the rule requires.

23         I think the reply, which they filed late Monday

24    night, is revealing.  On some points of the reply, they seem

25    to say they're bringing the same claims and seeking the same

1    relief as us.  You know at Paragraph 27, they say Onset

2    seeks the same relief at Debtors.

3            But then at other times, in the same reply, they

4    say they're bringing different claims and seeking different

5    relief.  At one point, they say their claims align closely

6    with ours, which I read to mean are not the same at

7    Paragraph 31.  And then in the replying again today, there

8    was talk about different remedies, constructive trust with

9    respect to Onset's right to the funds, which is not the

10   remedy we're seeking in this case.

11           Rule 24(c), and its mandatory pleading

12   requirement, is designed precisely to avoid exactly this

13   sort of ambiguity and uncertainty.  It forces them to

14   articulate their claims so that we and the court can

15   understand what they are trying to do here, and we could

16   oppose it appropriately.

17           Onset's inability or unwillingness to articulate

18   their claims, much less step them down in a pleading, feels,

19   to me, indicative that it's somewhat revealing that they

20   perhaps lack standing or know they lack standing to bring

21   those claims.  The claims we're bringing, as you said, are

22   estate claims.

23           Onset may have claims against the estate that they

24   can assert in connection with the plan process, but they

25   don't have standing to bring those claims against third

1    parties who misappropriated funds from the Debtors.  And if

2    they have other claims that don't belong to the estate, we

3    don't know what they are, and we haven't seen them in a

4    pleading.

5         I just want to touch on 1109, which came up in

6    Onset's reply.  At times in the reply, they suggest that

7    1109 provides them withstanding and confers them a right to

8    intervene in the adversary.  And this is straightforward.

9    The Fifth Circuit and the fuel oil supply case made very

10   clear that 1109 does not confer an unconditional right to

11   intervene in adversary proceedings and that Rule 24 sets the

12   standard.

13        And Rule 24 requires a claim, it requires a

14   pleading, and they don't have one.  That alone is reason to

15   deny the motion.  And I'll add a point that was made in the

16   opposition brief by the defendants.  If the court is

17   inclined to potentially allow intervention, even to some

18   degree, we would ask that the court require them to comply

19   with the rule and submit a pleading, and we'll reserve all

20   rights to address that pleading as necessary if and when we

21   get there.

22        THE COURT:  And the issue with 1109, I'll lay it

23   out there, and then -- that they're not relying heavy on it,

24   but I know they threw it out there, is it just says you have

25   a right to be heard, right?  It doesn't mean participate in

1    any manner.  And theoretically, that would mean, right, that

2    just any general unsecured creditor could show up in this

3    adversary and be heard on an issue, right?

4          And so you kind of get into the specific rules.

5    When you have an adversary proceeding, you proceed under the

6    applicable rules and contested matters and general matters.

7    So if there's a fee application, folks can be heard, right?

8    That's 1109.  It's in the main case.  If you have an

9    adversary proceeding, then the federal rules of that -- you

10   know then the 7001 Rules kind of kick in, and you

11   participate in that.

12         So I think they're not heavily relying on it, but

13   I do understand.  It just gives you standing to be heard,

14   right?  To make a point, people can address the court.  It's

15   access to the court.  You're an unsecured creditor.  You

16   want to be heard on an issue in the case.  I agree with the

17   cases that say that this does not confer.

18         You know and there's a difference between being

19   heard and participating.  It's just that -- but there's a

20   reason that the specific rule plays into it here.  But I

21   agree with that, but.

22         MR. NILES-WEED:  I think that's exactly right,

23   Your Honor, and aligns with what the Fifth Circuit said in

24   fuel oil.  And the rule itself says case.

25         THE COURT:  That's comforting.

 1             MR. NILES-WEED:  Got it.  It's always nice when

 2     binding precedent is also right.  So maybe I'll move on to

 3     the substance having hit the 24(c) issue.

 4             And so Rule 24 sort of has two paths to

 5     intervention.  There's mandatory and permissive.  But

 6     together, they're setting up a system that allow parties

 7     whose rights will be materially affected by the disposition

 8     of a case and who are standing to bring or defend a lawsuit

 9     in their own right to intervene.

10             For mandatory intervention, they have to show an

11     interest in the property or transaction of the action that

12     is so situated that disposing of the action is a practical

13     matter and impair or impede their interest unless there's

14     adequate representation.

15             And on the permissive side, again, that rule, that

16     portion of the rule says they have to have a claim or

17     defense that shares with the main action a common question

18     or a lot of fact.  And then the permissive intervention

19     standard is entirely discretionary, and it can be denied if

20     there's prejudice or delay.

21             So on the mandatory side, with respect to Onset's

22     interest, my friend on the other side quoted the language

23     about requiring an interest that is germane to the case.

24     And I think that's exactly the problem with their motion,

25     which is they articulate a number of wide-ranging interests

1    in the status of collateral with respect to the Carnaby

2    Debtors.

3              Those may be interests that will be argued about

4    elsewhere.  But again, those are not interests that will be

5    directly affected by this case.  Again, we're not asking the

6    court to adjudicate any rights of creditors to proceeds we

7    recover in this action.  We're not seeking a determination

8    of how the proceeds will be distributed.  Those

9    determinations will happen elsewhere.

10             Onset focuses extensively on the fact that it's

11   the sole -- or claims to be the sole creditor of the Carnaby

12   debtor entities and the victim of the defendant's

13   misconduct.  Those facts, if true, and if proven, may

14   ultimately be relevant to ultimate allocation disputes among

15   the few of creditors.

16             They're not going to be resolved in this

17   proceeding where the question here is what happened to the

18   money when it left the estates and was misappropriated by

19   the Debtors.  We will prove that misappropriation was

20   improper and that the fund should be restored to the estates

21   for the benefit of the estates and all of their creditors.

22             Onset's main concern seems to be that the factual

23   record in this case will somehow develop in a way that harms

24   them later.  Rule 24 doesn't allow concerns about the

25   development of the factual record to justify intervention,

1    and those speculative concerns can be addressed later if and

2    when necessary, when the record that they are concerned

3    about developing becomes relevant to interest they are

4    asserting in other parts of this bankruptcy case.

5           They also speak a lot about how they're mentioned

6    in their complaint.  But I'd point the court to Paragraph 72

7    of the complaint, where we use the word illustrative to

8    describe how we are using Onset in the complaint.  Again,

9    the fact that they are featured in the complaint does not

10   satisfy the Rule 24 standard.

11          Just a bit on adequate representation, the other

12   side of the mandatory intervention calculus.  Again,

13   interests have to diverge in a way that is germane to the

14   case.  So while they may have other interests that diverge

15   from us on other issues, with respect to the goal of this

16   adversary proceeding to recover from defendants as much as

17   possible, our interests are exactly aligned.

18          And they say that.  They say Onset and First

19   Brands, and this is at 55 of their motion, have aligned

20   interests in pursuing claims against Mr. James and the other

21   defendants seeking recovery of funds misappropriated through

22   deceit.

23          In his presentation, my friend on the other side

24   cited a number of cases purporting to show the nature of

25   divergent interest.  But I think a close look at those cases

1    actually undermines their position.  So if you take the

2    Sierra Club case, I think this is a good example.

3            In that case, the Fifth Circuit found that there

4    was adversity of interest allowing intervention where you

5    had the party, who was the Forest Service, who agreed to an

6    injunction to stop selling lumber.  And you had lumber

7    companies who wanted to intervene in that action after the

8    Forest Service agreed to stop selling timber to advocate for

9    them to continue allowing the sale of timber.

10           That is a direct adversity of interest with

11   respect to the matter in dispute and germane to the case

12   that would be decided by the court, and then intervention

13   may be allowed.

14           Again, what we have here, which appear to be

15   concerns, speculative concerns about the development of a

16   future factual record, it's just not the sort of direct

17   adversity that undermines adequate representation.

18           And the rest of the cases are similar.  The

19   American Traffic Solutions case, the court mentioned that

20   the intervener's interest was unique because the main party

21   might be inclined to preserve an adverse ruling in the case.

22   Again, it would have been directly adverse to the interest

23   of the would-be interveners.

24           And in this court's DRF bench ruling, as I read

25   it, the guarantor there was concerned because the court, in

1    the proceeding, was going to determine the true nature of a

2    guarantee.  There's a possibility of recharacterization, and

3    that directly impacted the rights of the guarantor.

4          So again, the concerns that are finding inadequate

5    representation are ones where the subject of the action, the

6    claims to be decided are directly adverse as between the

7    parties.  That's just not the case here.  The claims that

8    are going to be decided are whether or not the

9    misappropriated funds will come back into the estates for

10   the benefit of whoever has legitimate entitlement to those

11   claims, which will be determined elsewhere.

12         THE COURT:  And if the money comes back into the

13   estate, am I making a determination of the ownership?

14         MR. NILES-WEED:  No.  Ultimately, of course, there

15   may be -- there will be competing claims to that, those

16   funds, and that will probably happen in connection with the

17   plan process or other proceedings in this case.  But for the

18   purposes of this proceeding, all the court -- all we're

19   asking the court to order is the funds to be returned to the

20   Debtors' states as a whole.

21         THE COURT:  Okay.

22         MR. NILES-WEED:  All right.  And then just a few

23   words about permissive intervention.

24         THE COURT:  Yes.  Your best argument on permissive

25   or against permissive, I should say.

```
 1              MR. NILES-WEED:  Yes.  And then I'll turn it over.
 2     I've been going on for a bit, apologies.  So on the
 3     permissive side, here too, they fail at the threshold.  The
 4     rule itself requires a claim or defense that shares a common
 5     question of law or fact with the original case.  So it's not
 6     just abstract questions of law and fact in which both
 7     parties may be interested.  They actually have to have a
 8     claim that they are trying to bring in this proceeding that
 9     is overlapping with ours.  And again, for all the reasons I
10     mentioned earlier, they fail right at the threshold there.
11              And then with respect to delay and prejudice, I
12     wish it were the case that having another party asking
13     questions at every deposition and participating in document
14     discovery, filing briefs, arguing a trial presumably
15     wouldn't delay or prejudice us, but I think that's just not
16     realistic.  I think we're here, at sword points already, and
17     that has characterized our relationship throughout this
18     proceeding so far, and I don't expect that intervention
19     would change that.
20              It would increase costs.  It could risk delay.  It
21     will complicate discovery and motion practice, multiply
22     filings.  And turn what should be a very focused proceeding
23     into a much broader and more complicated dispute about how
24     proceeds should be distributed among the Debtors' creditors.
25              And worse still, if Onset is allowed to bring
```

 1    those issues into this case, which don't belong here, we can

 2    expect that a bunch of other creditors who have different

 3    views from Onset about their entitlement to the proceeds

 4    will also want to show up and be heard in some form.  And

 5    you know at best, there will be a lot of intervention

 6    motions.

 7            At worst, what Onset wants is to turn this

 8    adversary proceeding and have it subsume the entire

 9    bankruptcy case.  But the court -- the code has a process

10    for the bankruptcy case.  That's the plan process.  That's

11    not what this adversary proceeding is for.

12            So the court should deny the motion, allow us to

13    vigorously and efficiently prosecute this action to recover

14    the hundreds of millions or billions of dollars defendants

15    misappropriated for the benefit of the estates and all of

16    the putative creditors, including but far, far from limited

17    to Onset.

18            THE COURT:  Thank you.

19            MR. NILES-WEED:  And unless the Court has any

20    further questions, I'll turn it over.

21            THE COURT:  No questions.  Thank you.

22            MR. FRIEDMAN:  Good morning, Your Honor.

23            THE COURT:  Good morning.

24            MR. FRIEDMAN:  Bryce Friedman, Simpson Thacher &

25    Bartlett.  I'm relatively new to this proceeding, so I --

1          THE COURT:  I just want to say welcome.

2          MR. FRIEDMAN:  Thank you.  I wanted to take a

3     moment now to introduce myself, and more importantly, my

4     client, and offer a few points of information to the court

5     that may be relatively new to the court and may help the

6     court evaluate the motion to intervene and how to exercise

7     its discretion.

8          In particular, I think it's important that the

9     presence of our client addresses Onset's articulated concern

10    that the interests of Onset's borrowers, the so called SPV

11    entities, won't be protected appropriately in this case

12    going forward.

13         My client is Benjamin Duster as the independent

14    manager of Viceroy Private Capital, which is the controlling

15    equity holder of the various SPV entities, the entities that

16    everybody has been calling the SPV entities.  He was

17    appointed on December 5, 2025.

18         His primary responsibility is to deal with any

19    conflict matters that may arise between the SPV entities

20    that have been alleged and the FBG entities in this case.

21    He has responsibility for any transaction agreement or

22    arrangement in which a conflict exists or is reasonably

23    likely to exist between the Viceroy SPV entities and an FBG

24    entity.

25         He's a 30-year veteran of Wall Street.  He works

1    in the restructuring and reorganization industry.  He served

2    as an independent director in the Expand Energy Group case,

3    which was Chesapeake Energy, in the Weatherford

4    International case, in the Republic First Bancorp case.

5    Those were all public company cases.

6            He was retained again at the beginning of

7    December.  And over the last month, he's retained my firm,

8    Simpson Thacher, as proposed counsel.  There's a January

9    26th objection deadline to our retention.  He's conducted

10   meetings with each of the SPV lenders and their

11   professionals.  He's requested -- including Onset.

12           He's requested documents from the Debtors and the

13   SPV lenders.  And to the extent we've received them, we're

14   looking at them.  He's reviewing and analyzing the already

15   extensive litigation record in this case.  And he's

16   requested evaluations of the value and ownership, or I

17   should say alleged value and alleged ownership of all the

18   assets, in dispute in this case.

19           With respect to Onset's intervention motion before

20   the court, there's no conflict at this time between the SPV

21   entities and the meaning the Onset borrowers and the FBG

22   entities.  We're aligned.  But the relief sought in the

23   complaint on behalf of all the Debtors includes relief

24   sought on behalf of the SPV entities, including the Onset

25   borrowers.

1            And I think this goes to the question you just

2    asked.  Any question of allocation of any money that is

3    received will be dealt with later after the litigation

4    reserved, and Mr. Duster will vigorously represent the

5    interests of the SPV entities and make sure that they

6    receive their fair share.

7            Going forward, we will assure that Mr. Duster is

8    vigilant in protecting SPV entities' rights and positions in

9    this very adversary proceeding litigation that Onset is

10   asking to intervene in.  And Mr. Duster may involve himself

11   in discovery and hearings and other matters.  It will

12   certainly involve continued and ongoing coordination with

13   Weil in representing the SPV entities in the adversary

14   proceedings.

15           For example, the complaint was filed before Mr.

16   Duster was appointed and Mr. Duster is going through all the

17   allegations in the complaint, looking at the backup,

18   evaluating those, and engaging with Weil where we think

19   there may be -- need to be new or additional or less or

20   other information or allegations made.

21           I want to flag something that Onset's counsel

22   said.  He said he wants to show that the money at issue in

23   this case belongs to him, Onset.  That's incorrect.  With

24   respect to the SPV entities, that money belongs to us, not

25   Onset.  And to the extent Onset is entitled to it, that will

1    be dealt with separately.

2            I submit that Mr. Duster is uniquely and properly

3    situated to do this job as an independent fiduciary for the

4    SPV entities, and I believe that should also inform the

5    court's decision and exercise of his discretion in this

6    case.

7            I do want to conclude with something very

8    important, and again, Your Honor hit on it as well.  I'm a

9    little concerned that the Onset Intervention Motion is a

10   disguised effort to assert the SPV entities as state causes

11   of action.  And there are a number of places in the reply

12   that suggest that might be what's going on.

13           And again, I flagged that Onset counsel said to

14   Your Honor, they're looking at -- I think he said earlier,

15   the funding belongs to Onset.  And again, I don't think

16   that's true.  The funding belongs to the SPV entered

17   entities.

18           So I think Mr. Duster clearly objects to the

19   usurpation of any of the SPV entities that state causes of

20   actions by Onset, and any order should be crystal clear in

21   Mr. Duster's view that those estate causes of action belong

22   to the SPV entities themselves.

23           So with that, I thank you, and I look forward to

24   working with the parties in interest in moving this case

25   forward.

```
 1              THE COURT:  And if I were to summarize your

 2    argument, one of the points that you're making is that if

 3    money is recovered, and again, if - I want to just be really

 4    clear, that money would come back to an entity and not go

 5    directly to an Onset or --

 6              MR. FRIEDMAN:  That's correct.

 7              THE COURT:  That's your argument, right?  And so

 8    there could be cause of actions that could be asserted, but

 9    you think that they would be derivative of the cause of

10    action that you all may or may not assert?

11              MR. FRIEDMAN:  As the complaint is currently

12    constructed, that is true, Your Honor.  Those are our causes

13    of action.

14              THE COURT:  Understood.  Okay.

15              MR. FRIEDMAN:  Thank you, Your Honor.

16              THE COURT:  I'm not saying I agree or disagree

17    with anyone.  I'm just making sure that before the folks

18    leave the podium that I've at least understood the argument.

19              MS. WEISGERBER:  Good morning, Your Honor.  Erica

20    Weisgerber of Debevoise on behalf of the defendants.  As Mr.

21    Niles -- we've pointed out, we very rarely agree on anything

22    and we, obviously on behalf of my clients, I vigorously

23    dispute the allegations that are being litigated in this

24    adversary proceeding.

25              But what we are in violent agreement on is that
```

1    Onset does not belong in this case.  And I want to start

2    with a critical point for context here.  Onset took 30 days

3    to file its reply in support of intervention.  By my count,

4    that was 23 days after the deadline.

5          But putting that aside, what's particularly

6    important here, Your Honor, is that notwithstanding the fact

7    that both the Debtors and defendants raised Onset's failure

8    to attach a pleading to its motion to intervene, on December

9    5th, as of January 7th, we're standing here without a

10   pleading.  Well, why not?

11         Well, by not filing a pleading, Onset can shift

12   its arguments in whatever manner benefits it when discussing

13   the elements of intervention.  And I'll provide some

14   examples.

15         First, Onset, at times, argues that it's merely

16   seeking the same relief from the claims as the Debtors in

17   this action.  But at other times, it argues it's seeking

18   unique relief and to assert its own claims.  Therefore, it

19   can shift its arguments as to standing by saying, for

20   example, as counsel did this morning, it doesn't need to

21   establish its own standing because "it seeks to pursue the

22   same relief as the party invoking the court's jurisdiction,"

23   here, the Debtors.

24         But there are several impediments to Onset

25   asserting those claims, and I think the court pointed out

1   some of those, and Mr. Niles-Weed covered those at length,

2   so I won't dwell on them.

3          But for similar reasons, Onset lacks

4   constitutional standing, which requires Onset to articulate,

5   among other things, how its injury would be redressed by a

6   favorable decision.  In his intervention motion, Onset

7   explains that its interest is "Any subsequent allocation of

8   recoveries among the various Debtors and their related

9   entities."

10          And as we're hearing this morning, that interest

11   cannot and will not be redressed by adjudication of the

12   Debtors' claims because allocation of any recoveries by the

13   Debtors would be addressed separately.

14          So then perhaps recognizing that it might be

15   called out on the fact that it's not seeking the same relief

16   as the Debtors, Onset says it can demonstrate its own

17   standing because it might have unique remedies and claims

18   that the Debtors may not.

19          So Onset is telling us both it doesn't need its

20   own standing, but actually, simultaneously still telling us

21   I have standing over my own claims with my own unique

22   remedies.  But because there's no pleading, once again,

23   we're left wondering what exactly are Onset's unique claims?

24   Who are those claims against?  Are Onset's claims against

25   the Debtors relating to Onset's ownership rights?  Are they

1    about the Carnaby Debtors' ownership rights?  Are they

2    claims against my clients?

3            Or are they claims against other personnel at

4    First Brands who Onset spends much of its time in its

5    pleadings discussing other individuals who it purports are

6    maybe the John Doe dependents in this case?  But we don't

7    know.  Onset's motion doesn't make any of this clear.  By

8    avoiding a pleading identifying its actual claims, Onset

9    avoids having to articulate its actual interests and

10   motivations.

11           Next, Onset shifts its articulation of which

12   protectable property interests it has at stake here.  It

13   repeatedly says its injury is that its money was diverted.

14   It also says a favorable decision will redress its industry

15   -- its injury by determining where the funds are returned.

16           But again, this relates to that interest about its

17   subsequent allocation of recoveries.  And the case law makes

18   clear, Your Honor, you have to look at what relief is

19   actually being sought.  The Debtors' claims here don't seek

20   to adjudicate whether -- where specific funds are being

21   returned.  And to the contrary the Debtors are telling us if

22   they succeed, which is disputed hotly, those issues will be

23   adjudicated separately.

24           Now, despite repeatedly articulating its interest

25   in its money that it invested, when we get to Page 15 of

1    Onset's reply papers, Onset seemingly recognizes that an

2    economic interest might sufficient for Prudential's standing

3    here based on the way that it invested this money, and it

4    claims that for purposes of Section 1109(d), its property

5    interest relates to the collateral that it claims was

6    committed in connection with its transaction.

7            But the Debtors' claims aren't focused on recovery

8    of ownership, or ownership of equipment and inventory.

9    There's no allegation that Mr. James pilfered equipment or

10   inventory from the company.

11           And similarly, contrary to Onset's arguments, the

12   Debtors aren't focused on whether Onset was the only

13   creditor of the Carnaby Debtors or whether Onset had a

14   valuable valid or enforceable financing arrangement with the

15   Debtors.

16           So for these reasons, Onset can't meet the

17   standard for mandatory intervention to show how the claims

18   in this case will impair or impede its ability to protect

19   its interests.  While Onset's belatedly filed reply brief

20   cites several new cases that a claim supports its position,

21   it's very important because they're all distinguishable for

22   one critical reason.

23           Those cases all allowed interveners to intervene

24   where their interests were going to be directly affected by

25   the adjudication of the specific claims in the litigation

1     that were already -- that was already pending.  It wasn't

2     about influencing the record in that underlying litigation.

3            Mr. Niles-Weed touched on a couple of these cases,

4     but for example, in Brumfield v. Dodd, the claim at issue

5     could directly affect the proposed interveners because the

6     issue was a potential injunction to pause a voucher program

7     that benefited the proposed intervener's children.  That was

8     what was being adjudicated, whether or not the voucher

9     program was permissible.

10           In La Union, the issue was permissibility of

11    amendments to the Texas Election Code, which amendments

12    directly the interveners' interests as committees that

13    trained poll watchers under those elections that were going

14    to be affected by the election code.

15           In Turbovic v. United Mine Workers, the court

16    allowed intervention where the primary plaintiff, was

17    litigating the specific claims first raised by the proposed

18    intervener relating to the election of officers in the

19    intervener's union.

20           In DRF, there was a right to intervene because the

21    issue in the litigation was determining the nature of a

22    financing arrangement for which the intervener was a

23    guarantor.  You could see how these interveners were

24    directly affected by the specific ruling of the claims in

25    that case.

1          Similarly, in the Texas case that Onset have

2     brought up today, the issue was whether a deferred action

3     immigration program should be invalidated, and the proposed

4     interveners were immigrants who might lose their opportunity

5     to obtain status under that program that might be

6     invalidated.

7          But here, as far as the claims that are actually

8     being asserted in the adversary proceeding, you heard Onset

9     this morning say they fully support the Debtors in

10    succeeding on the merits of their claims.  They do not have

11    a different interest with respect to the claims that are

12    actually avert -- being asserted here.

13         So turning then to permissive intervention,

14    because I think all of those facts really explain why

15    mandatory intervention is not necessary.  On common issues

16    of law or fact, again, we don't have a pleading here.  It's

17    not clear to me how Onset has claims against the defendants

18    in this case as a legal matter or a factual matter, frankly,

19    Your Honor.  We don't go pleading articulating what those

20    claims are.

21         We do have a filing saying that Onset primarily

22    interacted with an entirely different person at First Brands

23    other than my client.  And I don't know if there are common

24    issues of law or fact there because, again, we don't have a

25    pleading.

1          As far as the question of whether there would be

2     undue delay or prejudice, we believe the answer is

3     unequivocally yes, it would cause both.  Onset's

4     intervention motion makes -- does make clear that it will

5     massively expand the issues in this case by whatever claims

6     perhaps it may be asserting and by the relevant facts that

7     it thinks needs to be explored.

8          It also appears to me that they might add new

9     parties, new defendants to the action that will certainly

10    expand the discovery record, the facts, and cause delay.  So

11    I join in the other arguments made by Debtors counsel on

12    this issue.

13         As far as delay, we also don't have a pleading

14    crystallizing what alleged claims Onset has.  We just have

15    Onset's say so that it will be efficient to the extent its

16    interests align with the Debtors, while Onset, of course, is

17    simultaneously arguing repeatedly in its pleadings that its

18    interests do not align with the Debtors.

19         So for those reasons, and the ones in our papers,

20    we believe the motion to intervene should be denied.

21         THE COURT:  Thank you.  Let me just see if anyone

22    -- I think those were the three.  I'll certainly give you an

23    opportunity to respond.  Thank you.

24         MR. FIOTTO:  Thank you, Your Honor.  I'll be very,

25    very brief.  I really didn't touch on 24(c), because

```
 1   frankly, the law in the Fifth Circuit is very clear.  There
 2   is no obligation for a pleading, provided that the party
 3   seeking intervention provides notice.  And we cite the
 4   Diotto case, Fifth Circuit 2021, Liberty Surplus.  It says
 5   this loud and clear.
 6          And we have surpassed, as we demonstrated I think
 7   in the reply brief, all of the requirements of providing
 8   that notice.  Motion at Paragraph 55, we bring claims
 9   "against defendants and recover against James and affiliates
10   funds misappropriated through deceit."  Forty-vie, our
11   remedies include, and we list our remedies.  There's no lack
12   of clarity about what we want to do in these proceedings.
13          THE COURT:  I don't necessarily agree with that.
14   Because I had to ask you what you wanted to intervene on.  I
15   understand you put parties.  I think there's an argument
16   that maybe you put -- I need to think about that a little
17   bit more.  I'm going be honest with you.  I'm going give you
18   an opportunity to explain it to me.  I could not read, as
19   what you were asking for, what you were looking for in
20   connection with this adversary proceeding.
21          I could not understand whether you were seeking to
22   establish to step into a fraudulent transfer action and it's
23   kind of sign of seek derivative standing to pursue cause of
24   -- in other words, I'm asking these questions because I
25   couldn't tell from the pleading.  I got it.  The Fifth
```

1    Circuit says it's not -- and this case is out there.  Judge

2    Rosenthal said it's not fatal, right?

3           But it doesn't mean that we just overlook it.  And

4    this one's a little different than those other cases

5    because, right, in those instances, what you told me was you

6    were thinking about trying to almost step into a lawsuit

7    that could only be brought by the estate, right, 542, 548?

8    And there, there's usually standards for when you can kind

9    of step into those.

10          And so I was trying to find the angle that you all

11   were trying to pursue, and I couldn't read it in the

12   pleadings.  And that's why I needed to understand it.  And

13   that's why I'm asking for clarity as to exactly what you're

14   seeking to intervene in connection with.  Like what does a

15   complaint look like?

16          MR. FIOTTO:  A complaint would look like, Your

17   Honor, us asserting that the defendants diverted hundreds of

18   millions of dollars of state funds that also included Onset

19   funds.  And we would proceed to seek that through equitable

20   remedies, constructive trust, accountings, things like that,

21   directly against the defendants.  That's what we would be

22   seeking.  And I think we made that clear, and we point out

23   in our reply the various paragraphs.  We said it, I believe,

24   repeatedly.

25          And the notice standards under Liberty Surplus,

1    for example, as an example.  Liberty Surplus, the intervenor

2    did there was say, we think we've got a serious interest

3    here, and our interests are not satisfied adequately by the

4    proposed party or the existing party, and we intend to adopt

5    some of the legal theories presented in the original

6    complaint.

7            THE COURT:  So here's a question for you.  In the

8    case Judge Rosenthal in Liberty Surplus ends by saying, in

9    the present case, the motion to intervene that Jacobs filed

10   does put the parties on notice of his grounds for

11   intervention.  The motion is timely filed.  The motion is

12   filed.  Liberty Insurance does not contend that it would be

13   prejudiced by the intervention.  How do I read that in

14   connection with 24(c)?

15           MR. FIOTTO:  You're suggesting, Your Honor, that

16   the other side --

17           THE COURT:  But you can't just --

18           MR. FIOTTO:  -- didn't say it was prejudice.

19           THE COURT:  -- flaunt and just not put it -- did

20   you really put parties on notice?  Because they're alleging

21   that -- I mean they are alleging prejudice.  You had three

22   different folks kind of step up there.  So what's the answer

23   to the noncompliance with 24?  I got it in terms of the

24   putting on the notice because they're saying they are

25   prejudiced because they don't know what you would allege in

1    the complaint.

2          MR. FIOTTO:  But I'm not sure I follow that lack

3    of knowledge.  It's quite clear to -- it seems quite clear

4    to me that since we are featured in the complaint, and that

5    most of the money or many hundreds of millions of dollars of

6    the diverted funds were taken from Onset.

7          THE COURT:  I get the argument you're --

8          MR. FIOTTO:  We're seeking back --

9          THE COURT:  -- saying, yeah, I am named -- your

10   client is named in the complaint.  Part of establishing the

11   record is establishing what happened to your client

12   according to the complaint.

13         MR. FIOTTO:  That's correct, Your Honor.  That's

14   correct.  And that's why we think -- that's why the language

15   may as a practical matter be impaired is very, very

16   different from cannot intervene unless collateral estoppel

17   or res judicata impacts it.

18         Our ability, Your Honor -- and this court, make no

19   mistake, the adversary proceeding, whether anybody

20   stipulates or whether anybody agrees that there will be no

21   absolute preclusive effect down the road, the Court is going

22   to make findings of fact and conclusions of law after this

23   trial in June.  And those findings of fact are going to make

24   statements presumably based upon the record that was

25   established by the existing parties.

```
1            And without us, without Onset contributing the
2    distinct evidence and distinct legal arguments that the
3    Fifth Circuit has recognized as divergent, we will be left
4    to having to accept those or chisel away at them impossibly,
5    I submit, sometime down the road.
6            Now, the other thing I just want to point out, if
7    I may, Your Honor, unless you have another question on
8    24(c).
9            THE COURT:  No.  No, no other questions.  I'm just
10   making sure I'm flushing all the issues out.
11           MR. FIOTTO:  Is that -- you know we're very happy
12   about the independent director who did not submit any papers
13   and objection or anything like that.  But I think the fact
14   that the independent director stood up here and said, I'm
15   here to protect, and I'm going to be looking, we have two
16   issues with that, although we are very grateful for the
17   existence of the independent director and we look forward to
18   working with the independent director.
19           The two issues I have, Your Honor, is that, to me,
20   it just highlights the conflict.  It highlights the conflict
21   here and the lack and divergence of motivations between what
22   the debtor is doing and what is going -- what Onset would
23   like to do.  That's Point 1.
24           Point 2 is that why is it that instead of Onset
25   protecting its rights, who has obviously the singular
```

1    economic motivation to do that, the independent director

2    would somehow be able to intervene or participate or be

3    involved in protecting Onset's rights or the SPV rights,

4    I'll be more general and that was to be fair to the

5    independent director, I believe that's what he was saying.

6              So think, Your Honor, there's actually -- and the

7    third point I want to make about that is litigation that's

8    going on right now, and it's a firestorm of litigation,

9    right?  You know they've got four months to trial.  I'm sure

10   it's going to be a knife fight in a phone booth.  That's

11   what I would imagine that case is going to be like.

12             But in connection with that, Your Honor, the need

13   for Onset to be involved in shaping that record, and to have

14   the motivation to be involved in dealing with the issues

15   that they are going to be talking about concerning Onset, is

16   critical.

17             Now, I may have misunderstood, but when I heard my

18   colleague, I believe the first gentleman who stood up and

19   pointed to the table and said, we are already at sword

20   points, I heard him to say that he, in fact, and Onset are

21   at sword points and perhaps I misunderstood.  Perhaps he was

22   speaking of another committee, but I thought what my

23   colleague said is that, in fact, we are already at sword

24   points, and Onset that is, and the Debtors.

25             And then I heard defendants say that we are at

1    sword points with them as well.  And so we are now -- I mean

2    I see my client.  I have this image of my client gagged and

3    tied to a chair in the middle of a boxing ring.  And both

4    parties are talking about Onset's rights throughout.

5           We're not talking, Your Honor, about trying to go

6    in on a conflict and trying to fight with the Debtors at

7    this point.  As I said, we're going in there really to

8    protect our rights, to row in the same way, in the same

9    direction that the debtor is rowing and proceed on that

10   point.

11          And lastly, I just want to point out, there seems

12   to be a conflation of when the question was asked, where are

13   you bringing the money back to?  And then I heard the

14   estate.  Well, isn't an acknowledgment that there are really

15   two parts of this estate.  There's the Viceroy side and then

16   there's the FBG side.

17          So it's a little hard for me to understand how

18   just saying, well, it's going back to the estate answers the

19   question that our interests, which are solely devoted to the

20   SPV side, totally devoted to two feature Carnaby SPVs are

21   going to be protected.  Thank you, Your Honor.

22          THE COURT:  Thank you very much.  I'm going to

23   just take the matter under advisement.  I think I can give

24   you an answer by Friday.  I just want to take a look at some

25   cases.  So parties who in this matter, if you could -- as a

1    matter of fact, by tomorrow, early afternoon, I'll let you

2    know if I am -- if I can give you an answer.

3            And if I can give you an answer, just want to go

4    back and look at some cases.  I can give you an answer on

5    Friday morning, I'll do it.  Parties can dial in, and I'll

6    just rule on this issue.  If not, by no later than the 13th,

7    you'll have the answer on this.  But I think I can give you

8    an answer by Friday.  But I want to give myself a little bit

9    of flexibility.  But if I do, I'll let you know so that it's

10   no surprise as to what I'll do on Friday.  Okay.  Where do

11   we go next?

12           Maybe I should ask.  Do folks want a five-minute

13   break or?

14           MR. TECCE:  Yes, Your Honor.

15           THE COURT:  Okay.  How much time do you think you

16   need?

17           MR. TECCE:  Your Honor, I rise because I -- we

18   filed a motion to quash.  My argument is quite short

19   actually.  It's not very involved, so.

20           THE COURT:  Okay.  Let's see.  All right.  Let's

21   just take five to seven minutes, somewhere around there, and

22   then we'll get started.  Thank you.

23               (Off the record.)

24           CLERK:  All rise.

25           THE COURT:  Please be seated.  All right.  We are

```
 1   back on the record in First Brands.  Why don't we make --
 2   let me just make sure I got my docket numbers right.
 3                MR. TECCE:  Your Honor?
 4                THE COURT:  Yes.
 5                MR. TECCE:  There are three quash motions, one
 6   from myself on behalf of Mr. James, one from Onset, and one
 7   from Mr. Crighton.  And we discussed, if it's okay with you,
 8   we would argue the three of them together, and then the
 9   committee would respond at once unless you'd prefer to do
10   them seriatim.
11                MR. FIOTTO:  That's fine with us, Your Honor, for
12   the committee.
13                THE COURT:  That works for me.
14                MR. TECCE:  Is that okay?
15                THE COURT:  That works for me.  Yep.  But I want
16   to take up insurance first.
17                MR. TECCE:  Okay.  That's fine.  I just was next
18   on the agenda.
19                THE COURT:  Yeah.
20                MR. TECCE:  But that's fine.
21                THE COURT:  No.  No.  No.  No.  Oh, got it.  No.
22   No.  Let's --
23                MR. TECCE:  If you want to take up insurance,
24   we'll take up insurance.  That's --
25                THE COURT:  No.  Let me think about this.  No.  It
```

 1    makes more sense to take this one up.  You're right.  I

 2    think it makes more sense to just follow the order and let's

 3    take up the quash.

 4         MR. TECCE:  Your Honor, you know I'll speak very

 5    quickly and get through this very quickly.  I don't have

 6    much to add beyond what's on our papers, but I just want to

 7    respond to a couple of the arguments that came in and just

 8    to highlight a couple of points.

 9         So again, for the record, my name is James Tecce.

10    I'm here on behalf of Mr. James and the related entities.

11    We filed a motion to quash the subpoenas at ECF 914.  We

12    have a reply at 1034.  The committee objected at ECF 938.

13         And, Your Honor, I respectfully submit that there

14    is no legal justification for the committee to pursue Rule

15    2004, discovery of Mr. James, and the related entities.

16    Because Rule 2004 affirmatively does not apply given the

17    existence of an ongoing adversary proceeding against our

18    clients, even if it's only a subset of the entities that

19    have been subpoenaed.

20         And separately, but equally compellingly, rule

21    2004 discovery should not be available given the examiner's

22    forthcoming investigation of the very same topics.  And so

23    that means that the discovery that's been proposed promises

24    duplication, and not much more at this point.

25         And so as you're well aware, Your Honor, on the

1   3rd of November, the Debtors initiated an adversary

2   proceeding against Mr. James and four related entities at

3   ECF -- or at Adversary 25-03803.  And that adversary alone

4   has several obstacles to the Rule 2004.

5         First, Your Honor, the purpose of Rule 2004 has

6   been spent.  And this is not a pending proceeding rule

7   argument.  This is before we get to pending proceeding rule.

8   This is first principles of Rule 2004.  If you examine the

9   case law, it's pretty clear, that the complaint is a pre-

10   complaint discovery tool that exists to identify estate

11   assets and litigation targets.  It's to obtain preliminary

12   information.  It's to determine whether or not litigation

13   should be filed.  That's the purpose of the rule.  and that

14   set forth in the cases that we cite.

15         And at this point, Your Honor, the Debtors have

16   identified what they believe are estate assets.  They've

17   identified the litigation targets, which would include our

18   client and entities that are named in that suit.  And so the

19   purpose of rule 2004 has passed.

20         Section 1103 of the code doesn't help the

21   committee here either.  That is something that authorizes

22   them to look into the location of estate assets, supposedly

23   concealed assets, assets of the debtor.

24         But again, the committee doesn't get 1103 given

25   the filing of the adversarial proceeding as it relates to

1    Mr. James.  Mr. James and the related entities take issue

2    with the legal sufficiency of that complaint, but it does

3    cover a significant amount of real estate, including

4    purported transfers among the Debtors in those entities,

5    factoring arrangements and supposed issues involving special

6    purpose financing lenders, or SPV lenders rather.  So 1103

7    doesn't help the committee either.

8             So another basic Rule 2004 tenant, before we even

9    get to pending proceeding rule, is that Rule 2004 discovery

10   cannot be duplicative of other discovery.  And here, the

11   committee is pretty transparent.  They basically would like

12   to shadow the Debtors.  They want to bring the same

13   avoidance claims that the Debtors do.  They would be estate

14   claims that they get by derivative standing, and their

15   discovery duplicates that of the Debtors.

16            And to that end, Your Honor, I would just refer

17   to, and I have copies of these documents, if you want them,

18   ECF 1034-1, which is the Debtors' very broad discovery

19   requests of our clients in the adversary proceeding, and ECF

20   A 21-1, which is just one of the subpoenas that the

21   creditors' committee has propounded.

22            And if you compare the two documents, you'll see

23   that there's just a significant overlap in the topics.  They

24   both want to take discovery about management materials,

25   about acquisitions, investments, transfers, sales,

1   disposition, planning of collateral, any account, asset

2   liability, any and all holdings, investments, transfers from

3   January 21, 2018 to present, documents concerning assets,

4   liabilities, and bank accounts, documents concerning special

5   purpose vehicles, documents concerning invoice factoring,

6   transactions, and practices.

7        Both of those at ECF 1034-1 and ECF A 21-1,

8   they're both looking for the same materials, Your Honor.

9   That's a high-level analysis.  I think if you drill down on

10  that, you see that there's a lot of overlap.

11       The committee insists that its requests are

12  different because they focus on SPV lenders.  But again, the

13  Debtors' complaint asserts claims relating to those

14  financing arrangements, its off-balance sheet financing

15  arrangements.  And the Debtors' discovery requests are

16  correspondingly directed at SPV lenders.

17       The committee claims that it focuses more on

18  insiders and related entities that haven't been named in the

19  complaint.  But again, the Debtors' discovery takes -- asks

20  questions about several insiders.

21       And as for the related entities, Your Honor, these

22  are companies that are related to Mr. James.  There's

23  nothing unique about the committee trying to bring them into

24  discovery.  There are four of these companies that have

25  already been named as defendants in the adversary

1   proceeding.

2          And those have been selected as four.  And for

3   what it's worth, Your Honor, we do in our motion to dismiss

4   highlight that there are really no substantive allegations

5   about those entities.  But the committee doesn't identify

6   any allegations about those entities either.

7          But the larger point, Your Honor, is that if the

8   committee looks to improve the complaint or add defendants,

9   that's not a basis for Rule 2004 discovery given that the

10  lawsuit is on file.  It's clearly related to what's being

11  alleged in the lawsuit, and it's clearly the province of the

12  Debtors at this point.

13         Quickly on the pending proceeding rule, Your

14  Honor, separate and apart from Rule 2004 principles, the

15  pending proceeding rule does apply.  And that means that

16  Rule 24 applies on intervention.  That means that Rule 26

17  applies on proportionality.

18         And the argument that the committee makes is that

19  the rule only applies to requests made by a party.  And

20  since they're not a party, therefore, the pending proceeding

21  rule does not apply to them.

22         And it's true that one of the purposes of the

23  pending proceeding rule is that if you're a party to an

24  adversary proceeding, you have to comply with the rules of

25  civil procedure.  You can't seek Rule 2004 discovery of

1    another party.  But it also ensures that parties to an

2    existing adversary proceeding are not themselves the

3    recipient of nonparty Rule 2004 discovery.

4           And so to that end, I also think, Your Honor, that

5    the party argument proves too much because the committee is

6    a statutory fiduciary.  It's a uniquely situated entity

7    here.  Any claims it would bring or claims that it would

8    obtain derivative standing to bring.

9           And to that end, if we're bringing claims, it's

10   bringing estate claims.  And if it's bringing the eight

11   counts in the complaint, it's bringing the estate's counts.

12   And so they'd be identically situated to the estate in any

13   event.  And so they're not necessarily your typical non-

14   party.

15          But again, also in the authorities, Your Honor,

16   the pending proceeding rule is not that narrow.  It doesn't

17   just make distinctions based on party or non-party.  What

18   matters is whether the target and the discovery topics will

19   be affected by the proceeding, whether they're being

20   addressed in the proceeding, and whether they're related to

21   the proceeding.

22          And that's the Bennett Funding case, that's

23   Washington Mutual, and that's even the Buick case that the

24   committee relies on.  Duplicate discovery of the needs and

25   activities of other interested parties is not a proper

1    subject of 2004.  On the point of the examiner, Your Honor,

2    also a level of duplication here that would militate against

3    discovery.

4            And Your Honor, I have a copy of the examiner

5    order.  I don't know if I can hand it to you, but I think

6    it's important to take a look at it, the one in the pointing

7    exam, if I may.

8            THE COURT:  Which paragraph do you want me to look

9    at?

10           MR. TECCE:  It's 726, Your Honor.  It's also

11   Exhibit 2 on our --

12           THE COURT:  I know.  I've read it so much, I

13   probably have it memorized.

14           MR. TECCE:  So many times.

15           THE COURT:  But go ahead.

16           MR. TECCE:  And you wrote it, so I think -- so I

17   just if you wanted to have it in front of Your Honor, but I

18   think it's important to look at what the examiner is looking

19   at.  I think what you're going to see here is a significant

20   level of overlap in addition to between what's in the

21   adversary proceeding, but also what is the subject of the

22   creditors committee's discovery.

23           The examiner in Paragraph 3 of this order, and I'm

24   reading from ECF 726, is to investigate the facts and

25   circumstances, including the general corporate practices

1    concerning the debtor's pre-petition factoring processes and

2    factoring transactions, related to allegations that the

3    debtor's pre-petition third-party factoring transactions

4    included fraudulent or inaccurate invoices in the related

5    accounts receivable in the debtor's books and records and

6    order reports, accounts receivable factored more than once,

7    and in each case of A and B, the persons or entities

8    responsible for any of the factoring transactions.

9         Same in Paragraph 2, transfers between the

10   Debtors, insiders, and affiliates of the Debtors, entities

11   owned or controlled by an insider or affiliate, unaffiliated

12   third-party factors, little three in the whole, any

13   accounting with respect to the proceeds of factoring

14   transactions.  And four, investigating the facts and

15   circumstances, including general corporate practices

16   concerning off-balance sheet transactions.

17        So the examiner's scope overlaps with what the

18   committee is seeking in discovery, particularly from our

19   client.  Again, I refer the court to 812-1 as just one

20   example of the subpoenas that have been propounded, but they

21   certainly track and copy those topics.

22        I just want to be very clear, Your Honor, that we

23   -- there's an allegation that we destroyed documents.  We

24   strongly dispute that.  We use pretty strong language in our

25   pleading, and I don't want it to go unmentioned, but we --

1   no one has accused us of that.  To date, we've already had a

2   preliminary injunction hearing with documents prosecuted by

3   the Debtors.  This issue has never been alleged before, and

4   I just don't want to leave that unanswered.

5         At this point, Your Honor, the committee's remedy

6   is to seek intervention in the adversary.  I'm not inviting

7   that.  I'm not inviting any other intervention request in

8   the adversary.  We have enough as it is.

9         But that is, the rule applies, Rule 24 applies

10  because the rules of civil procedure apply.  And the

11  committee can't satisfy that standard.  They don't really

12  even try to satisfy that standard, Your Honor.  The Debtors

13  are adequately representing their interests in the

14  adversary.  And so that's their remedy at this point.

15        And so I conclude, Your Honor, with a few points.

16  First, here the circumstances are just what they are.  The

17  Debtors have already brought claims and causes of action

18  occupied the territory as it relates to our clients.  The

19  examiner is a separate work stream that will do the same and

20  look into the same transactions.

21        We have two fiduciaries already occupying the

22  space as it relates to our clients.  There's a total of 53

23  subpoenas or 55, 38 already and more on the way.  It's

24  burdensome to require us to respond to each one of those on

25  an entity-by-entity basis, given that we're already being

1    sued under those two -- under the adversary proceeding, the

2    examiner's already been appointed.

3           And this is basically a fourth probe that would be

4    open against our clients that we don't think it's

5    appropriate.  So unless you have any questions, Your Honor,

6    that's my presentation.  I'd like to come back if there's

7    anything else to add at the end.

8           THE COURT:  Thank you.  No questions.

9           MR. LEVINSON:  Good morning, Your Honor.

10          THE COURT:  Good morning.

11          MR. LEVINSON:  Jeffrey Levinson on behalf of Nigel

12   Crighton.

13          THE COURT:  Good morning.

14          MR. LEVINSON:  We are also a move-in with respect

15   to the quash relief.  We joined basically everything that's

16   just been said.  I would add, though, that this morning is

17   an excellent example of why it's a good idea to come to

18   court early.  Because we learned or heard that the Debtors

19   will be filing soon, adversaries are adding defendants to

20   the 100 John Doe's very soon.  And that is probably relevant

21   to why we are here this morning, both with respect to this

22   motion to quash and with respect to the D&O motion.

23          I don't want to get too far ahead, but I think

24   that's significant.  Because while Mr. Crighton has not yet

25   been named specifically as a defendant in the case, he

1    stands otherwise in the exact same position as James, the

2    James party.

3           So I also think that it's important to note that

4    the intervention points, separate and apart from the pending

5    proceeding rule here, where the Debtors have commenced, an

6    adversary proceeding relating to virtually all of the areas

7    covered in the committee's 2004.  And the Committee doesn't

8    have, and it really can't establish standing.  With respect

9    to such areas, the committee's redundant 2004s should be

10   quashed.

11          I adopt again the arguments made with respect to

12   the pending proceeding rule, both in our papers and as

13   articulated by prior counsel.  Our papers, I think, lay out

14   the breadth and redundancy of the discovery itself and the

15   undue burden that it's going to put on Mr. Crighton.

16          And all of that coupled with the fact that Mr.

17   Crighton would be unduly prejudiced by the likely adverse

18   inference in the adversary proceeding because of having to

19   assert his Fifth Amendment privilege against self-

20   incrimination, it's very prejudicial to him and -- because

21   the committee can access this information elsewhere

22   primarily through the Debtors, which is most appropriate

23   here, there's no need to put Mr. Crighton through that.

24          So unless the court has any questions, again, we

25   join in the arguments that were just made.  Thank you, Your

1    Honor.

2              THE COURT:  Thank you.

3              MR. KOTLIAR:  Good morning, Your Honor.  For the

4    record, Bryan Kotliar of MoFo on behalf of Onset Financial.

5    Your Honor, I'm in a very weird spot because even though I'm

6    the third --

7              THE COURT:  It's the podium.

8              MR. KOTLIAR:  Even though I'm the third, and I'm

9    not used to being at the podium, Your Honor, I'm used to

10   having to click through the phone, so it's nice to be here

11   in person.  Even though I'm the third quash, there's two

12   important differences, and then a host of other ones.

13             THE COURT:  Okay.

14             MR. KOTLIAR:  The first most important difference

15   is that I basically disagree with everything that was just

16   said, with the exception of the words examiner and examiner

17   order.  We support the committee's efforts to get as much

18   discovery as possible.

19             THE COURT:  Okay.

20             MR. KOTLIAR:  Including from the targets of those

21   motions.  We're different because --

22             THE COURT:  Can you explain to me what you mean by

23   that?

24             MR. KOTLIAR:  Sure.  So let me get into my

25   presentation.

 1          THE COURT:  Oh, I'm sorry.  I apologize.

 2          MR. KOTLIAR:  So for Onset Financial, we filed a

 3  motion to quash two deposition subpoenas that served by the

 4  committee.  We're different than all the other parties that

 5  filed motions to quash today or any other motions in this

 6  case.  And that's first and most importantly, we're

 7  cooperating fully with the committee's investigation.  We've

 8  not said to anyone that we will not produce documents or

 9  that we will not sit for depositions.  And that's because

10  we're innocent.

11          And second, the only issue for me today is about

12  depositions.  A lot of people like to start these hearings

13  by saying, oh, Your Honor, we hate to bring a discovery

14  dispute before the court.  I personally like being here on

15  this.  For one, I appreciate the opportunity to speak with

16  Your Honor.  Happy New Year, by the way.

17          But also these discovery disputes are a symptom of

18  a bigger case issue that needs to be resolved for this case

19  to operate.  In fact, for this case to continue at all, as

20  you heard this morning, which the committee recognized this

21  morning, and it lengthened their objection.

22          This case is at a very real risk of running out of

23  money while the patient, the debtor is on the operating

24  table.  Victims like Onset do not want that to happen.

25  Onset absolutely does not want the investigations to fall

1   short of getting to the bottom of the truth, especially in

2   light of what I would call the highly defamatory and

3   baseless objection that the committee filed, which I'll get

4   into at the end.

5           There are many duplicative investigations, nearly

6   all of them paid for by this estate.  There's an

7   investigation by the Debtors.  That includes document

8   requests to Onset with which we're cooperating.  There's

9   another investigation by the committee.  That includes

10  document requests to Onset with which we're cooperating.

11          Both of these investigations for Onset cover

12  precisely what is in the examiner's mandate, which is to

13  review the off-balance sheet transactions with SPV lenders,

14  that includes Onset.  The third investigation is that

15  examiner.

16          Fourth, there are well-documented and publicized

17  governmental investigations, including criminal

18  investigations.  We are cooperating fully with the committee

19  and the Debtors, and we will cooperate fully with the

20  examiner.  We have already produced more than 5,500

21  documents to the Debtors and the committee, comprising more

22  than 188,000 pages, the vast majority of which come from

23  emails.

24          That includes thousands of documents and hundreds

25  of thousands of pages produced the day after Christmas and

1    the day after New Year's.  The Debtors and the committee

2    requested more email communications that, including search

3    terms, includes hundreds of thousands of documents, and

4    we've not said no to any of those documents.

5            We're working hard to get our arms around that and

6    to continue to make productions on a rolling basis.  I think

7    it's very telling that there's very little of what we

8    produced to the committee that's in the objection that they

9    filed despite the grave allegations in there.

10           The committee preordained Onset being a criminal

11   mastermind before they started their investigation.  There

12   are time entries in their fiat filed on Monday night that

13   reflect starting work on litigation against Onset starting

14   on December 9th.

15           December 9th, Your Honor, is not so coincidentally

16   the day before the committee reached out to us suddenly

17   demanding documents at a faster pace.  But we're not here to

18   talk about documents.  We're here to talk about depositions.

19   So why are we talking about that?

20           We have not said no to any documents, and we've

21   not said no to any depositions.  We only have one issue,

22   which is the examiner impact and the burdensome argument.

23   We said, let's be efficient about these depositions and

24   schedule them together with the examiner whose mandate is

25   precisely the issues that the committee is seeking to

1    explore.

2            We're not saying no, never.  We're just saying,

3    hey, not right now.  Let's wait a little bit, let's be

4    efficient.  The committee can point to no prejudice

5    whatsoever in waiting a little bit to do that.  There's no

6    challenge deadline.  There's no deadlines requiring the

7    committee to move quickly.

8            The committee says, yes, right now.  And if not

9    now, then it will never happen, and everyone gets off the

10   hook.  The committee's entire argument is premised on the

11   estate potentially running out of money before the examiner

12   can make it to the exam room.

13           I'm a little confused by that because if the

14   estate's running out of money, they want to supercharge the

15   estate with discovery costs now, that's a self-fulfilling

16   prophecy.  If they have their way, then it makes it more

17   likely the examiner won't get the chance to do its job.

18           Your Honor, for the very first time in my career,

19   I used AI in a courtroom.  And this is what AI told me is

20   the definition of self-fulfilling prophecy, and I think it's

21   true.  A self-fulfilling prophecy is a belief or expectation

22   that causes itself to come true because people act in ways

23   that make the expected outcome happen.

24           If you have to drive 100 miles on a single tank of

25   gas, Your Honor, you shouldn't start by pouring out half the

1    tank of gas.  The committee has it backwards.  If the estate

2    is running out of money, it should be more efficient, not

3    less.  This is quickly moving to a bankruptcy case.  Rushing

4    to take depositions before document productions are complete

5    is not wise, especially given the pleading that they filed

6    that I'll get into in a minute.

7          Targeting those depositions at the most senior

8    Onset personnel, the CEO and founder and the CFO, when the

9    committee clearly has no understanding of basic facts, is

10   not wise.  Plus they create a risk that later when the

11   examiner goes to do its job, the examiner says, hey, I've

12   run out of time and money because there are all these

13   depositions that were taken before I could get involved.

14         In terms of the case law, the committee cites

15   nothing relevant to the issues before the court today.

16   Every case is different.  What matters is the facts and

17   circumstances of this case.  The committee says the most

18   important fact and circumstance, in this case, on this

19   issue, is that the estate is running out of money.

20         The committee doesn't cite a single case where

21   that was present.  The committee cites a bunch of general

22   case law that says, yeah, courts can and have authorized

23   expedited duplicative discovery, but no cases where that was

24   authorized because the estate was running out of money.

25         Here's just one example.  In one of the Enron

1   cases they cite, the court authorized discovery duplicative

2   of the examiner because there was a court order that

3   precluded other parties from sharing discovery with the

4   examiner.

5          I think what's really going on here is that the

6   committee was a little unhappy with the speed with which we

7   were producing documents.  Parties have a remedy for that.

8   It's coming to the court.  They didn't do that.  To put it

9   mildly, they chose harassment.  They chose to harass my

10  clients by disposing process servers to their homes where

11  they were greeted by their wife and kids.  They chose

12  harassment when they filed that hit piece objection on

13  Monday.

14         Your Honor, on this next part, I had a

15  substantially different presentation prepared, but every

16  time I practiced it, I ended up screaming in the mirror.  So

17  I'm taking a different approach with a little less adverbs.

18  The committee filed what I would describe as a highly

19  defamatory, highly inaccurate, misleading, and flat-out

20  untrue objection.  And the court need look no further than

21  the four corners of that document to reach that conclusion.

22         The objection proves our point that the committee

23  is in no position to take depositions now.  Because they

24  don't know what they're talking about because they haven't

25  done their homework.

1           The entire objection says either one, we don't

2     know if what we're saying is true because we're still

3     looking into it, or two, we don't have any evidence that

4     Onset did anything, so Onset must have known or should have

5     known.  Both are a far cry from any evidence that Onset was

6     part of the fraud.  Because there's no such evidence that

7     exists because it never happened.

8           So what do they say in their objection?  They say,

9     well, first, here's some unflattering things that the

10    Debtors' employees have said about Onset.  That has nothing

11    to do with Onset.  To make matters worse, we've asked the

12    committee and the Debtors to provide Onset with all the

13    documents that the Debtors are providing to the committee,

14    and neither of them have given us anything.

15          Second, they say the fact that Patrick James stole

16    money from Onset's obligors.  That Patrick James stole money

17    from Onset's obligors.  This is Onset's money that we put

18    in.  Somehow, Onset was in on the fraud.  They throw words

19    around like concert and conspiracy, but nothing showing

20    either.

21          In fact, after saying that in the beginning of

22    their brief, buried later in Paragraph 23 of their

23    objection, they admit they don't know if Onset knew about

24    any of Patrick James' theft of almost $250 million.  Of

25    course, Onset didn't know.  These allegations were shocking

1    and heartbreaking to read in the pleadings in this case,

2    which is when we learned about this massive fraud.

3            The Debtors, by the way, have said those actions

4    resulted in Onset losing its property, losing its

5    collateral, security, and ownership rights in its property,

6    and is at risk of losing billions of dollars in property and

7    liens and claims.  How could Onset have possibly been

8    involved in that is completely absurd.

9            The evidence is that in the summer when the

10   company was in default, Onset was lied to by the company to

11   prevent it from exercising remedies.  There's nothing in the

12   objection about that.

13           THE COURT:  And I don't need to get into the

14   merits of kind of -- I got what you have to do, and I

15   understand why you're doing it.  I'm just telling you, I

16   don't give that -- I don't -- there are allegations in a

17   complaint, or I should say in a pleading, and I got it, your

18   side vigorously disagrees with them.  I don't give them any

19   weight one way or the other.

20           MR. KOTLIAR:  Understood, Your Honor.  I think

21   what I'm getting at is that the committee wants to

22   investigate Onset, and we're cooperating fully with that

23   investigation, but they have never had a substantive

24   conversation with Onset or us at MoFo or Perella, our

25   investment bankers.

1          Not one conversation with potentially the estate's

2     largest creditor and largest victim.  Yet they want to get

3     on with depositions because the estate's running out of

4     money?  There are so many other things this committee can be

5     doing to investigate Onset and get to the truth in an

6     efficient manner before costly depositions.

7          We are fully available, doors open, waiting by the

8     phone.  They clearly have no interest in doing that.  I

9     mentioned the time records earlier.  They have been working

10    on litigation against Onset since the very beginning before

11    they did very little analysis before we made any productions

12    to them.

13         And again, in light of all of the allegations that

14    were made and their objection that was filed, we have still

15    said yes to making the right people available for

16    depositions at the right time.  Instead, they've said, let's

17    pick this up faster by trying to argue motions to quash and

18    serve harassing deposition subpoenas.

19         The committee says this case is running out of

20    money, but is also trying to supercharge it with expenses.

21    They're arguing a self-fulfilling prophecy.  This estate

22    should have some discipline over how it spends money before

23    it runs out.  Thank you.

24         THE COURT:  Thank you.

25         MR. JONAS:  Good morning, Your Honor.

```
 1              THE COURT:  Good morning.

 2              MR. JONAS:  Jeff Jonas from Brown Rudnick for the

 3    Official Committee of Unsecured Creditors.  Your Honor, the

 4    committee opposes each of the three motions to quash being

 5    heard today.  But before I get to those in particular, and I

 6    might regret reminding you, but at the last hearing, you

 7    told us that you were inclined to delay further committee

 8    discovery pending, the examiner appointment, but that you'd

 9    give the committee an opportunity to change your mind.

10              So I want to take on that challenge because I

11    think it's critically important.  And I'll try and explain

12    why it's critically important to the committee as well.  And

13    then I'll also address, in a general way, the particular

14    motions to quash.

15              Your Honor, again, I want to be mindful of your

16    comments at the last hearing, and I won't reiterate

17    everything that's in our papers, which I incorporate by

18    reference.  But I hope you'll indulge me for a few minutes

19    because we believe that these motions and whether the

20    committee can continue its ongoing discovery could, at least

21    for the committee, be among the most important rulings in

22    this case.  And again, I'll get to explain that.

23              We believe that allowing these motions and/or

24    delaying discovery by the committee could dramatically limit

25    and perhaps eliminate any recovery by unsecured creditors.
```

1    So I appreciate while it may seem somewhat of a procedural

2    matter, that's our view.  I'll explain it, Your Honor.  And

3    it's why we feel so strongly about it.  So let me explain

4    that a little bit.

5         And as Mr. Stark did, I think we have to take a

6    little bit of a step back briefly.  As the court is aware,

7    the case began under a cloud of suspicion.  The board

8    uncovered what appeared to be a corporate fraud of massive

9    scale.  Billions of dollars in factored AR were just plain

10   missing.  And by the petition date, the board had ousted

11   Patrick and Edward James and the Debtors were beginning to

12   publicly disclose what they were learning in the aftermath.

13        And the case became a matter of public fascination

14   likened to another Enron cautionary tale, no lesser than

15   Wall Street personas like Jamie Dimon characterized this as

16   a cockroach, this case.  Within weeks of the Chapter 11

17   filings came a powerful call for an examiner and the Debtors

18   launched massive litigation against Patrick James and

19   others.

20        The court will recall that months back, we had a

21   contest over the DIP financing.  And that contest almost

22   went to trial.  We settled that contest on the courthouse

23   steps, actually in the courthouse.  I remember sitting right

24   there getting ready, looking forward to trial and then it

25   didn't happen.  And it was a remarkably balanced settlement.

1   It brought new liquidity to the case, which was needed.

2        It -- and there was a reward to the lenders for

3   that liquidity.  But critically, the case procedure was

4   going to be fast-tracked and with relatively near-term

5   milestone covenants.  And those milestones served as a sort

6   of litmus test for the case.  We were going to learn,

7   because the DIP mandated that we learn, of the value,

8   whether the value here was chiefly in the business or in the

9   litigation or some mixture of both.  And those milestone

10  covenants required us to dig in as a committee.

11       Immediately and with all deliberate effort, we

12  endeavored to figure out where did the billions go, how did

13  they do what they did, who could be held responsible and

14  could we get it back.  Despite the call for an examiner, we

15  had no time to waste.  Because there was a looming deadline

16  of January 31, 2026, which was a milestone.

17       And back in late October and early November, we

18  circled that on the calendar.  We knew we had to get ready

19  and we had to get very smart by that date.  Because come

20  January 26, this company could be out of cash.  The

21  committee urgently undertook Rule 2004 discovery to advance

22  the ball as much as possible before that date.

23       We issued 2004 requests, we participated in many,

24  many meet and confers.  And I'll tell you, Your Honor, in

25  doing so, as we always try and do, we did try to reduce the

1    burden on recipients of the request by agreeing to accept

2    productions that the recipients previously had made to

3    others, including the Debtors.

4            And as of now, the committee has collected

5    approximately 6.8 million documents.  We've run more than

6    100 targeted searches, and identified and reviewed more than

7    100,000 relevant documents as a result of those searches.

8    We've also scoured various public databases and found

9    additional probative evidence.

10           And I'm not telling you this just for the sake of

11   telling you this, Your Honor, although I want the court to

12   be informed of the work we've done.  I'm telling you this

13   because it's going to come to my argument and be important

14   to the argument of why we shouldn't be put, if you will, on

15   a standstill or in abeyance while the examiner begins to

16   gear up, and I'll get to that in a minute.

17           Your Honor, our effort was fruitful.  We learned

18   more than a lot, an awful lot.  We are now beginning to

19   understand what transpired, who acted wrongfully, how they

20   did what they did, and importantly, how to bring order out

21   of the chaos of this case.

22           At this moment, we have significant momentum.

23   We've worked quickly.  We've tried to be efficient.  Of

24   course, there's always inefficiencies in something of this

25   scale.  But we really are well down the road to figuring

1    this out.  And frankly, Your Honor, in light of the many

2    aspects of the case you're already aware, we think that

3    these claims and causes of action might be the only source

4    of recovery for unsecured creditors.  And that's why it's so

5    important to us.

6        And we're happy -- so let me say this.  We're

7    happy to actually be here today because as it turns out, the

8    company is almost out of cash, and the Debtors are going to

9    start a quick M&A process and there's neither funding nor

10   time to let this all play out much longer.

11       And with that, I do want to tell you a little bit

12   about what we've learned and I appreciate, Your Honor, these

13   are, if you want to call them allegations, we're not here,

14   we're not having a trial on any fraud today.  But it's

15   important because there's been lots of talk of fraud in this

16   case, but I'm not sure the court has ever actually seen or

17   touched or smelled anything in terms of evidence, or at

18   least in this case, it's documents we've received so that

19   you understand the work that we've done.

20       And I think it goes to the heart of why putting us

21   on the shelf and letting the examiner start from scratch,

22   even with our cooperation, why that doesn't make any sense,

23   and why, in fact, that would be a more chaotic approach than

24   a more ordered approach, and I'll get to that.

25       But I do think, just indulge me, it'll only be a

1    minute or two, but I want to explain it, and some of it was

2    in our papers.  And it will be truncated, but again, I think

3    it's important.

4            While the court is aware of certain claims the

5    Debtors have brought, at least in a general sense, again,

6    Patrick James, the committee has uncovered additional areas

7    of fraud, we believe, committed by Onset, Edward James,

8    who's not a defendant, by the way, Your Honor, in the

9    existing complaint at this time, and other parties.

10           We believe Onset extended purportedly secured

11   financing, often disguised as leases, but in economic

12   reality they were loans to the company that is the SPVs.  We

13   believe, Your Honor, our financial advisor has done work on

14   this.  And by the way, I don't think the court would be

15   interested, but if it is, we actually brought them today,

16   and would be prepared to have them take the stand.

17           But the average rate of internal return on Onset's

18   loans exceeded 300 percent.  In fact, we believe certain

19   loans may have had an IRR in excess of 1,000 percent.  Onset

20   advanced financing of approximately $2.5 billion.  The

21   company paid Onset $2.9 billion.  And based on our

22   discussions with the Debtors, we believe Onset likely will

23   assert another $1.9 billion in claims against the Debtors.

24   No borrower, no borrower could sustain borrowing at this

25   price or this pace.

1          So the question is, in part, Your Honor, how did

2     Onset get away with, we call it, pillaging the company?

3     Maybe you can't blame a lender who can charge as much as

4     they want, but you have to ask the question, why, and it's

5     easy.  They had an inside man, Your Honor.

6          Edward James, Patrick James' younger brother, was

7     executive vice president and was working with Onset.  He

8     approved and authorized the company's transactions with

9     Onset, and for his efforts, Onset handsomely rewarded Edward

10    James.  It allowed him to personally invest in the Onset

11    financing to the company, ultimately providing him with

12    hundreds of millions of dollars by way of fees and these

13    exorbitant returns on the Onset loans, all at the company's

14    expense.

15         A simple example, Edward James received, or was

16    scheduled to receive, more than 25 million dollars for

17    negotiating and approving Onset's financing.  Whether you

18    call those kickbacks or something else, they were wrong.

19    Edward James was on both sides of these transactions.  To

20    his personal benefit and the company and its creditors'

21    detriment.

22         Additionally, as we note in our response, hundreds

23    of millions of dollars of Onset financing proceeds also

24    appear to have been diverted to Patrick James personally.

25    Edward James made his alleged investments and received fee

 1    payments through various shell companies, Optimist Private

 2    Capital, LLC, and JCMC, which appear to have been managed by

 3    his family members.

 4              Your Honor, I'd like to -- I'm actually going to

 5    hand -- I can hand up and around copies, but I'd also like

 6    to, if we could put it up on the screen, our Committee

 7    Exhibit B, which is -- and I'll explain what that is.  And I

 8    see Mr. Int-Hout on the screen, Your Honor.  If he could be

 9    made the organizer, he could put that up.  And may I

10    approach you, Your Honor, with a hard copy?

11              THE COURT:  Sure.  You can just give it to one of

12    my law clerks.

13              MR. JONAS:  Okay.

14              THE COURT:  Thank you.

15              MR. JONAS:  And if we just turn the page.

16              MR. TECCE:  I'd ask what this document is.

17              MR. JONAS:  I'm going to explain.

18              THE COURT:  Well --

19              MR. TECCE:  But what is it?

20              THE COURT:  Why don't we just take it down first

21    and then parties can --

22              MR. JONAS:  Sure.

23              THE COURT:  -- have a discussion about it.  Why

24    don't you flip through it and see if there's anything?

25              MR. TECCE:  I can't tell what it is because it was

1    prepared by Brown Rudnick.

2         THE COURT:  No.  No.  I understand that.  What I'm

3    saying is parties can flip through it and then he can --

4         MR. JONAS:  May I explain, Your Honor?

5         THE COURT:  -- provide a short explanation, but

6    parties can flip through it and just before we put it up.

7    Go ahead.

8         MR. JONAS:  Sure.  Your Honor, this is a document

9    -- and again, I want to just be clear, Your Honor, I'm not

10   here to prove a case.  But I do have to explain to the court

11   because the court has told me it thinks or it's inclined to

12   let the examiner proceed.  But I think it's critically

13   important for the court to understand what we've -- some of

14   what we have uncovered, and why it's critically important

15   we've been allowed to complete the exercise and why we'd be

16   allowed to do that now.

17        And to that end, this particular document, for

18   example, I don't 00 I'm not one, I think you know, Your

19   Honor, to stand up here and make allegations.  So to do

20   that, to support what I've already told you, this is a

21   document which was produced to us.  We know from the

22   metadata that Edward James was custodian of this document.

23        And in it, he summarizes, among other things, his

24   Onset investments since 2022.  And it evidences relevant

25   payments to him in excess of $200 million.  And that's why

1    I'm showing it today, Your Honor.

2              THE COURT:  What does that have to do with the --

3              MR. JONAS:  What's that?

4              THE COURT:  I got it.

5              MR. JONAS:  I just want to support what I said,

6    Your Honor.

7              THE COURT:  No.  I understand the point.  I

8    understand the point.  And I don't want to put sealed stuff

9    up on a screen.

10             MR. JONAS:  I would not do that, Your Honor.  I

11   didn't intend to.  I was -- let me turn to that next, and

12   I'm not going to put it up on the screen.  You're looking at

13   Committee Exhibit G.  This is a May 6th, 2025, Ed James

14   email to Remington Atwood at Onset.

15             And the email demonstrates Edward James' efforts

16   to enrich himself at the company's expense.  Here, he's

17   confirming his sharing arrangements with Onset, including a

18   50 percent share of forbearance fees and late fees.

19             He actually was incentivized to have the company

20   default so that he could achieve larger payments.  And Your

21   Honor, you don't have to believe me.  Just look at the

22   company's internal emails.

23             If you look at Committee Exhibit A, which is the

24   next slide, you'll see here, the company -- these are First

25   Brands employees, amazed at how much Onset was charging the

1    company when one employee, Mr. Reminsky, told it like it

2    was.  It was Ed taking whatever he could get.

3            So, Your Honor, and again, this -- I am not -- I

4    said this would be a truncated presentation.  Again, I'm not

5    here to make the case for the fraud, but it's important that

6    the court understand some of the work we've done and what

7    we've uncovered.

8            To that end, Your Honor, there's other pieces of

9    fraud and other parts of fraud.  As described in our papers,

10   we have identified other fraudulent contact by Edward James,

11   including his retaining an entity known as Helios, or

12   Helios, to arrange financings for the company.

13           It appears Helios sourced financing from two other

14   SPV lenders, Aequum and Evolution, and the company paid

15   Helios a substantial fee, and it kicked back money to Mr.

16   James and his family.  Like with Onset, it appears he also

17   co-invested in a Helios investment fund, which provided

18   financing to the company.

19           Your Honor, like most massive frauds, getting to

20   the bottom of what happened here is not easy, and it

21   requires digging and skill.  While I've only described

22   certain matters involving Edward James, Onset, and Helios,

23   based on the work we've done, we are focused on other

24   fraudulent activities, which could give rise to substantial

25   claims and recoveries for unsecured creditors.

1          MR. BEREZIN:  Your Honor, if I may.  Mark Berezin

2     of Bracewell.  I represent Edward James.  I don't know what

3     this has to do with any of the committee's presentation.

4     This is all hearsay.  We have our own 2004 discovery served

5     upon us by the committee.  We filed our own motion to quash.

6     It's not set for hearing today.

7          I understand what they're trying to do, which is

8     to create a record as to why they should go before the

9     examiner, but I find all of this wholly inappropriate.

10         THE COURT:  Okay.  Your objection is noted.

11         MR. JONAS:  I'm done with that part of my

12    presentation, Your Honor.

13         THE COURT:  Okay.

14         MR. JONAS:  In any event, Your Honor, the -- just

15    to highlight why this is only part of the work we've done

16    and are doing, there remain many questions.  What about non-

17    Onset-related SPV financing?  What do those lenders know or

18    should have known?  Who else aided and abetted these frauds?

19    And we've requested discovery on these questions as well.

20         Your Honor, the good news, in my view, is the

21    committee has made great progress in discovery.  The bad

22    news, and it's not the synchronon of our case at all, as was

23    suggested.  But the bad news is that the company is running

24    out of liquidity.

25         And if you look, it's part of our slide

1    presentation.  I don't think there'll be any issues with

2    these, Your Honor.  There's two demonstratives.  There's J,

3    which is the debtor.  This is work that our FA did relating

4    to the debtor's latest cash flow forecast, which was

5    provided to us on January 3rd.  And you'll see that the

6    Debtors are, as has already been put forth by the Debtors,

7    that we'll run out of cash by the first week of February,

8    four weeks from now.

9          And the next slide is another demonstrative which

10    our FA put together indicating the trading levels of the DIP

11    loan, which are now at around 20 cents, confirming lack of

12    confidence in the reorganization prospects.

13          So with that, Your Honor, let me turn to some of

14    the arguments.  First, the examiner and what that means to

15    our ongoing discovery.  Your Honor, the committee has made

16    tremendous progress in a relatively short period of time

17    under difficult circumstances.

18          Likely the only hope for recovery lies in the

19    discovery and what will result from that we're doing.  In

20    less than a month, we think we can get much of what we need.

21    But, Judge, we need this month and believe it would be

22    detrimental for us to be shut down now.  Waiting for the

23    examiner will prejudice us, and I'll explain.

24          When weeks or months from now, the examiner who

25    first must get appointed, then have a work plan approved by

1    the court, begins seeking discovery, the Debtors likely will

2    be out of cash.  Maybe the cases -- I'm not suggesting the

3    cases will be converted, but if they were, should we be

4    relying on a Chapter 7 trustee for recoveries?

5            THE COURT:  Wouldn't the committee cease to exist

6    at that point as well?

7            MR. JONAS:  I agree, but unsecured -- where will

8    unsecured creditors be, Your Honor?  That's my point.

9            THE COURT:  Understood.

10           MR. JONAS:  And, Your Honor, the committee's

11   continued discovery need not be duplicative of anything the

12   examiner is doing.  The committee will cooperate with the

13   examiner who can participate in and receive the documents

14   we've collected, can participate, and sit side by side with

15   us at depositions.

16           It's -- and this is why I say, Your Honor, I know,

17   I think the effort here, in some way, is to say it will be

18   chaotic for the committee to continue.  I think it's quite

19   the opposite.  I think the committee, willing to work with

20   the examiner, helping the examiner get up to speed, who can

21   jump in with us, to the extent the examiner is obviously

22   interested in doing that, we're already way up the learning

23   curve.

24           Why start with someone who is new to the case, I'm

25   sure quite good at what he does, but new to the case, has a

1   huge learning curve, it will be weeks before he can even --

2   it's not even in place, weeks before he can begin his

3   discovery.  I just think it's a much more ordered approach

4   to let us -- and we can do it in short order, Your Honor.

5          Let us complete our discovery.  We'll work with

6   the examiner.  We'll share every -- we're not hiding

7   anything.  We're not trying to husband it.  We'll share

8   everything with the examiner.

9          And I'll just -- last in this particular regard,

10  Your Honor, as stated in Enron, with respect to discovery

11  sought by a creditor's committee and an examiner.  "The two

12  serve different functions.  The creditor's committee owes a

13  fiduciary duty to creditors, but examiners are information

14  seekers who remain neutral parties."

15         Let me just quickly address the inconvenience

16  factor, or argument, in its objection Onset, as it

17  mentioned, is only opposing two depositions, it's -- again,

18  its primary legal argument is, we don't want to sit for more

19  than one deposition.

20         Again, Your Honor, we can -- you know the examiner

21  will be in place in a week, or less than a week.  We'll work

22  on scheduling that deposition, but again, it won't be in --

23  it may not be the case to have to sit for more than one

24  deposition.  And I don't think there'll be an inconvenience

25  in that regard.

1           And, Your Honor, they relied on MF Global.  I

2     think the case was different.  It involved private party

3     discovery, not an official committee who has a statutory

4     right and fiduciary duty to conduct discovery.

5           Pending proceeding rule, Your Honor, the opposing

6     parties cite the pending proceeding rule in support of

7     denying the committee discovery, but the committee is not a

8     party to the debtor's adversary proceeding versus Patrick

9     James.

10          Accordingly, the pending proceeding rule is not

11    applicable.  Even if the committee was a party, which it's

12    not, application of that rule is discretionary, and under

13    the facts and circumstances as I've described, we don't

14    think it should be applied.

15          Generally, there's an argument that because there

16    are other pending proceedings and investigations, that fact

17    should -- the opposing parties argue that aside from whether

18    the committee is a party, the fact that there is another

19    proceeding and another investigation means the court should

20    not permit the committee to go forward.

21          We think that's nonsense, Your Honor.  We've cited

22    numerous cases where a court permitted discovery,

23    notwithstanding pending proceedings, or investigations by

24    others, such as Debtors and trustees.

25          Again, Enron, 281 B.R. 836, at 843 n.7.  The fact

1    that an investigation by a creditor's committee, debtor,

2    examiner, or trustee is ongoing does not preclude the use of

3    Rule 2004 by a party in interest.

4          Your Honor, in conclusion and in sum, the

5    committee has made great progress in getting to the bottom

6    of the fraud here, and if you permit us, we will continue to

7    do so, and we think we can complete that in short order.

8          We've made this progress even though eight former

9    company executives, including Patrick James, Edward James,

10   and others, have refused to comply with any 2004 requests.

11   We have done so despite delays on the part of nearly every

12   other third-party recipient of a 2004 request, including

13   Onset in some respects.  It's obvious that these parties'

14   goal is to run off the clock for their strategic advantage.

15         This should not be countenanced by the Court.

16   They and other recipients of the committee's 2004 request

17   should be required to comply with the committee's discovery

18   so the committee can rapidly complete its investigation and

19   further construct the foundation of claims and causes of

20   action, which will serve to provide a recovery to unsecured

21   creditors, likely the only recovery.

22         The committee's investigative authority should not

23   be abrogated such the committee -- such that the committee

24   cannot perform its statutory duties.

25         Judge, on behalf of the committee and unsecured

1   creditors, and I don't use the word lightly, I implore you

2   to deny the motions to quash, and permit the committee a

3   limited period of time to complete its work.  The committee

4   will cooperate with the examiner.  This will be the more

5   ordered approach.

6         With the company running on fumes, the committee

7   fears that any hope of recovery for unsecured creditors will

8   be lost if it is not permitted to complete its discovery.

9   As you heard, there'll be ongoing negotiations about

10  resolution of this case.  We feel we'll be disadvantaged if

11  we are not able to, if you will, have something to

12  negotiate, have value, and we -- to get to that value, we

13  need to complete our investigation.

14        And unless you have any questions, Your Honor, I

15  appreciate you giving me the time.  Thank you very much.

16        THE COURT:  No.  Thank you very much.  Held before

17  the court are several motions to quash 2004 examinations

18  filed by the -- as I say, requested by the official

19  committee of unsecured creditors.  Improper notice and

20  service of all these required motions the court set for

21  today to take up the various motions to quash.  Parties have

22  made their arguments and I'm going to grant the three

23  motions to quash.

24        I'm going to note a couple of points.  The

25  applicable rule here is 2004, and it says "On motion of any

```
 1    party in interest, the court may order the examination of
 2    any entity.  That's all it says.
 3          The court may order the examination of any entity
 4    once the court, if the court grants it, then B gets into
 5    what the scope of the examination is.  So may is the
 6    applicable word here.  There are no limitations, no limiting
 7    principles upon which the court can grant or not grant 2004
 8    as they are, by practice, routinely granted.  But the court
 9    retains absolute discretion as to what to grant one in any
10    particular case and parties have the right to seek to quash
11    a 2004 exam.
12          I'm quashing each of these because I find that,
13    again, I can do it.  I have absolute discretion within it.
14    And I'm granting them and I -- one of the reasons that I
15    felt earlier about the examiner.
16          And let me just note a couple of things, too.  I
17    think you look through the bankruptcy rules.  I think, you
18    know, the rules use may, shall, and must, right?  So in
19    other words, there's a difference between the three.  Must
20    is used over 160 times.  Shall is used about 39 times.  May
21    is used about 173 times.
22          So there's a difference between them, and you've
23    got to respect what they are, so.  But I should provide a
24    reason in this case because it's incredibly important
25    issues.
```

1          I'll note this case started in September, late

2     September of 2025.  On October the 8th, Raistone filed the

3     first motion seeking appointment of an examiner.  A week

4     later, on October 15th, the UST moved for appointment of an

5     examiner.  I set the hearing out, in part, to allow a

6     committee to get formed, and to have the opportunity to

7     provide input there.

8          And they've been great.  And they've done exactly

9     what they're supposed to be doing in order appointing the

10    examiner, an agreed order, quite frankly, with committee

11    input, which was exactly what I hoped in the office of the

12    United States trustee and other parties.

13         That order was entered on December -- excuse me --

14    on November 19th.  So just about a month after the motion

15    was filed, an order signed by me, was entered to appoint.  I

16    don't need to get into kind of what happened between

17    November and December, but I think with incredible effort,

18    the Office of the United States trustee appointed an

19    examiner on December 16th.  Two days later, filed the

20    application.

21         And from December 18th, I'm now going to consider

22    that order two days from now to appoint the examiner.

23    There've been minor comments filed, I think, Katsumi filed

24    something, but there's no serious challenge as to who the

25    examiner is.  It sounds like the examiner has been getting

1    up and working.

2         The bankruptcy code mandates the appointment of an

3    examiner.  That's just the way it's written.  I don't have a

4    whole lot of flexibility on that.  The examiner is ordered

5    to conduct an investigation.  The statute mandated the

6    appointment of an examiner in this case, because it was

7    requested.

8         And the scope, I do have some say in scope, and

9    the parties worked on that, and I got comfortable with the

10   scope.  The examiner has to have the opportunity to do its -

11   - the examiner has to have the opportunity to do the job,

12   which means that they have the opportunity to present to the

13   court a scope of work, have that scope of work approved by

14   the court.

15        And there's no question that, you know, a good

16   amount of what is being -- no, virtually all of what's being

17   requested here is duplicative of what the examiner would

18   seek to do.  And the examiner, by code required appointment

19   on it, and now has an order for me ordering the examiner to

20   do the job.

21        And the examiner is to do and conduct an

22   investigation, hire professionals, get involved, there's a

23   budget set out and provide a report.  The examiner and the

24   scope of work has to go first here.  And that doesn't mean

25   that the -- I'm not saying no forever.  I'm just saying no

1    for now.

2         I don't know what the scope of work is -- the

3    exact scope of work that I will approve is.  Maybe there's -

4    - but the examiner has to have the opportunity to put forth.

5    Yeah.  And he's entitled to get up to speed, and it sounds

6    like he's already doing that, but he's got to have the

7    opportunity to comply with the court's order.

8         And we'll talk on the 9th, two days from now.  I

9    know that -- I don't think I'm conflicting with the

10    committee's fiduciary duties.  1103 talks about what the

11    committee may do, which includes investigate, which also

12    includes seek appointment of an examiner so that the two

13    don't necessarily conflict.

14         But certainly, the committee has every right to go

15    seek an investigation.  I'm just saying I want to pause for

16    a moment and allow the examiner to take the lead on some

17    issues.  And it sounds like he's going to be off to a great

18    start in terms of what the scope of information that has

19    been retained.

20         In terms of kind of the state of affairs, I would

21    call it, with respect to kind of where the Debtors are, it

22    seems to me the examiner should start doing the examiner

23    work.  I'm really encouraging parties to start, and I'm sure

24    they are.  And I'm encouraging it from my viewpoint to

25    coalesce about what the next 90 days or so, it looks like.

1           It sounds like the Debtors have a plan, and I'm

2    encouraging them to reach out and talk to anyone else who's

3    interested in talking to see where this goes.  But I think

4    the fact that, you know, potentially the state runs out of

5    money in the next 30 days isn't a reason enough to start

6    granting and work.

7           It's not like the work is going to go anywhere.

8    The work will be completed, and I'm not saying no forever.

9    I'm just saying no for now.  And the court has discretion to

10   do so.  There will be inevitably duplication of effort and

11   I'm trying to minimize that.

12          But maybe once the examiner is appointed, meets

13   with the committee, meets with other professionals, maybe

14   there's not so much of it.  I don't know.  But whatever the

15   examiner feels like the examiner needs to do, the examiner

16   gets to put forth the scope of work, and that is mandated by

17   statute, mandated by the order.

18          I got it.  There could be multiple 2004s and work

19   that the examiner is working at simultaneously.  But I got

20   to see what the examiner wants to do.  I got to see what the

21   examiner feels, wants the opportunity and the examiner is

22   not here yet.  And I've got to give the examiner that

23   opportunity.

24          So I think we just put the 2004s on ice for now,

25   and we maybe, maybe not, take it up later.  But for now,

1    they're quashed.  I'll enter a short order.  I don't want to

2    get into -- let me back up for a second.

3           I'm not -- I'm intentionally not addressing merits

4    in the issues.  I think I've said on numerous occasions that

5    there are really serious red flags in this case.  I'm hoping

6    the examiner can provide a public report that sheds light on

7    a number of these issues and -- but certainly within the

8    order, hopefully, we'll allow the opportunity to do so.

9           So I'm cautioning them for now.  I reserve the

10   right later in time.  And it's without prejudice to revisit

11   one or more of these 2004s, but for now, they are quashed.

12   We'll see where this goes.  But I'm really -- it's just, I

13   think all energy needs to be on the case.

14          And I know that there are multiple moving pieces,

15   but it sounds like folks are already doing it.  I'm just

16   encouraging parties to put as much energy as they can on,

17   that doesn't necessarily mean agree.  It just means energy

18   on the issue.

19          It's about 12:10.  Do we -- someone give me a

20   sense of timing on what I would call the D&O insurance

21   proceeds stay relief motion.  Can someone just give me a

22   sense of timing on that?  I don't know if we should take

23   lunch, come back, or see if we can get it done.

24          MR. STARK:  Your Honor, if I may.

25          THE COURT:  Yes.

```
 1              MR. STARK:  It's Robert Stark on behalf of the

 2    committee.  First of all, we thank you for your ruling.  We

 3    respect it, and we will honor it.

 4              THE COURT:  Thank you.

 5              MR. STARK:  Both in letter and in spirit.  With

 6    respect, we do have a presentation to make.  We do have

 7    demonstratives.  I don't think there's a big evidentiary

 8    record.  I think we need to walk through the policies and

 9    talk about them.  But I think it -- I sort of envision for

10    myself maybe 15, 20 minutes.  I don't know how others -- we

11    haven't had much colloquy.

12              THE COURT:  I understand.

13              MR. SAVAL:  Your Honor.

14              THE COURT:  Yeah.

15              MR. SAVAL:  Good to be here.  Daniel Saval from

16    Kobre & Kim.  On behalf of Stephen Graham, one of the

17    movements, I'm going to be taking the lead on the motion.

18              THE COURT:  Okay.

19              MR. SAVAL:  I have a presentation that will

20    probably go maybe 15, 20, 25 minutes at most.

21              THE COURT:  Why don't we just -- can we come back

22    at 1:00?

23              MR. SAVAL:  It works for us.

24              THE COURT:  Yes.  I -- my 1:00 just earlier got

25    adjourned to something else.  So I've got a -- it's not an
```

1    open invitation to take -- go from 1:00 to 3:00, but I

2    certainly, I think there's time.  I don't want to rush it.

3    Let's just come back at 1:00, and I'll give everyone a full

4    and fair opportunity to take up the motion at that time.

5    Just in terms of who will be presenting, I know both of you.

6    Is someone else?

7            MR. DENDRINGER:  Yes, Your Honor.  Mark Dendinger

8    of Bracewell for Edward James.  As Mr. Saval said, he's

9    going be taking the lead for the movements.  We are a

10   movement.  I may have five minutes of remarks depending on

11   what's said and would want to reserve time for --

12           THE COURT:  okay.

13           MR. DENDRINGER:  -- rebuttal.

14           THE COURT:  Is there anyone else who thinks they

15   may?

16           MR. DENDRINGER:  Your Honor, there were a number

17   of joiners to the motion as well.  I don't know whether they

18   plan to speak or which of them plan to speak, but that is a

19   possibility.

20           THE COURT:  Okay.  So --

21           MS. DWOSKIN:  Some of them are on the line.  I

22   think folks who may have comments are going to be brief.

23           THE COURT:  Yeah.  So maybe I'll just -- yeah.  So

24   it just makes sense.  Let's just take the time, come back at

25   01:00, and then just -- I'll give everyone -- the line will

1    be open.  We'll give everyone an opportunity.

2        But I'll take -- I'll listen to presentation in

3    the court, right?  You'll take lead.  You'll put on your --

4    and then I'll hear from anyone who supports the relief

5    requested in support of it.  I'll turn to the committee and

6    then anyone on the line.

7        That will be the order of flow, but we'll start

8    right back at 1:00.  Thank you very much.

9        CLERK:  All rise.

10       (Recess)

11       THE COURT:  All right.  Good afternoon.  This s

12   Judge Lopez.  We're back on the record in First Brands.

13   Let's proceed.

14       Actually, before you do, if you think or know you

15   may wish to comment in connection with this motion, why

16   don't you hit five-star now and I will unmute your line.  I

17   apologize, Counsel.  I thought about this last moment.  I'm

18   just going to -- it's a 312 number.

19       MR. TUMSUDEN:  Good morning, Your Honor.  Kyle

20   TumSuden of Mayer Brown on behalf of Katsumi Servicing.  And

21   I believe I am joined on the line by my colleague, Sean

22   Scott.

23       THE COURT:  Okay.  Good afternoon.  A 210 number.

24   A 210 number.  San Antonio.  You're up.

25       MS. SANTOS:  Your Honor, good morning.  Sarah

1   Santos and Jay Hulings on behalf of David Parker.

2          THE COURT:  All right.  A 202 number.

3          MS. O'DONNELL:  Good afternoon, Your Honor.

4   Margarita O'Donnell from Zuckerman Spaeder on behalf of

5   Laurie Stein.

6          THE COURT:  Okay.  Good afternoon.  A 212 number.

7          MR. MENZ:  Peter Menz, Morvillo Abramowitz Grand

8   Iason & Anello, on behalf of Michael Baker.  My colleague,

9   Tim Kasulis is also on the line.

10          THE COURT:  Good afternoon.  A 646 number.  A 646

11   number.

12          MR. KASULIS:  That's Tim Kasulis from Morvillo

13   Abramowitz for Mr. Baker.  Hello, Your Honor.

14          THE COURT:  Good afternoon.  And a 212 number is

15   the last one.

16          MR. SHARGEL:  Your Honor, David Shargel from

17   (indiscernible) on behalf of Edward James.  My colleague is

18   in the courtroom, Mr. Dendinger.  It's unlikely I'll need to

19   become involved, but I just unmuted just in case.

20          THE COURT:  All right.  If I have unmuted you, can

21   you just mute yourselves on your end and I will give you

22   opportunity to speak.  I just want to make sure we can all

23   hear each other.  Thank you.

24          Counsel, if you can state your name for the record

25   and we'll get started.

```
 1          MR. SAVAL:  Good afternoon, Your Honor.  Daniel
 2    Saval from Kobre & Kim.  Our firm represents Mr. Stephen
 3    Graham, who is the Debtor's former chief financial officer.
 4    As I mentioned before the break, I am going to take the lead
 5    for the movants in connection with this motion.  Some of the
 6    other movants and/or joiners may chime in, but I am going
 7    to, as I mentioned, take the lead.
 8          Your Honor, the movants and joiners are both
 9    former and current executives that are covered by the
10    Debtor's director and officer insurance policies.  Some of
11    them are actually still employed by the company and actively
12    and diligently working for the Debtors.  We are here today
13    seeking authorization to access coverage under the
14    applicable D&O policies and to the extent applicable, relief
15    from the stay to allow for such access.  Although to be
16    clear, our position, as you will have seen from our papers,
17    is that the proceeds of the relevant policies that provide
18    coverage are not property of the estate.
19          Before I get into the substance of the motion and
20    as noted in our reply brief, we have reached a resolution
21    with both the Debtors, represented by Weil, and the
22    Ad Hoc Group of DIP Lenders, represented by Gibson Dunn with
23    respect to the terms of a revised proposed order that
24    reflects some concessions from the movants that they weren't
25    required to make, but decided to make in a good faith effort
```

1    to try and make this motion uncontested.  That revised

2    proposed order is at Docket Number 1150.  And I'm happy to

3    just walk through briefly the changes in that order that

4    reflect the compromise between the parties if Your Honor

5    would like me to do so.

6              THE COURT:  It's up to you.

7              MR. SAVAL:  Yeah.  So I'll just say briefly in

8    paragraphs 6 and 7 there has been an agreement on behalf of

9    the movants to provide certain reporting of the amounts that

10   are being accessed from the D&O policies and a requirement

11   to make monthly reporting of the amounts that were advanced

12   or paid under the relevant D&O policy.  That's both the Side

13   A and then the main ABC tower policy.

14             I would note, Your Honor, for the record, that the

15   Official Committee of Unsecured Creditors is included in

16   that order.  We understand that they were part of the

17   initial discussions to try and reach consensus but decided

18   to walk away from those discussions and raise an objection.

19   But to be clear, they are in this order notwithstanding

20   their objection today.

21             THE COURT:  Okay.

22             MR. SAVAL:  We have two objections, one from

23   Katsumi and one from the Committee.  I will get through the

24   substance of those objections.  But just to summarize them

25   at a high level, I would just say at the outset we don't

1    view them as based on applicable law, we don't view them as

2    based on the fact.  In fact, the arguments that have been

3    raised by the objectors fly in the face of the applicable

4    law and standards in this area.  And moreover, many of the

5    objections raised have been squarely rejected and are

6    inconsistent with cases that have been decided under similar

7    facts.

8             Indeed, one could argue the Committee's objection

9    is simply a freewheeling appeal to equity.  And I'd say

10   that's a charitable characterization, the reason being that,

11   as I said before, the objection isn't based on fact or law,

12   it's based on innuendo and unproven allegations, not based

13   on evidence.  And even if it was, that would be irrelevant

14   to the issues before this Court in connection with this

15   motion.

16            I think if there's anything that was said today

17   that bears on this motion in the prior statements and

18   proceedings is that there's a lot of litigation going on in

19   this case.  You've heard from Mr. Singh earlier today that

20   the Debtors are going to name additional parties in their

21   adversary proceeding.  There are investigatory activity

22   going on outside of this Court by government agencies.  So

23   we think it's clear that there's a need for the movants to

24   get access to the D&O policies and there's a need to get

25   access to those policies now.

 1          In addition to what you've already heard and as

 2    mentioned by Your Honor previously, the examiner will

 3    surface very soon and undoubtedly will want to talk to the

 4    various folks that have moved and sought relief under the

 5    D&O policies.

 6          Before getting to the objections, I think it's

 7    important to level set and briefly go over the policies.

 8    Because that's really what drives the analysis here.  And to

 9    be clear, there's no dispute here about what the policies

10    say, what the terms are, and how those terms apply.

11          First, Your Honor, we have the ABC primary policy,

12    or the tower policy that was issued to non-debtor Mayfair

13    Enterprises, but it does cover the Debtors as a subsidiary

14    of Mayfair.  There are there layers of coverage.  Side A for

15    non-indemnified losses of directors and officers.  That

16    includes defense costs.  That is really what's driving this

17    motion.  Side B is for company indemnification.  On that,

18    Your Honor, as we set forth in our papers, requests have

19    been made to the Debtors for indemnification.  The Debtors

20    have declined to indemnify the movants.  The Debtors can

21    confirm that position, but that is undisputed.

22          There is Side C entity coverage for the Debtors

23    for any claims against the Debtors.  Well, not any claims.

24    The claims have to be asserted as a so-called "wrongful act"

25    as defined in the policies.  And, Your Honor, with respect

1    to that, obviously any of those claims would be stayed.

2          Critically, Your Honor -- and this really goes to

3    the heart of the analysis and why the relief should be

4    granted in full -- is the policy includes an order of

5    payments clause.  The clause prioritizes Side A coverage for

6    individuals over Side B and C.  That means that the

7    directors and officers are first in line for the insurance

8    proceeds under the tower policy.

9          Second, Your Honor, there are multiple layers of

10   Side A execs policies.  Those execs policies provide for

11   additional D&O coverage exclusively for individual insureds

12   and do not provide coverage to the Debtors.  The Side A

13   policies are designed to follow form to the ABC primary

14   policy and function as a backstop to ensure continuity of

15   individual defense coverage when primary coverage is

16   unavailable or delayed.

17         Importantly, Your Honor, because the Side A execs

18   policies (indiscernible) only to the individuals who -- or

19   are directors and officers and not the Debtors.  We

20   understand it's undisputed today that the proceeds of the --

21   what I'll call the pure Side A separate policies are not

22   property of the estate.  And we haven't seen any argument to

23   that effect in either the objections of Katsumi or the

24   Committee.

25         Your Honor, going into the analysis here, you

1    know, as you are aware and as the papers articulate, it's

2    really a two-step analysis, are the policies or the proceeds

3    of the policies, assets of the estate.  If the answer is no,

4    that ends the matter.  If they are, then the Court needs to

5    proceed with a cause analysis.

6         Your Honor, as I said before, the Side A policy

7    only provides coverage to the directors and officers, the

8    insured persons.  Does not provide coverage to the Debtors.

9    It may be true that the policies are considered property of

10   the estate.  And I know the objectors cite to law for the

11   proposition that policies are property of the estate, but

12   that isn't the analysis.  Certainly not the analysis in the

13   Fifth Circuit, which creates a key distinction between who

14   owns the policies versus who owns the proceeds.  And as the

15   Fifth Circuit said in Edgeworth, where the debtor has no

16   legally cognizable claim to the insurance proceeds, those

17   proceeds are not property of the estate.

18        So if we're looking at the tower policy, we submit

19   that, similar to the Side A, the conclusion should be that

20   these are not property of the estate.  I'd be relying on the

21   order of payments provision which contractually prioritizes

22   the Side A claims over any entity coverage.  And courts

23   consistently hold that where such priority exists, D&O

24   proceeds to not become property simply because the policy

25   also provides Side B or Side C coverage.

1          As I mentioned before, the Side B indemnification

2     coverage is indeed either hypothetical, speculative, or

3     nonexistent based on the Debtor's position that they will

4     not indemnify the directors and officers seeking coverage.

5     And then with respect to Side C entity coverage, that's also

6     we would submit it is just not existent based on the stay.

7          One of the objectors, Katsumi, suggests the ABC

8     policy is a wasting one.  Even if it were, courts have

9     repeatedly held that wasting policies can still fall outside

10    estate property where the debtor's claim to the proceeds is

11    speculative, hypothetical, or stayed.  I would cite for that

12    among other cases In re Downey Financial Corp., bankruptcy

13    court in Delaware of 2010.  The structure of the D&O

14    policies matters here.  There's no dispute in terms of how

15    the policies work, how the priority works.  Side A coverage

16    provides for the directors and officers to obtain defense

17    costs and other coverage that is given priority over Side B

18    and Side C.

19         So, Your Honor, I think on that basis alone the

20    Court should grant the relief.  But we don't believe the

21    Court would need to even reach a decision on that question

22    because we think there's ample cause for relief under the

23    stay -- relief from stay because the movants indisputably

24    face active litigation investigations right now.  And

25    denying them defense costs would cause irreparable harm.  As

1    Your Honor is obviously aware, Mr. James is subject to the

2    adversary proceeding.  The Debtors have indicated that

3    they're going to add additional parties.  There has been a

4    flurry of Rule 2004 subpoenas that have been issued by the

5    Committee.  Notwithstanding Your Honor's ruling today,

6    there's already been substantial costs that have been

7    incurred by a number of the movants and having to respond to

8    those.  There's a government investigation.

9           So there really isn't any factual or legal basis

10    to deny coverage here.  The cases fully support that

11    position.

12           So turning to what I'll refer to as the equitable

13    arguments raised primarily by the Committee, there are a few

14    themes here.  A complaint about alleged policy depletion and

15    unclean hands argument and what's been referred to as a wait

16    and see approach that somehow all this needs to wait until

17    there's been an adjudication either at Mr. James' trial or a

18    trial of other parties.  It's not clear exactly that that

19    proposal is.  However, it's viewed -- it's irrelevant, does

20    not move the needle, and the position should be rejected.

21           Courts do not deny advancement or stay relief

22    based on speculative depletion on proven allegations of

23    misconduct or the suggestion that insured individuals must

24    await the outcome of litigation before accessing defense

25    coverage.  That position has been repeatedly rejected

1    because that would undermine the core purpose of D&O

2    insurance and rewrite the parties' bargain.

3            I note, Your Honor, that several decisions,

4    including those by Judge Glenn in Silicon Valley Bank and in

5    MF Global Holdings, it was stated that the fact that there

6    are allegations of wrongdoing is precisely why such

7    insurance exists.  It's not a basis to deny the insureds

8    access to the policies.

9            There's also a "war of attrition" argument raised

10   by the Committee that somehow by accessing the policies,

11   we're depleting assets of the estate.  This is really just

12   an impermissible, backhanded attempt to regulate defense

13   costs.  That argument has been squarely rejected by courts.

14   In particular I think the Allied Digital Technologies case,

15   a bankruptcy decision from Delaware in 2004, addresses this

16   in a very apt way.  A quote from the decision where the

17   trustee was opposing access to D&O insurance, and I'll read

18   from the decision at Page 513.

19           "The Trustee's real concern is that payment of

20   defense costs may affect his rights as a plaintiff seeking

21   to recover from the D&O policy rather than as a potential

22   defendant seeking to be protected by the D&O policy.  In

23   this way, the trustee is no different than any third-party

24   plaintiff suing defendants covered by a wasting policy.  No

25   one has suggested that such a plaintiff would be entitled to

1    an order limiting the covered defendant's rights to

2    reimbursement of their defense costs."

3              In other words, what the Committee is really

4    asking this Court to do is precisely what the caselaw

5    forbids; rewrite the policies to earmark them for some

6    future hypothetical judgement or settlement at the expense

7    of the insured's bargained-for right to defense and cost

8    advancement.

9              Similarly, Your Honor, there's an unclean hands

10   argument.  I don't think that there's really much to say

11   about that.  Alleged wrongdoing is not a basis to deny

12   coverage.  As I said before, the cases squarely support the

13   position that it's precisely because of allegations of

14   wrongdoing that access to insurance should be provided.  As

15   I mentioned before, the cases from Judge Glenn and Silicon

16   Valley Bank, MF Global Holdings, and other cases squarely

17   support that position.

18             Next, Your Honor, the Committee raises an argument

19   that there's been a -- or will be an improper profiting by

20   the movants in accessing their D&O coverage.  Movants

21   certainly are not profiting.  What they were doing is

22   seeking funds to defend themselves, just as any litigant

23   would.  And in this case, the access to those proceeds is

24   governed by contracted clear terms, which are undisputed.

25             The wait and see approach also should be rejected

1    out of hand.  There's really no basis and there's no case

2    cited for the proposition that the movants should have to

3    defend legal proceedings without getting access to coverage

4    and await the determination of a court of competent

5    jurisdiction.

6        Ultimately, Your Honor, the Committee asks this

7    Court to use equity to override an unambiguous insurance

8    contract.  That is not what equity permits.  Equity cannot

9    rewrite bargained-for insurance contracts.

10       Yes, Justice Douglas noted in Pepper v. Litton, a

11   1939 Supreme Court decision that was cited by the Committee

12   to the effect that equity prevents fraud.  But here,

13   enforcing the policy terms is not fraud; it is honoring

14   contractual rights.  So that covers the Committee's

15   objections.

16       Next, Your Honor -- and I'm close to being

17   finished with my presentation -- Katsumi raises a number of

18   proposed revisions to the order that it's seeking to compel

19   on the movants without their consent.  We don't believe

20   there's any legal or contractual basis for that.

21       As I noted before, there is a resolution to the

22   estate fiduciaries.  That would include the third estate

23   fiduciary, the Committee, for reporting and transparency.

24   There's no need to broaden the recipients who get that

25   reporting.  If Katsumi is going to get it, then we're going

1    to have floodgates of all sorts of parties potentially

2    showing up and say they should get this information, too.

3    And we think the provisions of reporting is more than fair

4    and reflects a good faith compromise that doesn't compromise

5    the movants' rights under their policies.

6           Second, Katsumi is requesting some type of a cap,

7    a soft cap, however you want to call it.  That would

8    override the bargained-for contracts.  They had cited the MF

9    Global decision, saying it was instituted in that case.

10   Actually what happened was in a subsequent case, the court

11   revisited the issue, concluded the D&O proceeds were not

12   estate property, relying in part on the priority provisions,

13   which are essentially the same as what you have here, and

14   did not impose any cap going forward.  Similarly, Your

15   Honor, the demands for (indiscernible) alerts or court

16   oversight are equally unsupported.  The policies contain no

17   such provisions.  Fiduciaries will already receive

18   reporting.  That's enough, more than enough.

19          And finally, Your Honor, the jurisdictional or

20   claw back conditions are unnecessary, unwarranted, and not

21   supported by applicable law.  The ABC policy already

22   supplies a dispute resolution framework for any issues with

23   advances.

24          In sum, Your Honor, with the concessions that have

25   been made, there should be no issue from any estate party or

1    any party generally that this isn't appropriate relief

2    within the context of this case, and we would ask the Court

3    to enter the revised proposed order without imposing any

4    further restrictions by Katsumi or any other party.

5            Finally, Your Honor, as requested in our motion,

6    we have sought a waiver of the 14-day stay requirement to

7    the extent that waiver is applicable.  As set forth in the

8    papers, the movants requested that waiver because legal fees

9    are accruing now in active proceedings, investigations.  Mr.

10   James is a defendant in the adversary proceeding.  Others

11   may soon be named.  There were Rule two-thousand --

12   subpoenas that as Your Honor is aware were the subject of

13   extensive motion practice.  And any delay in getting this

14   relief we submit would cause immediate prejudice by

15   depriving the movants of the ability to defend themselves by

16   having access to the policies.

17           So unless Your Honor has any questions for me,

18   that concludes my presentation.

19           THE COURT:  No questions.  Thank you.

20           MR. DENDINGER:  Good afternoon, Your Honor.  For

21   the record, Mark Dendinger of Bracewell for Edward James,

22   otherwise known as the other Mr. James, I suppose.  Perhaps

23   I should clarify with Your Honor for purposes of the record

24   how I should refer to Mr. James.  Because I refer to him as

25   Mr. James.  Should I call him Edward James?

1              THE COURT:  You can call him what you like.

2              MR. DENDINGER:  Okay.  Sounds good.  Thank you,

3     Your Honor.  I represent Edward James, one of the movants

4     here.  I echo the comments of Mr. Saval.  And I just have a

5     few things I would like to say in connection with our

6     request to enter the revised proposed form of order that's

7     been on the docket for about a week now.

8              This morning I was listening acutely to the status

9     conference, and it sounds like litigation has already been

10    brought in this case, as we know.  And it sounds like from

11    Mr. Singh perhaps there will be other litigants who are

12    named as soon as this week.  I think that that could include

13    some of the movants for the joinder parties.  And so I think

14    time is of the essence to get a ruling from Your Honor on

15    this issue, because I expect additional litigation to come.

16             Mr. Stark also made comments to the Court this

17    morning about litigation.  I think he said this is either a

18    business with fraud attached or a fraud with a business

19    attached, echoing the comments that there will probably be

20    additional litigation that's brought soon enough.  But even

21    if there isn't additional litigation brought, Your Honor, my

22    client and some if not all of the other movants and joinder

23    parties are already being investigated on several fronts.

24    From the Debtor's Special Committee, from the UCC's 2004

25    examinations up to this point, requiring parties to file

1    motions to quash, from the SEC, from the DOJ, from what it

2    sounds like soon to be as of this Friday, the examiner.  And

3    all of these costs are compensable to the Ds and the Os that

4    are entitled contractually to the proceeds of this policy.

5         To reiterate, if the Court were to rule that the

6    proceeds of the Ds and Os policies were not -- were property

7    of the bankruptcy estate such that proceeds of those

8    policies could be utilized to distribute monies to creditors

9    as part of this bankruptcy, I think it really is unworkable

10   and would turn D&O insurance law on its head.  I'm not

11   certain a D or an O that would be wanting to serve in a

12   capacity as in a special committee role, on a board of

13   directors heading into a bankruptcy proceeding if by the

14   simple filing of a complaint in the bankruptcy process, the

15   D or the O therefore couldn't access the insurance proceeds

16   to defend himself or herself in the bankruptcy proceeding.

17   That just seems to be unworkable as a practical matter.

18        And particularly here, the Committee cited largely

19   equitable concerns.  That's unsurprising because of the

20   binding Fifth Circuit precedent that says that proceeds of

21   D&O policies are not property of the bankruptcy estate.  So

22   they had to cite to something, the unclean hands arguments,

23   and the like.

24        But that also -- to cite some equity back in

25   response if the Court might indulge me, the Committee is

1    already off to the races.  They've said so this morning.

2    Now, perhaps they'll have to pump the brakes a bit with the

3    2004, but they certainly have as estate fiduciaries many

4    other things to do in these cases that are going to be

5    adjacent to investigative work of the various parties,

6    including the examiner.  Counsel this morning just said that

7    he would like to work in tandem alongside and help the

8    examiner with the work product that's been generated.

9            And thus far the Brown Rudnick firm just filed fee

10   applications, and that's cost the estate $12 million in a

11   75-day period.  And that's not including the fees of local

12   counsel.  And if Brown Rudnick would have its way or the

13   objectors would have their way, they would be asking us to

14   have zero dollars to defend ourselves in a contract that we

15   believe is not part of the bankruptcy estate.  The proceeds

16   of the contract are not part of the bankruptcy estate.  And

17   that seems to be unworkable.  How could we be asked to

18   comply?  How could we be asked to properly defend ourselves?

19   How could we ask to be cooperative with the Committee, with

20   Katsumi, with the Debtors if we don't have access to the

21   proceeds to help us do that?

22           And the last thing I would say, Your Honor, is

23   it's obviously hopefully not lost on the Court that the

24   Debtors themselves support the relief requested in the

25   revised proposed form of order.  The DIP lender as the only

1   financing party in these cases support the relief requested,

2   the revised proposed form of order.  I don't -- we didn't

3   draw any opposition papers from any of the SPV lenders.

4   Really, we're here today because we were unable, although we

5   tried, to work out the form of a consensual form of order

6   with the case parties.  And that included the Committee.

7   They were in initially and they elected to pursue a path of

8   opposition.  They are in the order.  We are prepared to keep

9   them in the order as an estate fiduciary.  And we do think

10  by having them as an estate fiduciary, they do speak for all

11  unsecured creditors in the case.  That's their statutory

12  role.  And that would include Katsumi.  So I do agree that

13  by opening up the flood gates and allowing Katsumi the same

14  information rights, it could be that other parties in

15  interest ask for the same treatment.

16          Unless Your Honor has questions for me, that's the

17  end of my presentation.  Thank you.

18          THE COURT:  No questions.  Thank you very much.

19          Anyone else in the courtroom support the relief

20  requested, or that wish to be heard?  Let me just turn to

21  the phone line.  Is there someone who wishes to be heard who

22  supports the relief requested?  Ms. Santos?

23          MS. SANTOS:  Your Honor, this is Sarah Santos.

24          THE COURT:  Ms. Santos, I'll start with you.

25          MS. SANTOS:  Thank you, Your Honor.  We represent

1    David Parker.  He is the current Executive Vice President of

2    Global Special Projects and Integrations for the Debtor.

3    And as the movant's counsel -- we have filed a joinder to

4    what the movants filed to their motion, their reply.  And

5    we're in agreement with the arguments that they have

6    presented to the Court in their briefings and today at this

7    hearing.

8            One important factor that I wanted to add to what

9    they've already stated.  Yes, movant's counsel recognized

10   there are directors and officers who are seeking coverage

11   for both former and current employees.  Our client is one of

12   those current employees.  And he is performing his day-to-

13   day job, his duties as an executive vice president.  And not

14   just performing his day-to-day duties, Your Honor, but also

15   helping with restructuring of the Debtor in a variety of

16   tasks which we can provide more light on.

17           Then separately he is also being asked to respond

18   to inquiries to cooperate with interviews, with requests for

19   documents.  And currently he is paying out of pocket, which

20   is certainly not what any director or officer who takes on a

21   role like this bargained for when they become an executive

22   vice president of a company such as this.

23           One added point that I wanted to make.  There's

24   caselaw as well such as In re SVB financial Group case out

25   of the Southern District of New York that talks about

1    situations where current employees look to protections from

2    the D&O policy for reasons such as the ones we're describing

3    here today.  Right?  In the absence of such a policy, their

4    attention would be diverted.  They would be paying out of

5    pocket funds just to defend and to be able to cooperate and

6    assist with all the inquiries and investigations that are

7    undergoing in this case.  And that in fact would be

8    detrimental to the estate.

9          In the In re SVB Financial Group case, the Court

10   says, you know, the movants reasonable argue that absent the

11   assurance that the D&O policies are protecting them in the

12   various lawsuits and investigations.  Their attention would

13   be diverted from the Debtor's operations to the detriment of

14   the estate.  And that's the situation where our client and

15   various other current employees are in as well.

16         And so to prevent him access to the D&O insurance

17   proceeds so that he can have defense costs certainly is a

18   harm to him.  But not only a harm to him as a current

19   employee, but also to the estate.

20         And so that's the only added point that we wanted

21   to make, Your Honor.  Unless there's any questions for us,

22   we ask that the Court grant the relief sought.

23         THE COURT:  Thank you very much.  Anyone else?

24   Yes, Mr. Kasulis?

25         MR. KASULIS:  Yes, thank you.  This is Tim Kasulis

1    from Morvillo.  We represent Stephen Baker, who is the

2    former chief corporate strategy officer at First Brands.

3    Thank you for the opportunity to speak, Your Honor.  I will

4    be very brief.

5           We join all the arguments of the other movants.

6    It seems very much that they are consistent with the

7    principles and precedent dealing with these issues in this

8    Court and across the country.

9           I wanted to be heard separately only to respond or

10   address the allegations on the Committee that they may be

11   bringing more claims in the future of an enormous scale,

12   according to their response.

13          I agree with Mr. Saval that that cannot possibly

14   be an impediment to the relief granted here.  It can't

15   amount to saying that if you need to be able to file a claim

16   under the D&O policy, you are barred from doing so.  That

17   cannot be the way the law works.  And I think they cite no

18   caselaw to support that proposition because there is none.

19          But moreover, uniquely to Mr. Baker, Your Honor,

20   there are no allegations that I am aware of filed literally

21   anywhere in the country, in this court or otherwise,

22   asserting misconduct against him.  He was a highly-respected

23   lawyer before he went to First Brands.  He was a partner at

24   both the Shearman & Sterling and Paul Hastings law firms.

25   And when you take a job, as Your Honor knows, to be a

1   director or officer at a company, having the availability of

2   the D&O policy is a substantial employee benefit.  It's

3   something employees rely upon in taking the job and they

4   accrue value in it while working there.  So not only is this

5   exactly why the relief is needed, Your Honor, it's why the

6   relief is needed right now for the reasons stated by all the

7   other counsel.  Thank you.

8         THE COURT:  Thank you very much.  Let's see.  Ms.

9   O'Donnell?

10         MS. O'DONNELL:  Thank you, Your Honor.  We

11   represent Laurie Stein.  Ms. Stein is the Chief Legal Risk

12   and Administrative Officer at First Brands and has been

13   there for some time.

14         Like other current employees, she is also

15   assisting the Debtors in the restructuring work and

16   attending to her daily duties.  And in her role, she has

17   received a request for an interview from the Debtors, and

18   she has received requests for involvement with law

19   enforcement proceedings.  And so we don't want to add much,

20   but just to join what the other movants have said.  Thank

21   you.

22         THE COURT:  thank you very much.

23         MS. O'DONNELL:  Oh, I'm sorry.  The only other

24   thing is there are no allegations of misconduct against Ms.

25   Stein.  She wasn't referenced in any of -- we've been here

1    for hours.  She wasn't referenced once.  And we haven't

2    heard any allegations of misconduct against her.  Thank you.

3            THE COURT:  Thank you.  Let's see.  Mr. TumSuden,

4    do you wish to be heard?  Anyone else wish to be heard?

5    Let's see.  Anyone else?  Going once.  Let's see.

6            Mr. TumSuden, are you trying to -- do you wish to

7    be heard?

8            MR. TUMSUDEN:  Yeah.  Thank you, Your Honor.  For

9    the record, Kyle TumSuden, Mayer Brown, on behalf of Katsumi

10   Servicing.

11           THE COURT:  Yes.

12           MR. TUMSUDEN:  Apologies.  You still wanted to

13   hear from those in support of the motion, but I'm happy to -

14   -

15           THE COURT:  Oh, that's -- no, no, no.  I was just

16   -- I still am going.  I'm just making sure.  I forgot you

17   represent Katsumi.  I apologize.  I was just calling names

18   on boxes.  Apologize.

19           Let me hear from the Committee.

20           MR. STARK:  May I bring this up?

21           THE COURT:  Yeah, absolutely.  Absolutely.

22           MR. STARK:  I have agreements with judges around

23   the country; if I break it, I buy it.

24           I have a demonstrative that I'd ask if I can --

25           THE COURT:  Yes, of course.

1          MR. STARK:  May I approach?

2          THE COURT:  Yes, absolutely.  Thank you.

3          MR. STARK:  Thank you.

4          THE COURT:  Thank you.

5          MR. STARK:  I have to do two things, Your Honor.

6     First, forgive me, my old colleague and former partner, and

7     it's the first time that I've been across the table from

8     him.  So it's an honor for me to be able to talk to Mr.

9     Saval, number one.

10         Number two is I think we did not put anything into

11    evidence, and we should probably just do that.

12         THE COURT:  Okay.

13         MR. STARK:  There's Exhibits 26 and 27 on the

14    Committee's list.  It's just the insurance policies.  We

15    listed a bunch of other things, but I think given the

16    earlier hearing, we can probably put them off.  And I don't

17    believe we have any dispute from --

18         THE COURT:  If you can just give me the docket

19    number.

20         MR. STARK:  Apologies.  It's my exhibit number --

21    the witness exhibit binder for the Committee.

22         THE COURT:  Committee Exhibit 26 and 27?

23         MR. STARK:  Yes, Your Honor.

24         THE COURT:  Okay.  Any objection to the admission

25    of 26 and 27?

1          MR. SAVAL:  (indiscernible) the same policies into

2     the record as well.

3          THE COURT:  Okay, 26 and 27 are admitted.

4          (Committee Exhibits 26 and 27 admitted into

5     evidence)

6          MR. STARK:  Okay.  Thank you, Your Honor.  If Your

7     Honor will walk through the slide deck with me.

8          THE COURT:  Okay.

9          MR. STARK:  I think we've got to just understand

10    the policies first.  Because we're talking really high-level

11    and lots of stuff.  And I'm at fault for that, too.  I was

12    trained to start with Pepper v. Litton for almost

13    everything.  So that's sort of how I think about the world.

14    And then I kind of move in from there.

15          Maybe we should retract and look at the policies

16    holistically.

17          THE COURT:  Okay.

18          MR. STARK:  So let's get real basic.  We've got

19    two towers of policy.  We have what we call the Berkshire

20    Hathaway tower, which is $100 million, and we have a second

21    tower, which is the AIG tower, for another $100 million.

22    The first tower has Berkshire Hathaway as the lead primary

23    insurer.  The second one has AIG as the lead primary

24    insurer.  There are ten entities in each tower.  Each of

25    them have supplied $10 million to make a hundred million in

1    both.  Okay?

2            The Berkshire tower is Side A, Side B, Side C.

3    The AIG tower is just Side A.  And that's magical.  Let's

4    talk about what that is.  Side A means that directors and

5    officers, to the extent that a loss is visited upon them

6    individually can look to the policy to reimburse them for

7    the losses or to satisfy those losses, right?

8            The second is Side B, which is that there are

9    losses visited on the company.  Because the company has to

10   pay indemnification or other reasons for those Ds and Os.

11           The third is that the claims are made against the

12   company qua the company and they're covered losses and then

13   they get paid, the estate gets paid or the creditors get

14   paid from the policy.  Okay?

15           So Berkshire Hathaway is sort of more along the

16   lines of what a lot of the caselaw talks about where the

17   Debtor and the Ds and Os are co-insured.  We have two more

18   sides than they do, but we are coinsured.  The AIG is just

19   them.  We are not coinsured.  Okay?

20           Now, had those conversations that they were

21   chatting about earlier before we got into this contested

22   matter actually migrated the conversation towards the AIG

23   tower and not the Berkshire Hathaway Tower, we might not

24   have this problem.  But they didn't do that.  They want $200

25   million of defense availability.  Not for a lawyer, not for

1    two, but for what seems to be mushrooming dozens of lawyers.

2    We now even have a legal administrator who has hired a law

3    firm with three lawyers sitting on a box watching our

4    proceedings.  Not for now, but for the whole day.  Right?

5    How many administrators do we have?  How many executives,

6    present and former, do we have?  $200 million.  Would have

7    been different if they only focused on the hundred.  Let's

8    go to the next slide.

9            An important part of this policy, of both policies

10   which make them different than many of the policies is

11   there's no insured versus insured exclusion.  Right?  So to

12   add some understanding of that phraseology, the Debtor can't

13   sue the Ds and Os and the policy won't pay if they get a

14   judgement against the Ds and Os because we are both insured,

15   except neither tower has that very common exclusion.

16           With respect to the Berkshire tower, they had it

17   originally, but they did an override.  I guess they knew the

18   estates would be coming.  With respect to the Side A, there

19   never was the exclusion to begin with.

20           So those policies pay to the estates as well on

21   claims to the extent that we have claims that would go to

22   losses, like breaches of fiduciary duty.  And oh, do we have

23   breaches of fiduciary duty.  Okay?

24           One last slide on just getting our context right

25   and then I'll delve into the polices more specifically so

1   you really understand it.  Okay?

2           Our jurisprudence talks about an adverse effect.

3   Does allowing stay relief as the movants requested create an

4   adverse effect on the estates?  Sort of an easy call with

5   respect to the Berkshire Hathaway tower.  Side A, Side B,

6   Side C were coinsured.  Two of the three sides are for us

7   for the estate, not for them.  But okay.

8           If they use up the $200 million, right, we don't

9   get paid on claims.  And importantly, creditors who have

10  claims that are losses assertible against the company, and

11  oh, are we going to have creditors asserting claims for

12  losses against this company that would be covered by the

13  policy.  They don't get paid, which means our claim burden

14  goes up.  Exhausting it by lots and lots and lots of

15  lawyers, right, makes it dollar for dollar reduced about the

16  claims that get taken care of that become dollar for dollar

17  increases in the claim burden of the estates.  That's what

18  all the cases talk about.  Okay?  And we have that insured

19  versus insured exclusion.  So it also erodes asset value

20  that is discernible.  And if you haven't noticed, Your

21  Honor, we have a shortage of liquidity in this case.  These

22  are important things when we have claims that are being

23  asserted amongst others in a present adversary proceeding

24  against Patrick James going to trial in June.  Having access

25  to that policy is probably something that we would like at

1   least to talk about with the carrier.

2         But now let's go over to the AIG.  Because this is

3   the harder one, because it's much more indirect.  Right?

4         You could have bowled me over with a feather when

5   counsel to Mr. Edward James gets up and wants to talk to you

6   about equitable principles and policy about what honest Ds

7   and Os should get.  But leaving his colloquy aside for the

8   moment, right, claims that are -- if the policies are

9   absorbed by all of these lawyers, right, there are going to

10  be, and in fact there may even be on the Hollywood Squares

11  lawyers representing less culpable, more good faith people.

12  But in the zeal to go after the James brothers and the

13  people close to the James brothers and their battery of big-

14  time expensive lawyers, there may not be anything left for

15  them.  And then they have indemnity claims against us.

16  Indirect, I got it.  I understand.  And I understand what

17  the case is about, estate value and estate asset.  But that

18  is an adverse effect that is palpable in the particulars of

19  this case.  And I'm going to come back to that.  Okay?

20        Let's go a little bit further if we can because I

21  want to make sure that Your Honor really understands these

22  policies and really understands what they gloss over the top

23  and then don't get down into the weeds.  Okay?  So we'll

24  talk about the Berkshire Hathaway tower.  If you go to slide

25  six, this is the cover sheet.  Just so we're orienting

1   ourselves.  Why we call it the Berkshire Hathaway tower.

2   Okay.

3           On slide seven you actually see the cutaway from

4   the policy that defines Side A, Side B, Side C.  Again, Side

5   A, the Ds and Os get losses, they go to the policy and they

6   say pay on them.  B, if we the estate have to pay indemnity,

7   then the policy pays us to reimburse us.  And C of course is

8   if the policy pays on creditors who otherwise would have

9   claims against us.

10          There is no argument under any of the cases -- I

11  understand we all agree that the policies themselves are

12  assets of the estate.  But there is no capacity to argue

13  that the proceeds of the Berkshire Hathaway policy is not an

14  asset of the estate.  It says it directly, it pays to the

15  estates.  And there's no ambiguity under any of the cases.

16  And we could start with Louisiana World if you would like.

17          Another point about these policies.  I'm going to

18  just do a couple points about each policy and make sure Your

19  Honor understands it.  If you go to slide eight.  Okay.

20          They make it sound like if Kobre & Kim has an

21  invoice for work they did last month and they tender it to

22  Berkshire Hathaway, Berkshire Hathaway then cuts them a

23  check for the work.  That is not how it works.  There is no

24  covenant in there to pay Kobre & Kim's invoices.

25          What there is is a payment priority provision,

1    which says before we, Berkshire Hathaway, pay for any other

2    law -- any other less, excuse me, we must then pay their

3    invoices to the extent that it's reasonable and fits within

4    the other sort of things.  There is no obligation by the

5    insurer immediately to pay on this.  Okay?  So this need,

6    this we've got to get our bills out, we're going to get

7    paid, that is not reality under this agreement.  There is no

8    deprivation of a contractual entitlement.  It doesn't exist

9    as they've presented it to Your Honor.  And this is the

10   heart of their motion.

11         Then these costs might never get paid.  It's not

12   only that they may not get paid immediately, they may never

13   get paid because there is a wrongful act exclusion that says

14   that if the losses arose from doing really, really, really

15   bad things, you don't get paid your defense costs for them.

16   Okay?

17         Now, it is true, I acknowledge it, it says that

18   this exclusion only comes into bear if there is a final non-

19   appealable order to that effect.  But I've been around

20   bankruptcy cases long enough to know that insurers sometimes

21   say I'm going to wait and see on that sort of stuff.

22   Because there's a permeating allegations and admissions by

23   the Debtor of a lot of bad stuff, including thank you people

24   who have lawyers, who are standing at this podium saying I

25   am entitled as if I was honest as the day is long access to

1    this policy.

2            But I will tell you, Your Honor, if you go to

3    slide ten, whereas their entitlement is very inchoate and

4    may never actually achieve anything, right, creditors will

5    most assuredly be asserting claims to get to this policy.

6    That is without a doubt.  Because this -- this is really,

7    really important, Your Honor.  Right?  We've talked all this

8    morning about allegations by the Committee.  And nothing is

9    proven and there's no merits trial.  Okay?  This is not a

10   widget company.  This is not business as normal in Chapter

11   11 land.  This is cockroach land.  The allegations are more

12   than allegations.  These are admissions by the Debtor

13   through sophisticated professionals, a lot of which is under

14   oath.  And in the record of this case not only is

15   declarations and affidavits in the pleadings, but in

16   adversary proceedings.  This is not a fly-by-night set of

17   people who are making statements to Your Honor as

18   representations of truth about what they actually found when

19   then went into the room after the James' were gone and what

20   they saw, oh my god.  These are not people who are flimsy

21   when they make these statements to Your Honor.  This

22   permeates every attribute of this case.  Right?  There will

23   be lots of creditors, and they've already shown up in this

24   case.  They were the ones who started moving for the

25   examiner, for example, saying where did $2.3 billion go,

1    right?  and that's just the beginning.  Statements from the

2    company itself by respectable people who don't file

3    pleadings unless they have basis to do so say things like

4    the 2.3 was procured through nonexistent or doctored

5    invoices and double-pledging of assets.  Conversion,

6    embezzlement, misappropriation of hundreds of millions of

7    dollars.

8            I did not make these up.  These are not my

9    allegations.  These are representations from the Debtor, and

10   they know what they're doing.  And it goes beyond the James

11   brothers.

12           If you read the complaint further and you read the

13   pleadings further, there was a coterie of people around them

14   that helped them, that received instructions and directions

15   to effectuate the things that now we're around chasing our

16   tails trying to figure out how to get the money back.  And

17   many of them have since resigned.  Not all of them.  I

18   acknowledge from the Hollywood Squares, not all of them.

19   Some are there and they're helping, and maybe we need to

20   consider that in this situation.  But there clearly is a

21   camp that is not of that variety.  But in the end from a

22   legal analysis perspective, every dollar of claim that is

23   paid by the policy is one less dollar of claim that is

24   assertable and payable by the estate.  And that under our

25   jurisprudence in this circuit should be the beginning and

1    the ending of the question of whether or not cause needs to

2    be established for relief from stay.

3         I'll go on slide 11 and the little gilding.  Here

4    is your override.  Just so that Your Honor sees it.  Okay.

5    And this is not normal.  This is not a usual thing.  This is

6    Endorsement 12 that says if the Debtor sues -- and look at

7    the -- what debtor?  Any claim brought or maintained on

8    behalf of a bankruptcy or insolvency receiver, trustee,

9    examiner, conservator, liquidator, rehabilitator, or

10   creditor's committee is payable as a loss under the policy.

11   Did they see it all coming?

12        Slide 12, Your Honor.  Okay?  And this is just the

13   final point with respect to this.  Because Mr. Saval, my

14   good friend, I saw it in the papers on the first line and

15   reiterated it here.  It talks about this settlement that was

16   achieved.  In New York where I'm from, we call that fugazi,

17   Your Honor.  There was no settlement.  There was a debtor

18   who did not advance the objection because the debtor

19   contractually obligated itself not to do so and doesn't want

20   to breach the agreement.  Because there are other people

21   that have D&O coverage that they are particularly protective

22   of right now.  And the lenders didn't do it because this

23   isn't what lenders do; this is what creditors' committees

24   do.  So they left it for us because that's what the contract

25   says they are supposed to do, and that's how the process

1    works.

2              With that, Your Honor, can we turn to the AIG

3    tower?  I just want to make sure we understand that.

4              THE COURT:  Mm-hmm.

5              MR. STARK:  Slide 14 gives you the cover, so you

6    can see why we call it the AIG Tower.

7              This is Side A.  I don't run from that fact.

8    There is no payable directly to the estates, or to the

9    company I should say.  It goes only to the Ds and Os.  Okay?

10             If it is consumed in its totality, there will be

11   very little left.  If you are the James brothers and the

12   world is coming after you and you know they're coming after

13   you, you gird yourself with Quinn and with Bracewell and

14   with Debevoise and with every other lawyer you can find on

15   the street to build that fortress and hide in it.  And then

16   there ain't nothing left for everybody else.

17             Now, this is an important point, Your Honor.  And

18   this is a point that we had some colloquy about.  Right?

19   It's on slide 16, the really important point.  The Berkshire

20   Hathaway tower, that $100 million tower --

21             THE COURT:  You're on 16 -- yeah.

22             MR. STARK:  I'm sorry, Your Honor?

23             THE COURT:  Yes.

24             MR. STARK:  Okay.  $100 million tower is sort of,

25   for lack of a better word, the primary tower.  Right?  Lots

1    of excess in there.  This is another tower that seems to

2    kind of be another execs tower.  But it ain't, but it ain't.

3              Had they said, again, we're going to exert our

4    focus on the AIG tower and not touch the Berkshire tower, we

5    might not have had this contested matter.  So they don't

6    want to do that.  They want the extra $100 million.  Lots of

7    lawyers.  But importantly, they don't have a problem if they

8    only focus their efforts on the AIG tower.  It is what we

9    call a dropdown clause, which says that if I call up

10   Berkshire and say here is my Kobre & Kim invoice for last

11   month, would you please pay it.  And they say I'm not

12   feeling like it today.  Okay?  That doesn't mean that the

13   AIG tower can't receive the same invoice and in fact pay it.

14   Right?  The dropdown clause says if it's denied by

15   Berkshire, come back to us at AIG and we'll pay it there.

16   And if the dropdown clause is there and it's pretty clear,

17   why are we having this contested matter?  Why do you not

18   focus your efforts on the tower that's set up for you?  Why

19   do you got to take the estate's tower?

20             Next slide, Your Honor.

21             You will try in vain to look through the guide at

22   the top of this tower, the table of contents.  You will not

23   find an insured-versus-insured exclusion because it doesn't

24   exist.  When the estates sue and they get judgement, the

25   tower pays so long as it's a loss within the exclusions that

1    are there.

2              Hopefully Your Honor has a better orientation

3    towards the policies now.  So it takes me to conclusions.

4              I end where I began, or I begin my conclusions

5    with where I began, which is when I graduated from law

6    school and there were dinosaurs still walking down the

7    street, we talked about Pepper v. Litton.  It was a north

8    star.  This is a court of equity because it has been framed

9    for over a hundred years as a court of equity.  Because we

10   have to do in summary fashion what other courts do in five

11   years.  Right?  We have to move quickly.  We have to think

12   about things.  So we have to look at things with an

13   equitable notion of what is there.  And of course Justice

14   Douglas's famous phrase about being -- judges have to look

15   behind what's going on, feel what's going on, and be able to

16   rely upon those equitable senses to get to the right

17   outcome.  To use Judge Learned Hand's famous quote,

18   bankruptcy cases not only must be right; they must seem

19   right.  That's all what that's about.

20             This case stinks.  It stinks so much that

21   everybody is talking about, watching it.  Jamie Dimon is

22   giving it names.  Right?  You cannot walk away from any

23   contested matter with the permeation, the stench of what's

24   happened here.  As the data becomes brought to the court's

25   attention, to the public's attention.  And that was what a

1    lot of today was about, was to start bringing attention to

2    where the money went, because we think we know where the

3    money went and how it got there.  We still have a ways to

4    go, but we're going to get there.

5         You can't walk away from it.  And you can't stand

6    up here as Mr. Saval did and quote from some cases that says

7    Ds and Os are entitled to the benefit of their bargain,

8    which is a Fifth Circuit phraseology and the two cases that

9    we have on point the benefit of their bargain, because

10   counsel was correct on the screen when they said it's

11   important for Ds and Os around the country to know that they

12   have insurance when they come in here.  Except Your Honor

13   heard it yourself, which is the James' brothers were on both

14   sides of the transaction and the money was swiped.  You

15   can't ignore it.  It's part of everything.  It's all over

16   the record.

17        And maybe you can't avoid analysis from

18   contractual purposes or assets of the estate purposes by

19   applying equitable principles, but it permeates areas of

20   judicial discretion.  Here, the requests are excessive.

21   Focus on AIG, Berkshire Hathaway alone because that covers

22   the estate.  You're consistent with the caselaw, you're

23   consistent.  It's a little Solomonic.  Don't ask for too

24   much.  Don't reach into places where we shouldn't.  Not on

25   this record.  And don't have your lawyers stand up here and

1    plead that you're innocent when we know you're not, and

2    you're going to be asserting policy issues all over the

3    place for benefits of the bargain that they sat on both

4    sides of the transaction.

5          I gather -- I know that there's room for debate on

6    AIG.  I appreciate that.  I read Louisiana World.  I read

7    Vitech.  I understand what those cases say about assets of

8    the estate and when proceeds are and are not.

9          And I would posit this to Your Honor, if you will.

10   Louisiana World was decided in the late 1980s.  Vitech was

11   decided 30 years ago.  The world has changed an awful lot

12   since those small opinions happened.  And the facts at issue

13   in those cases don't look anything like our facts.

14         THE COURT:  They don't look like 1939 either when

15   Pepper v. Litton was decided.

16         MR. STARK:  Fair point.  Fair point.

17         THE COURT:  Let's just stick to what we've got.

18         MR. STARK:  Very, very fair.  I only go back to

19   chestnuts as north stars.  You can go to precedent and say

20   this is binding precedent on us --

21         THE COURT:  Still binding.  I get it.

22         MR. STARK:  It is binding.  But the analysis may

23   very well be distinguishable for facts of the case that are

24   not before the Fifth Circuit.

25         I can see five different ways to read those two

1    decisions from the Fifth Circuit and say under the facts of

2    those cases, right, it looked very different than the facts

3    of this case as the record itself has presented itself.  I

4    gather we have another trial, I understand.

5              THE COURT:  No, no, I've got it.  But I'm just ask

6    you, on the AIG policy, what would be the legal basis to

7    argue that it's property of the estate?

8              MR. STARK:  Because there are two -- remember our

9    standard, if you can call it that.  There's not a lot of

10   caselaw.  There's --

11             THE COURT:  No, just statute, code.  How is it

12   property of the estate?

13             MR. STARK:  Yes, exactly right.  But what Judge

14   Sontchi did, what a few other --

15             THE COURT:  I'm asking you.  I don't -- but I

16   don't want you to focus on what other judges and what other

17   courts did.  We've got a policy here in front of me.

18             MR. STARK:  Yeah.

19             THE COURT:  It's AIG.  It's all Side A.

20             MR. STARK:  Yeah.

21             THE COURT:  You've got Louisiana World.  You've

22   got 541.

23             MR. STARK:  Right.

24             THE COURT:  Tell me how it's property of the

25   estate.

```
 1              MR. STARK:  I actually endorse the adverse effect

 2    concept.  It permeates other parts of the bankruptcy code.

 3    So --

 4              THE COURT:  And where do you find the concept of

 5    adverse effect under 541?

 6              MR. STARK:  Oh, those particular words?

 7              THE COURT:  Yeah.

 8              MR. STARK:  That was the interpretation -- this is

 9    -- as you sort of read through the cases, courts are

10    struggling.  And they talk about that there's like --

11              THE COURT:  They don't struggle on this point

12    though.

13              MR. STARK:  Well, they struggle on the notion of

14    how does one deal with a -- the policy is property of the

15    estate.  We know that money that seems to have been --

16              THE COURT:  And a non-debtor owns it, right?  It

17    gets more complicated in this case.

18              MR. STARK:  It does.  It does.  I understand that

19    point.  Right?  I don't have an easy answer to that, and I -

20    -

21              THE COURT:  I got it.  I'm waiting on them to come

22    back so I can ask them about the Berkshire Hathaway policy

23    and that stuff.  I wanted them to kind of get it all out.

24    But I just -- I appreciate the distinction.  There is a

25    distinction I think in my mind between the AIG and Berkshire
```

1    Hathaway.  One is -- they're different.  I'll just leave it

2    there.

3                MR. STARK:  And I agree with that.  And it's the

4    right question to ask me, Your Honor.  and I wish I had an

5    easy answer.  I read Louisiana World.  I know it's very

6    dated.  I know the world is very different.  And I know that

7    the lawsuit that was prosecuted by the creditors' committee

8    in that case was a busted LBO fraudulent transferee kind of

9    a claim.  This ain't that case.  Not by a long shot.  This

10   is tort.  This is really bad in a way that I have a lawyer

11   making a presentation on behalf of one of the people

12   involved here, says that if he's put into a deposition, he's

13   going to take the Fifth.  I heard that -- and again, another

14   moment where I almost rolled out -- fell out of my seat.

15   Right?  you have former officers and directors who are

16   telling Your Honor in court, open representation, that if

17   put in a deposition scenario, they're likely to take the

18   Fifth.  Is that Louisiana World?  Far from it.  Right?

19               On the facts of this case as the Court is aware of

20   today where nobody knows whose money it was that was

21   purchased, but we know who bought it, and we know who bought

22   it for what purpose.  And that the end result, they're

23   standing here right now saying I need $200 million of value

24   so that I can protect myself from the onslaught that's

25   coming.  That is not Louisiana World.  That is

1  distinguishable from our circumstances.

2        And back to Your Honor's point about 541, two

3  things I said on the adverse effect.  One is the estates

4  have claims that might pay on these facts.  I appreciate

5  that some of the case didn't like that analysis.  But those

6  are out of the circuit.  And on these facts, it may be very

7  different.  And again, look at what's happening.

8        Look at what Judge Glenn did in MF Global at least

9  initially where he said we need a little restraint.  Because

10  there are going to be people who are going to be big-time

11  targets for attack, and they might absorb all the money.

12  And then there will be people like a legal administrator who

13  might not have access to the money.  And that is something

14  that I do believe, Your Honor, from a property of the estate

15  perspective -- I grant you it's a flexible approach, I grant

16  you it's not easily found in the precedent.  But it feels

17  right under the facts of our particular circumstances that

18  in fact our law might recognize it as such.  Okay?

19        That takes me to my last point, Your Honor.

20        THE COURT:  Answer this question for me, because I

21  know that this is a point they're going to make on

22  (indiscernible).  How do I think about the argument -- let's

23  just put Berkshire Hathway...

24        MR. STARK:  Yeah.

25        THE COURT:  Before you get to B, you've got to

1    cover A.  So it may be a timing issue.  The Side A -- before

2    you -- there may be claims for Side B and Side C --

3            MR. STARK:  Oh you mean in terms -- because of the

4    priority of payment entitlement that (indiscernible)?

5            THE COURT:  Am I -- how do I think about that?

6            MR. STARK:  Well, one way to think about it -- and

7    I'm extrapolating from a different concept -- is sort of a

8    marshaling.  There is a $100 million tower that is set up

9    for you, Ds and Os.  Right?  Make your claim.  You don't

10   have to wait on the other one.  You don't have to go there

11   first.  You've got your dropdown.  Go do it.  Okay?  If you

12   do that, you sort of marshaled the resources.  $100 million

13   is still a lot of money, even in today's day and age, for

14   all these lawyers.  One would think that would be enough.

15   Why do you got to have 200?

16           If you're going into the situation of, well, I

17   need to figure out how to marshal vis-á-vis $200 million

18   stack, I still think you go to the hundred first and then

19   you see what you can do.  And if they say I'm not prepared

20   to do that, Judge, I want unfettered right wo sue up the

21   Berkshire piece first if I choose, which is implicitly what

22   they're saying, right, then that is most assuredly dangerous

23   to the estate, violates the automatic stay, and should not

24   be allowed.  Because you have ample access over there.  At

25   least come back at a later date if you find yourself three

1    months from now having used up $100 million.

2            And that gets me to my -- I don't know if I

3    addressed Your Honor's point.

4            THE COURT:  No, no, no, that's --

5            MR. STARK:  But let me give you my last point and

6    then whatever questions Your Honor may have for me.

7            No one ever likes a lawyer to get up and say, hey,

8    let's do this tomorrow.  Right?  Sometimes I find myself

9    having to sit in the courtroom and hear, well, not today,

10   but maybe tomorrow.  And that even happened today.  And

11   that's okay.  That's our process.  Because bankruptcy is

12   getting to something.  We're not litigating from something,

13   right?  We're trying to get ourselves to a solution in this

14   case.  And as we talked about this morning, we are going to

15   be working awfully hard now to try to get quickly to a

16   solution to this case because circumstances necessitate

17   that.  Right?

18           I can't propound 2004 anymore.  At least not now.

19   Right?  An examiner is going to take over after he gets

20   appointed, after he puts a work plan together, and after

21   Your Honor approves that work plan.  (indiscernible) a

22   couple weeks, right?

23           There is a litigation right now against one

24   person, Patrick James.  Not Edward, not any of these people,

25   not anybody but him.  Okay?  Sort of the last person to get

1    up at the podium and ask for equitable dispensation.  But

2    none of those other people right now, other than the lawyers

3    chomping at the bit to go do something and bill for it,

4    really at this moment is yet doing something.  Because I

5    can't go forward and the examiner is not yet ready to go

6    forward.  The only one that does not find themselves in that

7    position right now is Patrick James.  Pause on that one for

8    a minute.  Okay?  Because that's the only one that has

9    active litigation.

10            Now, there's discovery, that's true.  Right?  Is

11   it discovery to a point where our legal administrator has to

12   have three lawyers sitting in here to respond to document

13   productions?  I don't know.  I don't know what happened,

14   where that legal administrator is going through files to

15   deliver them to the lawyer, but I'm assuming Weil Gotshal is

16   involved in that sort of stuff.  Right?  that's what happens

17   in these types of situations.  Everybody girds for the

18   battle that hasn't happened.  They all get white collar

19   criminal law firms and they all sit with lots of lawyers

20   waiting for the subpoena to come, and then they churn and

21   then they bill.

22            We ain't doing that right now.  Your Honor told me

23   we're not doing that. And I know from the examiner we're not

24   doing that.  And I also know from the case context that

25   we're going to go start negotiating.  Maybe that arises in

1    the months ahead.  Maybe it arises in the weeks ahead if the

2    examiner gets this proposal up and running again.  But it's

3    not today.

4              The trial for Patrick James I believe is June.  He

5    may be different.  But he's also very unusual to be asking

6    this Court for dispensation in these regards.

7              So with that, Your Honor, if Your Honor has any

8    questions for me.  But I think we can probably wait, at

9    least for a lot of this.

10             THE COURT:  Thank you.  May I hear from Katsumi?

11             MR. TUMSUDEN:  Thank you, Your Honor.  Again for

12    the record Kyle TumSuden, Mayer Brown, on behalf of Katsumi.

13    I'll keep it short, Your Honor, given we agree with a lot of

14    the positions advanced by the Committee.  We don't have much

15    more than what we asserted in our objection, which is on

16    file at ECF 1145.

17             As a threshold matter, we don't dispute that the

18    policies under Side A tower are not property of the estate.

19    So we're not going to get into that back and forth. However,

20    all other policies, including the primary Berkshire policy,

21    are property of the estate, and so are their proceeds.

22             IN the Fifth Circuit, insurance policies and

23    proceeds constitute estate property where, as here with the

24    Berkshire policy, available coverage would serve to reduce

25    claims against the estate.

1          The estates, as Committee council pointed out, and

2     so did counsel for the movant, the estates and the directors

3     and officers here are coinsureds under the primary Berkshire

4     policy.  Moreover, the primary policy is a wasting policy.

5     Any defense costs advanced would reduce on a dollar-for-

6     dollar basis the amount of proceeds available to either the

7     estates for Side C losses or to the creditors with claims

8     against the estates.

9          For these reasons, we think that the risk of

10    prejudice to the estate and stakeholders arising from any

11    advancement at this point is concrete and substantial.

12    Allowing defense advancements under the primary policy would

13    reduce coverage available for Side C losses and could force

14    the estates to bear significant uninsured losses to the

15    detriment of all their stakeholders.  That risk is

16    especially acute here given the number of claim notices, the

17    number of movants, the allegations at plan in the adversary

18    proceeding that's already been filed, the number of law

19    firms already retained, and the numerous investigations that

20    are already underway.

21         Now to address the conditions and the safeguards

22    that we kind of plugged into our objection.  You know,

23    despite all these concerns, should the Court be inclined to

24    lift the stay, we propose that any relief should be

25    conditioned on a few what we consider reasonable safeguards.

1          First, we believe that the reporting obligations

2    agreed to by the movants, the Debtors, and the Ad Hoc Group

3    shouldn't be limited solely to estate figures and should be

4    extended to Katsumi.

5          With respect to Katsumi, we are a party to the

6    protective order and we receive similar reporting and

7    information rights from the Debtors on that basis in

8    connection with other matters in this case.  Katsumi is also

9    one of the largest if not the largest unsecured creditor in

10   these cases.  And given that the policies may be a source of

11   recovery for its claims, we think we should know -- you

12   know, we should be kept up to date on what's going on with

13   those policies.

14         Further, the movants have already agreed to the

15   contents of the reporting obligations.  So we don't see how

16   tagging on an additional recipient to that reporting would

17   impose any undue hardship on the insureds.

18         There's really no reason to limit it to just the

19   estate fiduciaries.

20         Second, one of the primary safeguards that we

21   lopped into our objections, we think it would be prudent to

22   require any movant benefitting from stay relief today to

23   consent to jurisdiction of this Court as a condition to

24   accessing any proceeds.

25         The Court -- I mean, it's supported by caselaw.  I

1    don't -- I know that nothing is -- you know, that nothing in

2    the Code per se.  The court in Celsius had enforced that as

3    a reasonable requirement.  And that's because in Celsius,

4    like here, the policies contained customary excluded conduct

5    provisions that are only triggered upon a final, non-

6    appealable adjudication.  And as a result, the insureds may

7    end up advancing defense costs under the Berkshire policy

8    that are ultimately excluded from coverage.  And then, you

9    know, the insurers are going to have to go out and try and

10   recuperate those payments.  Notwithstanding the Berkshire

11   policy's dispute resolution clause, we think that require

12   the movants to consent to jurisdiction, would ensure that

13   any dispute that arises after today concerning any advance

14   defense costs would be heard and determined by this Court.

15   And we think that condition is supported by the facts that

16   the Court heard just this morning from the Committee.  Some

17   of the directors and officers in these cases (indiscernible)

18   accept service of 2004s.  And just earlier statements from

19   counsel to a current director and officer of the Debtors

20   provided that it an exercise (indiscernible) rights.

21         With respect to Katsumi's discovery efforts in

22   particular, we've reached out to Patrick James' counsel to

23   try and set up a deposition and they said no.  So, you know,

24   I think in order to avoid any frustration of an insurer's

25   efforts to try and recruit payments that should be down to

1    the estate, any movant benefitting from stay relief today

2    should consent to jurisdiction.  And that's all we have.

3         THE COURT:  Thank you.  I will give a brief reply.

4         MR. SAVAL:  Thank you, Your Honor.  First of all,

5    I want to thank Mr. Stark for his kind remarks, even though

6    I disagree with everything else he said.  And it's good to

7    be in the case --

8         THE COURT:  You didn't disagree with that, huh?

9         MR. SAVAL:  A few things, Your Honor.  Whether you

10   call it wait and see, whether you call it marshaling or

11   anything else, what the Committee is asking for Your Honor

12   to do is two things.  Number one, rewrite the terms of the

13   insurance policies.  And number two, have this Court

14   regulate how those policies operate and how parties perform

15   under those contracts.  And --

16        THE COURT:  I'll give you the counterargument to

17   that.  Because I gave counterargument to a question for Mr.

18   Stark.  So they're not really asking me to regulate.

19   They're just saying there's one that's probably an easier

20   call for you to go to.  There's one that the Debtors may

21   have an interest in.  And -- right?  There is a property

22   interest in there.  What the extent is we don't know yet.

23   But the fact that the Debtors just have refused to indemnify

24   at this point, may mean something, may not.  But the Debtor

25   still has an interest in it.  So what they're saying is let

```
 1    them go use a hundred million first.  Don't let them drain

 2    this one.  Let them drain AIG first.  Or not drain it, seek

 3    to assert claims against that first because this Berkshire

 4    Hathaway one, there's an interest in there and, Your Honor,

 5    that brings in cause in there.  So what's the answer to

 6    that?

 7              MR. SAVAL:  Yeah.  So perhaps we can go back to

 8    the slides that Mr. Stark was using just to go through that

 9    --

10              THE COURT:  Just give me the answer.  What do you

11    think?  It's a legal question, right?  It's more of a cause

12    question.

13              MR. SAVAL:  yeah.  I do believe that it would be

14    putting the Court in a position to regulate how parties that

15    have entered into this agreement that are going to be --

16              THE COURT:  I don't think so.  Because there's one

17    that I'll tell you, I don't think -- I think AIG, it's just

18    not property of the estate.  Right?

19              MR. SAVAL:  Yeah.

20              THE COURT:  So I'm not regulating.  I'm just

21    saying one isn't.  And I'm asking you to help me think about

22    the other one.

23              MR. SAVAL:  Yeah.  Well, our position is that --

24              THE COURT:  So in other words, I'm not regulating,

25    because I'm saying I really don't have anything to do with
```

1    the first one.  So now the question is what do I do with the

2    one here.

3            MR. SAVAL:  Yeah.  So maybe we'll start with the

4    argument that the Berkshire Hathaway policy is property of

5    the estate.  Because I think that the presentation from Mr.

6    Stark and perhaps from Katsumi conflated the terms about why

7    the Debtor has an interest.  Because the focus as I

8    understand the Committee to be is that if this money gets

9    used up by defense costs, then there won't be money left

10   over if, as the Committee says, there will be lawsuits

11   against the movants and it will deplete the estate that way.

12   That's what I understand the argument to be.

13           THE COURT:  Or the interest that the estate has.

14           MR. SAVAL:  Yeah, the interest the estate has.

15   But the cases are clear, you don't look at hypothetical,

16   speculative interests.  You look at real interests.

17           THE COURT:  You look at state law.

18           MR. SAVAL:  Yes.  yes.  And that was the Fifth

19   Circuit --

20           THE COURT:  In other words, but doesn't the

21   contract itself provide that there's coverage?

22           MR. SAVAL:  Well, so yeah, that's exactly the

23   point where I was going to, Your Honor.

24           THE COURT:  Okay.

25           MR. SAVAL:  It provides coverage under Side C --

```
1              THE COURT:  I'm trying to get you there.  Go

2       ahead.

3              MR. SAVAL:  Yeah.  To the Debtor it provides

4       coverage under Side C for a claim made against the insured

5       entity, meaning claim against the Debtors, not claims by the

6       Debtors.  That's what the Committee is talking about.

7              THE COURT:  And who is the insured entity under

8       the policy?

9              MR. SAVAL:  That would be the Debtors, it would be

10      the non-debtors that are subject to --

11             THE COURT:  In other words, who is the defined

12      insured party under C?

13             MR. SAVAL:  It is -- just give me a moment, Your

14      Honor.

15             MS. WEISGERBER:  It's Mayfair Enterprises, Your

16      Honor.

17             MR. SAVAL:  And every sub underneath it.  it's

18      every --

19             THE COURT:  It's the non-debtor and each of the

20      subs, right?

21             MR. SAVAL:  It's every debtor.  It's the -- if a

22      claim is made --

23             THE COURT:  No, I'm asking.  Hold on.  That's the

24      question that I've got.

25             MR. SAVAL:  Yes.  so it's Mayfair and its
```

1   subsidiaries, which includes the Debtors.

2           THE COURT:  And the subsidiaries are...

3           MR. SAVAL:  Are debtors.

4           THE COURT:  Of Mayfield.  So the debtors are

5   covered under C, right?

6           MR. SAVAL:  Yeah.  So as an initial matter, the

7   UCC represent creditors of the estate.  They don't represent

8   the -- yeah.

9           THE COURT:  Let's just stick with 541 analysis.

10          MR. SAVAL:  Yeah.  And so what we're talking about

11  is, for example, a securities claim against the Debtor based

12  on a wrongful act.  Those actions are stayed.  No one has

13  come forward and said what those claims may be.  No one has

14  said they've been asserted or --

15          THE COURT:  Sixty days into a case or 90 days into

16  a case.

17          MR. SAVAL:  I understand, Your Honor.  We have

18  objectors that are very, you know, not only competent, but

19  excellent counsel.

20          THE COURT:  No, I'm just saying we don't have a

21  bar date yet, right?  So in other words, that's --

22          MR. SAVAL:  But even if there were let's say a

23  securities claim, that's likely going to be subordinated.

24  And so I think Your Honor has to take that into account, as

25  I believe the other cases have, in considering whether the

```
 1   estate's interest is real or if it's interest that's

 2   hypothetical and theoretical.  But I just wanted to -- if

 3   you will indulge me for a moment, Your Honor.

 4           THE COURT:  Of course.

 5           MR. SAVAL:  The Side C coverage is not for the

 6   claims that the estate has against potentially the movants.

 7           THE COURT:  Correct.

 8           MR. SAVAL:  That would be Side A coverage.

 9           THE COURT:  Correct.

10           MR. SAVAL:  That comes within the definition of

11   loss.  And if you look at the definition of loss, it's not

12   just defense costs.  It includes -- and I'm no page 3 of the

13   policy.  I don't have a docket number or page of a docket on

14   the PDF.  Perhaps someone can let me know.  But I will just

15   read from it that the definition of loss includes

16   compensatory, punitive, exemplary, and multiple damages as

17   well as settlement and judgements including costs and fees

18   awarded.  And then it includes defense costs.  So how I

19   perceive the argument from the Committee is they want Your

20   Honor to sort of splice up what the meaning of loss is and

21   say, well, the only loss that should be payable here is the

22   loss from a lawsuit against my client or one of the other --

23   but they shouldn't get the benefit of the other part of the

24   loss, which is defense costs.

25           And so no case that I am aware of has ever held
```

1   that this Side A coverage that allows for losses to be

2   recovered in claims against the Ds or Os is estate property

3   unless and until that money is actually funded from a

4   settlement or a judgment.  And that's exactly the point that

5   was made in the Allied decision where the Court flatly

6   rejected that argument.

7               And I don't have the case right here.  Here we go.

8               And as I -- I said this before.  The trustee's

9   concern is that the payment of defense costs may affect his

10  rights as a plaintiff in seeking to recover from the D&O

11  policy.  That is Side A coverage.  That's coverage for the

12  benefit of the movants, not for the benefit of the estate.

13  It just may so happen that if there is a judgment or there

14  is a settlement, it would get paid out via Side A.   But

15  that doesn't turn it into an estate interest.  And there's

16  no case that I'm aware of, no case that's been cited that

17  takes the position that because those settlement proceeds

18  may ultimately sort of come in the door, that that should be

19  considered as part of the analysis.

20              THE COURT:  I agree with you.  Let's just say

21  someone shows up five months from now -- or someone has

22  already sought to lift the stay to proceed against the

23  company, maybe there's insurance (indiscernible).  But let's

24  just say more people come.  Let's just say people file

25  proofs of claim seeking claims against the company.  Maybe

1    somebody wants to assert an action against an entity that

2    may be covered by the Side C, if we ever get there.  Right?

3    So you've got to kind of still work through the terms of the

4    policy.  But someone assertively makes it there.  I've got

5    it that Side A isn't -- but what about the potential

6    proceeds that the estate would have?

7            And I think your point is that you never really

8    get there because the Side A has to go first.

9            MR. SAVAL:  Side A has to go first.  Side C as to

10   the Debtors are stayed.  Side C, it's non-debtors, is not

11   relevant for the purposes of these proceedings.

12           THE COURT:  But your point is that the -- let's

13   just assume for purposes of where we are -- this is what I'm

14   trying to flesh out.  Let's just say you have Side A, and

15   let's just call it defense costs, keep it simple, $50

16   million.  And you have a claim that the estate is liable to

17   for $5 million, right?  And let's just say -- just using a

18   big number, but let's just assume that you've got two claims

19   at the same time, right?  One that would be covered by Side

20   A, one that would be covered by Side C.  They both go to

21   Berkshire Hathaway.

22           I think your argument, if I understand it

23   correctly -- and I'm not agreeing or disagreeing, I'm just

24   fleshing out -- is that the $50 million is going to have to

25   get paid before the five.

1          MR. SAVAL:  Absolutely.

2          THE COURT:  right?

3          MR. SAVAL:  Your Honor, I'm just going to cede the

4    podium to other counsel.

5          MS. WEISGERBER:  Your Honor, Erica Weisgerber for

6    Patrick James.  I'd actually like to make a point that

7    speaks to this Side C issue quite poignantly, actually.  And

8    I think it's going to clarify everyone's thinking on this.

9    The Side C coverage applies not only to the debtors as

10   entities, it applies to non-debtor entities like Mayfair and

11   the other non-debtor entities that are subsidiaries of

12   Mayfair.  That actually includes several of the defendants

13   in the adversary proceeding that I represent who are

14   entities.

15         However, Your Honor, I'm not standing here today

16   making claims under that Side C coverage for those entities

17   even though a basis for it has been triggered by the fact

18   that they have been sued.  There is real lawsuit on those

19   entities.

20         And the reason why I'm not standing here to make

21   claims under a Side C for those entities is because of the

22   waterfall provision that applies contractually that says

23   that the Side A has to come first.  There's no basis for the

24   outcome that the UCC seeks under the contract, the policies,

25   or under the law.  And if the Court did want to reserve the

1    Side C policies for entity claims, I don't see how the Court

2    gets to decide between reserving Side C for the Debtors

3    versus non-debtor entities that have been sued under Side C.

4    So I think that argument just simply doesn't work.

5         While I'm up here, I guess just a couple of other

6    points that I would like to...

7         Uh-oh, did you roll your eyes?

8         THE COURT:  No.

9         MS. WEISGERBER:  Your Honor, it just feels like

10   there are certain things to respond to from what Mr. Stark

11   had to say.

12        First, it's not clear to me, separate and apart

13   from what I just discussed, how the objectors contemplate

14   the insurance policies paying out claims that are filed

15   against the D&Os without the D&Os -- those policies of

16   paying coverage costs.  I am not aware of any insurer that

17   would gladly open its coffers to pay a claim that was not

18   defended against by capable counsel with the money that

19   those insurance policies retain in order to pay defense

20   costs.

21        THE COURT:  You're going to the point as to look

22   how many lawyers are here.

23        MS. WEISGERBER:  Exactly, Your Honor.

24        THE COURT:  Okay.

25        MS. WEISGERBER:  Second, you know who will be

1   certain to be policing these policies and whether or not the

2   claims they are under are appropriate; the insurers.  In my

3   experience, insurers spare no expense in ensuring that every

4   single claim that they are going to pay is well-documented

5   and there's a basis for it.

6           In addition, Your Honor, there's no policy here at

7   issue that has any exclusion to covering criminal claims.

8   That's not an issue here.  So the fact that there are

9   criminal allegations in this case or investigations that Mr.

10  Stark seems to be alluding to, again, not a basis for any

11  kind of different outcome from the well-established

12  precedent on these policies and what ought to be paid and

13  what is and is not property of the estate.

14          This is in our papers, but there's actually no

15  fraud exclusion for defense costs under the Side A AIG

16  policy.  So this notion of insurers waiting to pay defense

17  costs until there's a final non-appealable claim actually

18  does not apply at all in the Side A policy.

19          In addition, obviously there's lots of accusations

20  being made against my client.  We sat through a six-hour

21  hearing here where there was no showing of my client

22  actively engaging in fraud.  And Mr. Stark put on no

23  evidence today in support of his argument that this feels

24  like the type of case where the Court should reach a

25  different outcome from well-established precedent about

1    insurance policies.

2         In addition, just a couple of other points.  The

3    Fifth Amendment argument by Mr. Stark, the Fifth Amendment

4    is a constitutional right.  And by the way, there's actually

5    a wealth of caselaw that says that you can't draw inferences

6    of guilt from someone pleading the Fifth Amendment.  But

7    that's not a basis to deny someone insurance coverage.

8    There's no insurance policy here that excludes coverage for

9    defense costs for a defendant or an investigation subject

10   who has pled the Fifth Amendment.  That's simply not

11   relevant to the inquiry that the Court is looking at.

12        Finally, I think, Your Honor, we would be creating

13   new caselaw here to determine that pleading the Fifth

14   Amendment results in a denial of coverage.  And as for the

15   Berkshire tower versus the AIG tower, as I explained, the

16   waterfall provision controls.  There's tons of cases that

17   hold that it's not property of the estate because of that

18   waterfall provision.  As I explained, the Side C, we're not

19   making a claim under it because of that waterfall provision

20   that controls.  And in the case of my client certainly there

21   is an adversary proceeding.  There are active legal costs

22   and it is contractually entitled to those defense costs.

23        Nothing further, Your Honor.

24        THE COURT:  Thank you.  Mr. Stark, I'll give you a

25   brief response.  I'm going to take about 15 minutes.  I just

1    want to look at something.  And I'll give you an answer

2    shortly.

3           Oh, come on up.

4           MR. STARK:  I really don't have much.  She's not

5    going after C because there's no judgement yet for C.

6           MS. WEISGERBER:  Defense costs.

7           MR. STARK:  Right.  That's A.  Your argument was

8    I'm not making a claim under C because I have to defer to A.

9    There's no claim under C because you don't have a judgment

10   yet.  That's a red herring.

11          THE COURT:  I'm going to give you the same

12   hypothetical.

13          MR. STARK:  Sure.

14          THE COURT:  Let's just say there are two competing

15   claims, one under A, one under C.

16          MR. STARK:  The $50 million and the five?

17          THE COURT:  Yeah.

18          MR. STARK:  Yeah.

19          THE COURT:  Does the $50 million have to get paid

20   before the five?

21          MR. STARK:  Yes.  That is the payment priority

22   provision that I cited in here.

23          THE COURT:  So let's just say under the

24   hypothetical they run up $200 million bucks.  Everyone runs

25   up $200 million.  Right?

1          MR. STARK:  Right.

2          THE COURT:  What was the cause?  In other words,

3     what's different?  Are we just affecting timing of payments?

4          MR. STARK:  Yeah.  The estates just got screwed is

5     what happened there.

6          THE COURT:  In other words, if the costs are still

7     going to get incurred, they still have the right to the

8     hundred million under the Berkshire --

9          MR. STARK:  Well, yeah.

10          THE COURT:  You're saying that they should go

11     first under one and let's see -- don't drain one and then

12     deplete the other.

13          MR. STARK:  That's my Solomonic suggestion, for

14     lack of being entitled to make Solomonic suggestions, but

15     I'll so it anyway, right?  A hundred million dollars, even

16     in today's day and age, is an awful lot of money.  Right?

17          Your Honor, I understand exactly where you're

18     coming from about one is estate.  That's sort of an easy-ish

19     call.  The one that's not, that's sort of an easy-ish call.

20     I understand that.  But I think that was sort of your

21     phraseology, right?

22          THE COURT:  Yeah.

23          MR. STARK:  And then I don't know why we're here,

24     why we're having this big argument.  Channel your claims

25     against AIG.  If you find yourself in a situation where $98,

1    $99 million has gone out the door, I think Your Honor is

2    easy to come back to, right?  But if Your Honor is sitting

3    there and positing the situation where they do 590 and they

4    say I'm not feeling generous today, today I'm feeling like

5    I'd really like to hurt the estates.  So what I'm going to

6    do is instead of going to AIG, I'm going to tender it to

7    Berkshire and see how much of that one I can erode.  Because

8    this war of attrition thing I keep talking about, it's kind

9    of sort of real.  It is sort of how these things work.

10          So instead of doing the thing that marshals value

11   for the benefit of the estate, they intentionally don't.

12   And it's the only reason why we're even -- I don't

13   understand why we're here.  Why did you file a motion saying

14   not only do I have to have the 100, I also have to have the

15   two, and I have to have unfettered right to choose how it is

16   I do it so that if I'm $5 million below the 50, I can

17   intentionally go there if I want.  And that's the piece,

18   Your Honor, at the end of the day that you just can't really

19   square.

20          THE COURT:  Thank you.

21          MR. STARK:  Your Honor, I do have one last thing.

22          THE COURT:  Go ahead.

23          MR. STARK:  And I appreciate that by doing this, I

24   may be opening up my own can of worms.  But counsel raised a

25   very good point.  She said where's all of the evidence.

1          Notice that neither party put in any evidence

2     other than the two policies.  Why didn't we?

3          THE COURT:  I don't know.

4          MR. STARK:  Well, there's a reason.  None of us

5     know who bears the burden of proof on this one.  It's the

6     weirdest part of the law.

7          502(g), is that where you know was going to go?

8     Right?  If you read the SVB decision, it says the movant has

9     to establish cause.  And that seems the normal thing of

10    bankruptcy.  502(g) talks about shifting burdens, but it

11    seems by its words to apply -- and if you read Colliers, you

12    literally walk away and you have no idea what any of it

13    means --

14         THE COURT:  Agreed.

15         MR. STARK:  -- about the context of stay relief to

16    foreclose on collateral.  And that's what 502(g) really sort

17    of talks about.  That ain't us here.  Its words don't seem

18    to fit.  And you try in vain to figure it out.

19         So I don't know, counsel, who should be the one

20    here who said your client is a good person or a bad person.

21    Should I have submitted a trial subpoena and had him sit in

22    the box and answer questions or not?  Or are you going to

23    sit here and say, well, it was my burden.  It was not your

24    burden as movant, it's my burden or not.

25         And so what I did, Your Honor, is I said you don't

```
1    need to go there.  The case itself, even though we've only
2    been here for a little while, it's pretty thick.  It
3    permeates what's going on.  Maybe Your Honor finds that
4    insufficient to rely on age-old chestnuts like Pepper v.
5    Litton.  Right?  But in the end of the day, Your Honor,
6    neither side of the aisle knows exactly who bears the burden
7    here, because it ain't clear in the law.  I understand what
8    the statute says, but it doesn't make a lot of sense here.
9    And the only case that seems to address it -- they all seem
10   to avoid it -- is SVB that says that is the movant's burden
11   to establish cause.  Granted that's Berkshire Hathaway,
12   probably less likely AIG.  But it's interesting that counsel
13   said where is the evidence, and I turn back to her and say
14   where is the evidence.
15             MR. SAVAL:  Your Honor, I'm sorry, may I just add
16   -- take two minutes and add just a couple of points?
17             THE COURT:  Yeah, of course.  I think you're
18   referring to 362(g) though, Counsel.
19             MR. STARK:  362(g).  Did I say --
20             THE COURT:  You said 502(g).  I just wanted to --
21             MR. STARK:  They all merge in my mind.
22             THE COURT:  I know what you meant.  I was just
23   making sure we had a clean record.
24             MR. SAVAL:  Just very briefly, Your Honor.  the
25   first is that with respect to the movant's ability to make
```

1    claims under either policy, the policy is structured so that

2    the movants, in order to access the Side A coverage under

3    the AIG policy first needs to make a claim under the

4    Berkshire Hathaway ABC policy.  The movants can't go

5    directly to the Side A policy.  They work in tandem.  When

6    one coverage is denied by the ABC carrier, then the Side A

7    takes it --

8              THE COURT:  That's correct.

9              MR. SAVAL:  And I think it's also important for

10   the Court to recognize that once the Side A coverage drops

11   down, (indiscernible) covers different conditions that might

12   be -- where recoveries might not be available under the ABC

13   policy.  Once it becomes effective and drops down, it drops

14   down and essentially becomes the primary policy in the tower

15   of insurance.  There aren't really two towers of insurance;

16   there's one tower of insurance.  And this policy comes out

17   of its place in the say $100 million range and drops down to

18   the first layer.

19             And once that happens, there's a couple of

20   important things.  One of them being that the conduct

21   exclusion that Mr. Stark has been talking about, all the bad

22   conduct, the parade of horribles that we've been talking

23   about simply doesn't apply to defense costs.  And that's

24   primarily what's at issue here, is defense costs.

25             THE COURT:  I don't have any evidence of that.

 1   Right?  No one has brought any of these issues up, right?

 2           MR. SAVAL:  Evidence that the conduct exclusion

 3   could apply?  Evidence?  No.  There's been a lot of

 4   allegations.  So that doesn't matter under these policies.

 5   Not only do --

 6           THE COURT:  No, no.  but I'm just saying the

 7   effects of it as to the reason why one should lift a stay

 8   for cause if there is -- if the Berkshire Hathaway -- no one

 9   has made these arguments.  Everybody has just made the

10   argument -- that's what I've got to rule on today.  That's

11   where we are.

12           MR. SAVAL:  I'm just making the point that that is

13   -- right.  I'm just saying that once the Side A policy

14   applies, the conduct exclusion simply (indiscernible)

15   doesn't apply to defense costs.  That's all (indiscernible).

16           THE COURT:  Understood.  Okay.  Give me about --

17   give me about ten minutes.  Thank you.

18           CLERK:  All rise.

19           (Recess)

20           CLERK:  All rise.

21           THE COURT:  Please be seated.  all right.  Just

22   give me one moment.

23           Sorry, folks.  I'll be right back.  I forgot my

24   glasses.  And you don't want me reading without them.  So

25   I'll be right back.

```
1              CLERK:  All rise.

2              (Recess)

3              CLERK:  All rise.

4              THE COURT:  Thank you.  Please be seated.  All

5    right.  Now, okay.  Okay.

6              So before the Court is a motion filed by certain -

7    - and there's a number of joinders filed by what I would

8    call generally a D&O lift stay or want to confirm that two

9    policies are not property of the estate and to confirm that

10   the estate to the extent something is property of the

11   estate, to the extent necessary to modify the automatic

12   stay, to allow the use of proceeds of these Ds and Os and

13   their liability insurance policies issued to Mayfair, which

14   is a non-debtor, for defense costs.  I find that there's

15   been proper notice and service, and the Court certainly has

16   jurisdiction under 28 U.S.C. 1334.  And this is a core

17   proceeding under 28 U.S.C. 157.

18             The Court has considered the arguments of the

19   parties and here's the Court's ruling.  I would just note

20   that there are two policies here.  Well, really two towers.

21   One can consider them towers.  Each provide for Side A

22   coverage.  But I'll just note that there are two towers and

23   each -- a hundred million dollars each.  There is a

24   Berkshire Hathaway tower.  That's an ABC tower.  Side A is

25   for the D&O losses that are not indemnifiable by the
```

1    Debtors.  That's a pure -- that's pure D&O.  Side B, which

2    is typical, is for company losses that are not -- for not

3    indemnifying the D&Os.  And Side C, which is also typical

4    Side C coverage.  It's for company losses for claims

5    asserted against the company.

6            I would note that the insured under this policy is

7    Mayfair, which is a non-debtor.  But it includes -- coverage

8    includes as part of the insured parties' subsidiaries and

9    the debtors are subsidiaries.  Not all the subsidiaries

10   covered are debtors, but there certainly are debtors here

11   who are covered by this policy under Side C.

12           There's also an AIG tower, one primary policy for

13   $10 million, nine additional policies for $10 which provides

14   an additional $10 million each.  So you get to $100 million

15   there.  The insured party is Mayfair.  But again, this one

16   is different than the Berkshire Hathaway policy because it

17   is pure what we would call Side A for the benefit of Ds and

18   Os.  So I'm going to kind of take them separately as I

19   consider the motion and the arguments raised by the parties.

20           I would note that the evidence that has been

21   presented to the Court is in the form of three insurance --

22   excuse me, not three insurance, but just the insurance

23   policies themselves were admitted into the record.  The

24   Court considered no testimony; just insurance policies and

25   arguments.  And I would note for the record to the extent

1    something is property of the estate, you make a

2    determination as to one seeks to then lift the automatic

3    stay.  The automatic stay would only come into effect if

4    something is property of the estate.  Section 541 of the

5    Bankruptcy Code says that all legal and equitable interests

6    of the debtor are property of the estate upon the

7    commencement of a bankruptcy case.

8         The United States Supreme Court in -- I'll give

9    you an older case.  Not old, not that -- '83 case, but going

10   back.  This is post Code, United States v. Whiting Pools

11   said you -- you construe it broadly to include -- the Fifth

12   Circuit echoed that sentiment.  And in a case called In Re

13   Kemp, 52 F.3d 546, 550 (5th Cir. 1995), here's what it said.

14   "The scope of property rights and interest included in a

15   bankruptcy estate is very broad.  The conditional, future

16   speculative, or equitable nature of an interest does not

17   prevent it from being property of the estate."

18        There's another case called In re Equinox Oil

19   Company, 300 F.3d 614, 618 (5th Cir. 2002) that Section 541

20   is read broadly and is interpreted to include all kinds of

21   property, including tangible or intangible property and

22   causes of action.

23        I would note that (indiscernible) but it's this

24   line of reasoning was again mentioned in the Briar Capital

25   Working Fund v. Remmert case.  That's the Fifth Circuit case

1    that was entered in January of 2024 and talked about selling

2    estate causes of action, preference stuff, but talks about

3    Section 541 there and the use there.

4             You've got to look at two other cases there.  And

5    that's the case that have been mentioned today,

6    (indiscernible) and Louisiana World Expedition.  There the

7    Court held that a debtor could certainly have an ownership

8    interest in the policy itself, the debtor could own.  But

9    the proceeds of those policies may not be property of the

10   estate.  You've got to look.  And in those cases when there

11   were -- certainly in Louisiana World Expedition, if there is

12   pure D&O insurance, that is not property of the estate.  The

13   proceeds are not property of the estate.

14            I'll start with AIG because I think it's the

15   easier answer.

16            AIG policy is owned by a non-debtor and the

17   proceeds are pure Side A, only cover D&O insurance.  That's

18   -- and I know that counsel for the Committee said, well, you

19   can look at the facts of those cases and the world has

20   changed.  But I am still bound by precedent.  And the

21   holding of that case is at -- and you've got pure

22   (indiscernible) that are going just to the Ds and Os that is

23   not property of the estate.  I know in this case the policy

24   is owned by a non-debtor.  So the debtor doesn't even own

25   it.  So you don't have to kind of get into the distinction

1    between the ownership and then the use of the proceeds.

2    This is pure ownership.  So in that case, I am just

3    confirming that that's not property of the estate, the AIG

4    is not property of the estate.  And I've heard no argument

5    that would contradict that.  There's nothing that comes --

6    there's no legal equitable interest that the Debtor has to

7    some of those proceeds.  That goes purely to Ds and Os.  And

8    that's what you look to.

9          The Berkshire Hathaway tower I think does bring

10   into kind of -- you've got to look at it differently a 541,

11   362 analysis there.  Because when you look at the caselaw,

12   even speculative -- we kept talking about speculative

13   interests, right?  But 541 says all legal or equitable

14   interest that a debtor has in property, the debtor has an

15   interest in policy proceeds.

16         Now, it comes within the plain meaning of the

17   text.  All means all.  I know that there's a bunch of cases

18   there, and certainly I think Whiting Pools and Fifth Circuit

19   cases that I cite certainly provide color and reaffirm.  But

20   all means all.  And you look to underlying state law to

21   determine the nature and the extent of the interest.  But it

22   is property of the estate.  The side -- potential to Side C

23   is property of the estate.  Speculative, even contingent

24   claims, right, come into property of the estate.  It comes

25   in.  It's property.  It is property of the estate.  The

1     extent of it is determined by the contract.  Right?  And so

2     the question is how does one look to that and what does one

3     do.

4            The D&Os come in and they have a right to seek for

5     the purposes of making a claim against that policy because

6     they get paid first.  And if there's two competing claims,

7     Side A gets paid first.  It is what is considered a wasting

8     policy.  In other words, when you've got to kind of deplete

9     A before you get to B, before you get to C.  That's all

10    true.  And I've looked at the policy, and that's consistent

11    with the language.  And it is property of the estate, so

12    we've got to look to 362.

13           362(d) says that the automatic stay may be lifted

14    for cause.  And 362(g) says that in a hearing under (d) the

15    party requesting relief has the burden of proof on the issue

16    when it comes to equity and property.  Right?  And so that

17    doesn't really apply here.  But 362(d) says that upon

18    notice, right, on request of a party in interest, the court

19    may lift it for cause.  So it's the party in interest who is

20    moving has to establish cause to lift the automatic stay.

21    Cause is -- Bankruptcy Code I should say gives one example.

22    There's not a single definition of cause.  It goes one

23    example, but it's a non-inclusive list.  It says for cause,

24    including lack of adequate protection.  So there's certainly

25    for cause.

1          The Fifth Circuit has said in cases like Matter of

2     Little Creek that there's flexibility for courts in

3     determining whether cause exists.  779 F.2d 1068 (5th Cir.

4     1986).  Whether cause exists is a fact of inquiry that must

5     be determined on a case-by-case basis.  Henry Mosher, 578

6     B.R. 765, 772 (Bankr. S.D. Tex. 2017) case.

7          I would also note a matter of Reitnauer, 152 F.3d

8     341 n.4 (5th Cir. 1998) determining whether cause exists.

9     Cases indicate, and I agree, because you've got to determine

10    whether cause is, you've got to look on a case-by-case basis

11    so there's no kind of neat analysis here.  You've got to

12    look on a case-by-case basis to determine whether cause

13    exists.  And the cause that is given to me is we have the

14    right under Side A and Side C is speculative, right?  But

15    that's just not cause.  What's the harm to using $100

16    million under AIG before you come back and ask to use the

17    Berkshire Hathaway in which the estate has an interest?  No

18    evidence of any harm to anybody.  I don't have a single

19    piece of evidence to indicate we conducted an analysis based

20    on -- but certainly harm to the estates potentially if it

21    all gets depleted, one could speculate.  But I don't have

22    evidence one way or the other.

23         So it comes down to who has the burden upon

24    request of the notice and a party-in-interest after a notice

25    and hearing.  We are here on the notice and hearing.  What's

1      the harm in going to use the $100 million that you have and

2      then coming back to see if you can use -- I think there's a

3      short hearing.

4                 I think arguments about -- well, let me say this.

5      I think it's a short hearing if they have to use the money

6      because that's cause under the policies.  To me that's

7      cause.  You have access to D&O insurance and you have a

8      right to do it.  And I think that becomes a very short, very

9      direct hearing.  I think if there is a party, and they

10     certainly made their cases here, that need access to the

11     Berkshire Hathaway policy for whatever reason, I think it

12     becomes a short hearing.  But I've got to have cause.  And

13     what parties asked me to do was to confirm that it either

14     doesn't exist or to modify the stay to permit it.

15     Modification requires cause.  Cause requires evidence.  And

16     I've heard of no evidence today to say that they can't use

17     the $100 million first.  Just come back if you need it.

18     Again, need more.

19                I don't think there needs to be any restrictions

20     on the ability to -- you know, with AIG, because I don't

21     think AIG is property of the estate as a matter of law.  I

22     think parties get to use it.  and if there's any issues --

23     and there can be.  That could arise in connection with the

24     AIG tower.  I think you've got to go there first.  And then

25     we can have another hearing.

1          So it's not no, it's not never, it's just you

2     haven't established cause today.  And today was the day

3     everybody decided to come in here and have a hearing.

4     Evidence -- I don't -- the extent of company losses for

5     claims asserted against the company in a case 90 days in, in

6     a case like this in which we haven't -- don't have a bar

7     date, I don't know.  But 541 covers potential interests in

8     those proceeds.  And however remote, however speculative it

9     is, that's 541.  So it's without prejudice to coming back,

10    anyone coming back.  I'm not making findings in any way --

11    and I don't have the evidence for it, but I am certainly not

12    making findings based upon who has done what or the extent

13    of what has happened and who is to blame for that.  I think

14    that's a whole other day.  That's what trials are for.

15    That's what the judicial system is for.  People will have

16    their day in court to make arguments and assert claims, and

17    parties will have every right to assert their defenses.  And

18    we'll deal with those.  But I'm not here to prejudge any

19    litigation before me or to make findings one party is worse

20    than the other or that this person is to blame for that.  I

21    just think today I'm just ruling on 541, Louisiana World,

22    362 and 362(d) and the standards that are given to me by the

23    courts as to how I consider those statutes and the

24    application of 541 based upon binding Supreme Court and

25    Fifth Circuit and text, precedent from the Supreme Court and

1   the Fifth Circuit (indiscernible).

2          So I think -- I don't know what that does to the

3   order, but I probably don't need to sign that version of it.

4   I was going to -- even without it, I still think what I've

5   set up is a stopping point where one can ask the question.

6   Right?  Like what's going on with the AIG policy, has it

7   been depleted one way or the other.  And then we can see

8   where we are.

9          So I think the reporting requirements are good.  I

10  think they all make sense.  I hope they stay in the order.

11  But I still think I've got a backup just in case.  Because

12  parties will just have to come back and ask for the relief.

13  But I don't -- I want to be really clear that I think

14  arguments about kind of cause to lift the stay, I think they

15  really come down to, you know, do you have access to it and

16  do you need it.  My understanding based upon the evidence

17  that was presented in court is that folks have -- folks can

18  make a $100 million issue.  And I don't have any evidence or

19  expert testimony telling me otherwise.  So that's the

20  Court's ruling on that.

21          If the parties want to get me an order or think

22  about it, I'll sign it and we can talk about it more on

23  Friday.  I think I'm going to be in a position -- well, no.

24  Let me think about this.  I don't want to -- I will call

25  parties tomorrow about the motion to intervene.  They're not

1    fair, and I think that would be unfair for me to make a

2    statement on the record about what I can do.  So I'll rule

3    on that just today or tomorrow.  Just let me know what you

4    all want to do in terms of orders.  I can draft one.  I can

5    come up with it.

6              I think by my ruling today, I think the Katsumi

7    objection is kind of rendered moot, if you will.  Because I

8    don't need to put restrictions because one just isn't

9    property of the estate and the other one, I'm not lifting

10   the stay on.  But everybody's rights are preserved for

11   future hearings on any issue.  Everybody's rights are

12   preserved.

13             Yes, sir, Mr. Stark.

14             MR. STARK:  Your Honor, if it would please the

15   Court, we can confer.  And I would assume we would be able -

16   - I think Your Honor's ruling is very clear.  I think we

17   would be able to figure out an order and propose one if that

18   works for the Court.

19             THE COURT:  Okay.  I'm not on the -- I'm going to

20   be really clear on the -- I think there was one question

21   about the 14-day.  On AIG it's not -- my finding is that

22   it's not property of the estate and I don't -- I'm not

23   giving anyone 14-day -- I'm just saying I'm not giving

24   anyone 14-day notice of the ruling that it's not property of

25   the estate.  That's in effect right away.

1          MR. STARK:  To the extent, Your Honor --

2          THE COURT:  Mr. Tecce?

3          MR. TECCE:  Your Honor, I was just going to

4   propose to make everyone's life easier, if you were to so

5   order the transcript today, I think that would satisfy it if

6   AIG is not estate property.  Because that's sufficient.

7          MR. STARK:  We have no objection.

8          THE COURT:  In other words, that goes into effect.

9   I can -- I can -- what was your proposal again, Mr.

10  TumSuden?

11         MR. TECCE:  Just -- we're talking about

12  negotiation an order, right?  I mean, we could probably do

13  that.  But if you could so order the transcript, and that

14  would -- because AIG -- the finding is that AIG is not

15  estate property.  So...

16         THE COURT:  Yeah.  But what I was planning on

17  doing for that is just stating for the reasons stated on the

18  record.  And I was going to say the AIG policy is not

19  property of the estate and then you all can, you know, kind

20  of say that, you know, the parties are to submit an order as

21  to something -- I think you all can submit an order on the

22  other one, or I can just write it.  But I can write

23  something today saying the AIG policy is not property of the

24  estate.  And I can just enter an order.  So you've got an

25  order from me saying it and I'm not waiving any -- any 14-

1    day application is waived on that today.

2            MR. TECCE:  Thank you very much, Your Honor.

3            MR. STARK:  So just to be clear, would Your Honor

4    like us to write the order with respect to the other cases?

5            THE COURT:  On the...

6            MR. STARK:  The submission of invoices and all

7    that, the other stuff.

8            THE COURT:  I don't -- well, because I only think

9    it applies to Berkshire Hathaway in other words.  So I think

10   --

11           MR. STARK:  (indiscernible).

12           THE COURT:  That's where I'm going.  I think the

13   other one is just -- well, no.  No.  I thought about this.

14   I'm going to submit an order, one saying for the reasons --

15   I'll do it today.  Just -- I've got a couple more hearings

16   to get through.  But sometime today it will hit the docket.

17   For the reasons stated on the record at the January 7th, the

18   AIG policy is not property of the estate and the other --

19   and the Court denies -- the Court -- and I will say

20   something that I am denying stay relief with respect to the

21   Berkshire Hathaway.  It will be clean and my ruling will be

22   the ruling for the reasons stated on the record.  And I'm

23   kind of waiving any 14-day application of the order.  And

24   just kind of clean, to the point.  It will be for the

25   record.  Parties will have whatever rights they have.  Okay?

1                MR. STARK:  Thank you, Your Honor.

2                THE COURT:  All right, folks.  I've got to -- I'll

3       see some of you on Friday I guess virtually or in-person.  I

4       thank everyone for their time.  Thank you.

5            (Proceedings adjourned at 3:28 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                      CERTIFICATION

 2

 3   I certify that the foregoing is a correct transcript from

 4   the electronic sound recording of the proceedings in the

 5   above-entitled matter.

 6

 7

 8

 9

10   Sonya Ledanski Hyde

11

12

13

14

15

16

17

18

19

20   Veritext Legal Solutions

21   330 Old Country Road

22   Suite 300

23   Mineola, NY 11501

24

25   Date:  January 9, 2026
```